**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

**CASE NO. 12-24356-CIV-GOODMAN**

**[CONSENT CASE][1]**

PROCAPS S.A.,

      Plaintiff,

v.

PATHEON INC.,

      Defendant.

_____/

## ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT

In his famous "The Times They Are a-Changing" song, Bob Dylan advised listeners to "admit that the waters around you have grown and accept it that soon you'll be drenched to the bone."[2] The consequences of major changes, the subject that Mr. Dylan was singing about, are at the heart of this Sherman Act antitrust lawsuit seeking several hundred million dollars in treble damages.

Section 1 of the Sherman Act, 15 U.S.C. § 1, prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations." Interpreted literally, this statutory prohibition would encompass *every* contract, but as the Supreme Court has

---

[1]     The parties consented to full magistrate judge jurisdiction and the District Court referred the case to the Undersigned for all further proceedings, including trial. [ECF Nos. 88; 89].

[2]     From the album of the same name. (Columbia 1964).

explained, the statutory section does not mean that; it covers only *unreasonable* contractual restraints. *Am. Needle, Inc. v. Nat'l Football League,* 560 U.S. 183, 189 (2010).

Competitors plaintiff Procaps S.A. ("Procaps") and defendant Patheon Inc. ("Patheon") entered into a Collaboration Agreement, under which they would allocate customers and territories. They both contend this initial restraint was **lawful** because it permits the introduction of a new product to the marketplace. Patheon later acquired Procaps' competitor, Banner Pharmcaps Europe B.V. ("Banner"). Patheon continued to try and allocate customers and territories, but Procaps refused to participate in the allocation because it believed the continued allocation created an unlawful horizontal restraint on trade. The primary question here is whether this changed circumstance -- Patheon's acquisition of Banner -- transformed the once-lawful contract into an unreasonable horizontal trade restraint, in violation of section 1 of the Sherman Act.

Procaps wants the Court to first use the rule of reason form of analysis to assess the *initial* contract (and to deem it lawful) but then to **switch methodologies** and use the *per se* method to evaluate the very same contract after the Banner acquisition. Patheon says there was no agreement to violate the antitrust laws because Procaps never went along with the allocation.

Both parties have filed lengthy, detailed, and complicated cross motions for summary judgment in this five-count antitrust/unfair competition lawsuit. Procaps

seeks only partial summary judgment for certain elements concerning Counts I, III, and IV. Patheon seeks summary judgment on all counts.

The Court has reviewed the motions, memoranda (supporting, opposition, reply and post-hearing), and the evidentiary record. The Court also heard extensive argument on the motions. For the reasons explained below, the Court **DENIES** (in large part) and **GRANTS** (in small part) Patheon's motion and **DENIES** (in large part) and **GRANTS** (in small part) Procaps' motion.

The small portion of Procaps' motion which is being granted concerns a non-provocative, *agreed* issue: whether the interstate commerce requirement for a section 1 antitrust claim has been satisfied. The Court denies the remainder of Procaps' summary judgment motion. In doing so, the Court determines that this case warrants a rule of reason analysis, not Procaps' proposed *per se* assessment (and not another type of truncated mode of analysis, such as the so-called "quick look" doctrine).

The Court denies Patheon's summary judgment motion as to Counts I-III. The Court rejects Patheon's argument that *it* is entitled to prevail on these counts because there was never an agreement to unlawfully restrain trade. There was (and perhaps still is) an agreement between the parties (i.e., the Collaboration Agreement) and the appropriate finder of fact, using a rule of reason approach, will need to determine whether Patheon's contract-based conduct unlawfully restrained trade.

On Count IV, the statutory Florida Deceptive Unfair Trade Practices Act ("FDUPTA" or "FDUTPA") claim, the Court denies in large part Patheon's summary judgment motion because the section 1 Sherman Act claim effectively incorporated into this count is still viable. The Court grants in small part Patheon's summary judgment motion on Count IV for recovery theories other than the section 1-related unreasonable trade restraint because that is the only theory sufficiently alleged.

The Court grants Patheon summary judgment on Count V, Procaps' claim for common law unfair competition. There is no evidence that Patheon used or disclosed Procaps' confidential information or that there is customer confusion.

By way of a final introductory point, the Court will determine later the precise structure of the rule of reason analysis which ultimately will be used at trial. Because there is, in practical terms, a sliding scale in appraising reasonableness and because the quality of proof varies with the circumstances, the Court will choose the methodology which will be applied under the broad category of the rule of reason after an amended trial scheduling order is entered. The Court expects to enter an amended trial scheduling order after the forensic analysis of Procaps' electronically stored information is complete (and after the non-privileged results of that analysis are produced to Patheon).

## I.     BACKGROUND

### A.  <u>The Softgel Business</u>

Softgels are an oral dosage form for pharmaceutical products consisting of a gelatin-based shell containing active ingredients (e.g., medicine) within the shell. [ECF Nos. 333, ¶ 1; 335, ¶ 1]. Softgels are used for prescription and over the counter ("OTC") drugs, as well as nutritional supplements. [ECF Nos. 1, ¶ 28; 333, ¶ 2].

The softgel business has product and service sectors. [ECF No. 333, ¶ 2]. In the product sector, pharmaceutical companies develop and manufacture their own softgel Value Added Proprietary Products ("VAPPs"), also referred to as "proprietary products" or "internal development products." [*Id.*]. In the service sector, pharmaceutical companies outsource the softgel development ("PDS") and/or commercial manufacturing ("CMO") to a third party. [*Id.*]. The third party will run formulation trials and manufacture the softgels using the pharmaceutical company's medicine. [*Id.*]. Some companies provide both softgel services and products, while others focus on only one or the other.

### B.  <u>The Parties</u>

Procaps is a Colombia-based company that develops and manufactures softgel capsules. [ECF No. 1, ¶¶ 14, 30]. Before signing the Collaboration Agreement with Patheon, Procaps marketed its softgel services to pharmaceutical customers in the United States by calling on customers, attending trade shows, conducting customer site

tours, and attending meetings with pharmaceutical companies. [ECF No. 333, ¶ 3]. These efforts did not result in much success, but Procaps did secure at least one development and manufacturing agreement. [*Id.*]. It also provided nutritional and OTC softgel products in the United States through its generic softgel division. [*Id.*].

Patheon provides commercial manufacturing and development services to the pharmaceutical industry. [ECF No. 335, ¶ 2]. In contrast to Procaps, Patheon's strengths are its substantial pharmaceutical development capabilities and relationships with pharmaceutical customers in North America, Europe, and Asia. [ECF No. 333, ¶ 5]. Its weaknesses are its limited intellectual property and manufacturing capability. Indeed, it was only in 2010 that Patheon launched its development and manufacturing softgel services in its Cincinnati facility. [*Id.* at ¶¶ 4-5]. While Patheon had limited production capability, it nonetheless called on customers, and submitted proposals to potential customers. [*Id.* at ¶ 4]. Like Procaps' efforts, Patheon's efforts bore little fruit. Patheon won one softgel opportunity. [*Id.*].

While they were not particularly successful, undoubtedly Patheon and Procaps were competitors. For instance, in December 2011 they both submitted bids to do work for Biocryst -- although Procaps and Patheon ended up working together on the project.

### C.  The Collaboration Agreement

Not finding much success on its own, in early 2011, Patheon began to explore a "strategic relationship" with another softgel company so that it could compete more

effectively with Catalent, the dominant softgel company in the world. [*Id.* at ¶ 5]. Patheon looked at several companies. [ECF No. 335, ¶ 9]. Among the finalists for this "relationship" were Banner **and** Procaps. [*Id.*]. Patheon believed Banner and Procaps were competitors. [*Id.* at ¶¶ 11-15]. Eventually, Patheon decided to pursue a relationship with Procaps, not Banner.

In January 2012, the parties entered into the Collaboration Agreement to market PDS and CMO softgel services under the "P-Gels" brand. [ECF Nos. 333, ¶ 6; 335, ¶ 2]. Patheon and Procaps were targeting pharmaceutical companies looking for a third party to develop and manufacture softgel capsules. Patheon would market the P-Gels service to potential customers and offer development services through its Cincinnati facility. [ECF No. 333, ¶6]. Procaps would provide softgel development services and manufacturing services to third parties through its Colombian facility. [*Id.*]. The key terms of the Collaboration Agreement are as follows:

> **Market Allocation**: <u>Section 3.1</u> -- PDS opportunities are allocated between the parties by "mutual agreement," allowing them to service PDS opportunities through their respective facilities. <u>Section 3.2</u> -- manufacturing opportunities must be allocated to Procaps.
>
> **Limitations/Field**: <u>Section 10.2</u> -- the scope of the Collaboration Agreement is limited to softgel PDS and CMO *services* (rather than VAPPs), and *excludes* the parties' products.[3] Neither party may develop or manufacture softgels within the scope of the Collaboration Agreement individually. <u>Section 10.5</u> -- either party may independently "develop,

---

[3]     The Collaboration Agreement was later expanded to include non-prescription drugs for ten specific customers.

manufacture, sell and otherwise exploit" softgels outside the scope of the Collaboration Agreement.

**Procaps' Veto Right of Expansion**: <u>Section 10.3</u> -- Patheon is required to obtain Procaps' approval before expanding its existing manufacturing capacity to develop softgels within the Collaboration Agreement.

**Territory**: <u>Section 1.9</u> -- the Collaboration Agreement encompassed much of the world, including North America, Europe, and most of Asia, but excluding Mexico, South America, Central America, Iran, Thailand, Vietnam, Turkey, and the United Arab Emirates.

[ECF Nos. 333, ¶¶ 7-11; 335, ¶¶ 4-5].

Under the Collaboration Agreement, the parties manufactured and sold softgels through a unified brand, agreed to share profits, expenses, and the risk of failure, and created a Joint Steering Committee. [ECF No. 388, ¶ 40]. They had joint training sessions and got to know each other's facilities, customer contacts, and manufacturing capabilities.  Most relevant to the issues before the Court, Patheon executives, such as Geoffrey Glass, toured Procaps' factories in Colombia and became intimately familiar with Procaps' equipment, production capabilities, and technology.

Even though the Collaboration Agreement allocated markets and customers among horizontal competitors, the parties **agree** that the Collaboration Agreement was **lawful** because it brought a new competitor and a new product, P-Gels, into the Territory and Field. The Court is not making a ruling on the lawfulness of the initial Collaboration Agreement; it is merely noting the parties' shared contention that the agreement was lawful.

### D. **Patheon Acquires Banner**

The parties' collaboration did not go well. Between January 2012 and October 2012, the parties submitted 43 solicited and unsolicited proposals. [ECF No. 333, ¶ 12]. They won only two projects for a total of $123,003 in revenue. [*Id.*]. By August 2012, Patheon, without telling Procaps, began to reconsider whether it had chosen the right "partner." [ECF No. 335, ¶ 24]. Patheon began considering (again) entering into a strategic relationship with Banner, the "#2" player in the Rx and OTC softgel market by size. [ECF No. 335, ¶ 10].

On October 22, 2012, during a meeting in Miami, Patheon notified Procaps that it might acquire Banner, and it proposed Banner join the parties' collaboration. [ECF No. 333, ¶ 14]. Procaps began to analyze the pros and cons of integrating Banner. Procaps had some initial predictions that procompetitive benefits would result from integrating the Banner assets. [*Id.* at ¶¶ 17-18]. But it never gave Patheon its blessing to bring in Banner. [ECF No. 333, ¶ 26]. On October 29, 2012, Patheon went ahead and signed the Stock Purchase Agreement to acquire Banner without Procaps' approval. [*Id.*].

By the beginning of November 2012, after some further thought, Procaps believed that it could not continue performing under the Collaboration Agreement because it believed the Collaboration Agreement had become an illegal horizontal restraint on trade. [ECF No. 333, ¶ 15]. At the same time, some Patheon executives also believed that Banner's acquisition was problematic. [ECF No. 335, ¶¶ 32-33]. In

9

particular, they believed it created a conflict of interest for Patheon because both Banner and Procaps were engaged in the manufacture and sale of prescription softgels. [*Id.*].

The parties met in November 2012 to try and work out a solution to continue working together. [ECF No. 333, ¶ 16]. But this "strategic relationship" was, for all intents and purposes, over. Patheon suggested a few ways where all three entities could work together. [ECF No. 396, ¶ 14]. Procaps rejected all of Patheon's suggestions and offered none. [*Id.*]. Instead, Procaps focused on getting Patheon to pay it to leave the Collaboration Agreement or to divest Banner. [ECF No. 333, ¶ 20]. Patheon was not willing to do either.

### E.  **The Complaint**

After the November 2012 discussion failed to produce a resolution, Procaps concluded that if it filed a lawsuit to interfere with the Banner acquisition, then Patheon would be willing to settle and pay Procaps to leave the Collaboration Agreement. [ECF No. 333, ¶ 20]. As a result, on December 10, before the acquisition closed, Procaps filed its complaint. [ECF No. 1]. Procaps did *not* challenge Patheon's acquisition of Banner as violating any antitrust laws. Rather, Procaps claimed that the parties were *not* competitors before the Collaboration Agreement, but that the acquisition would **transform** them into competitors. This would in turn transform the Collaboration Agreement's allocation provisions into a *per se* unlawful horizontal market division.

Count I seeks a declaration that once the acquisition closed, "the Collaboration Agreement will be rendered a violation of Section 1 of the Sherman Act." [ECF No. 1, pp. 19-22]. Count II seeks to enjoin the acquisition or "a mandatory injunction ordering Patheon to divest Banner." [*Id.* at pp. 22-25]. Count III seeks antitrust damages trebled for harm to Procaps allegedly caused by Patheon's unlawful market allocation. [*Id.* at pp. 25-26]. Count IV claims a violation of FDUPTA, based on the same facts and theories of the federal antitrust claims. [*Id.* at pp. 26-27]. Count V seeks "damages under common law unfair competition" because Patheon allegedly acted deceptively "by entering into the Collaboration Agreement, thus gaining access to Procaps' intellectual property . . . then shortly thereafter," acquiring Banner and "gaining access to Banner's intellectual property." [*Id.* at pp. 27-28].

### F.  **Post-Complaint Developments**

Shortly after the Complaint was filed, Patheon offered to terminate the Collaboration Agreement, but Procaps refused. [ECF No. 333, ¶¶ 20-21]. Patheon has repeated that offer throughout the litigation and Procaps has likewise continued in its refusal. Procaps contends that the Collaboration Agreement is still binding but that its performance is being held in abeyance until this allegedly illegal situation gets resolved.

On December 14, 2012, the Banner acquisition closed, and Banner ceased to exist as a separately operating business. Patheon removed the Banner assets from the Territory and Field. In an attempt to abide by the terms of the Collaboration Agreement,

Patheon appointed David Hamby as the "gatekeeper" who would interpret the Collaboration Agreement and implement its market allocation requirements. [ECF No. 335, ¶ 37]. Hamby would evaluate each opportunity as it came in. His job was to determine whether a business opportunity went to Procaps or Banner. [*Id.*]. If the opportunity was "within the Collaboration, it went to Procaps." [*Id.*]. If it was not, it went to Banner. [*Id.*]. As noted, because it "suspended its performance," Procaps refused to accept any opportunities Hamby determined should be allocated and sent its way.

After Procaps' repeated failures to perform under the Collaboration Agreement, in mid-2013, Patheon purported to terminate the Collaboration Agreement and began using the Banner facilities to provide PDS and CMO services. [ECF No. 388, ¶ 22]. Procaps contends that the Collaboration Agreement has not been terminated.

## II.     STANDARD OF REVIEW

Summary judgment is appropriate when the pleadings, depositions, affidavits, and exhibits show that there is no genuine issue of material fact, and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a),(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). An issue of fact is "material" if it is a legal element of the claim under applicable substantive law which might affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997). An issue of fact is "genuine" if the record taken as a whole

could lead a rational trier of fact to find for the non-moving party. *Allen*, 121 F.3d at 646.

When evaluating a summary judgment motion, a court must view all the evidence and all factual inferences drawn therefrom in the light most favorable to the non-moving party and determine whether the evidence could reasonably sustain a jury verdict for the non-movant. *Celotex*, 477 U.S. at 322-23; *Allen*, 121 F.3d at 646.

## III.     DISCUSSION – THE SHERMAN ACT CLAIMS (COUNTS I-III)

### A.  Introduction and General Legal Framework

Section 1 of the Sherman Act provides that:

> Every contract, combination in the form of trust or otherwise, **or** conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal.

15 U.S.C. § 1 (emphasis added). Section 1 applies both to agreements between companies that directly compete with one another, called "horizontal" agreements, and to agreements between businesses operating at different levels of the same product's production chain or distribution chain, known as "vertical" agreements. *Spanish Broad. Sys. of Fla., Inc. v. Clear Channel Commc'ns., Inc.*, 376 F.3d 1065, 1071 (11th Cir. 2004). This is a horizontal agreement case.

In order to establish a section 1 violation, the movant must show (1) a contract, combination, or conspiracy among two or more separate entities that (2) unreasonably restrains trade, (3) affects interstate or foreign commerce, and (4) causes antitrust injury

and damages. *See Realcomp II Ltd. v. FTC*, 635 F.3d 815, 824 (6th Cir. 2011); *Todorov v. DCH Healthcare Auth.*, 921 F.2d 1438, 1455, 1459 (11th Cir. 1991).

Procaps' partial summary judgment motion relates only to the second (unreasonable restraint of trade) and third (affecting interstate or foreign commerce) elements. At the heart of Procaps' motion is its position that the *per se* rule applies to the restraint of trade here. Patheon, however, contests the applicability of the *per se* rule, but it nevertheless believes that it is entitled to judgment as a matter of law on Procaps' Sherman Act claims because: (1) there is no agreement, as Procaps did not agree to unlawfully restrain trade or, alternatively, Procaps withdrew from any such unlawful agreement; (2) Procaps lacks antitrust standing because it does not have an antitrust injury; and (3) the unclean hands (or *in pari delicto*) doctrine bars Procaps' claims.

### B. <u>Agreement</u>

#### 1. *Is There an Agreement?*

Patheon first contends that there was no agreement here, as required under section 1. Patheon argues that despite Procaps being a party to the Collaboration Agreement, there was no agreement to unlawfully and unreasonably restrain trade because Procaps neither agreed to the activity which it says created the unreasonable restraint -- the Banner acquisition -- nor participated in Patheon's attempted allocation post-acquisition. In other words, Patheon's argument is that the Collaboration Agreement is not, standing alone, sufficient to constitute the requisite agreement under

section 1. Rather, Procaps must have agreed to participate in the activities which Procaps contends made the Collaboration Agreement illegal. And, as Patheon points out, Procaps never agreed to do that. Consequently, Patheon contends, there is no concerted action; there is only unilateral action -- its own.

According to Procaps, the Collaboration Agreement itself satisfies section 1's agreement requirement. Procaps argues that under the Collaboration Agreement, Patheon has the right to control Procaps' participation in the Field and Territory. Although that agreement was originally lawful, it became unlawful after the Banner acquisition because now Patheon could control Procaps and Banner's participation in the Field and Territory. Further, Procaps argues that there is no requirement for a section 1 violation that it subjectively agree or acquiesce to the post-acquisition illegal activities under the Collaboration Agreement.

Whether an "agreement" exists for purposes of section 1 is separate from the question of whether an agreement, if found to exist, constitutes an unreasonable restraint of trade. *Am. Needle, Inc.*, 560 U.S. at 186 ("The question whether an arrangement is a contract, combination, or conspiracy is **different from and antecedent to** the question whether it unreasonably restrains trade") (emphasis added); *accord Paladin Assocs., Inc. v. Montana Power Co.*, 328 F.3d 1145, 1153-54 (9th Cir. 2003). *See also Eskofot A/S v. E.I. Du Pont De Nemours & Co.*, 872 F. Supp. 81, 92-93 (S.D.N.Y. 1995) (to allege a section 1 claim, the plaintiff need only allege that "there was a contract or

combination and that contract or combination resulted in an unreasonable restraint of trade"); Areeda, Areeda & Hovenkamp, *Antitrust Law* ¶ 1400b at p. 4 ("In the antitrust universe, the existence of an agreement must always [be] considered separately from the question of legality").

Here, it is undisputed that Procaps and Patheon entered into the Collaboration Agreement (i.e., a contract -- one of the scenarios expressly mentioned in the Sherman Act as being prohibited if it restrains trade). It is also undisputed that, under the Collaboration Agreement, **all** softgel manufacturing in the Territory and Field is allocated exclusively to Procaps, while softgel product development services in the Territory and Field are allocated between Patheon and Procaps.

The Court first observes that the **underlying factual scenario is substantially atypical** for a few significant reasons.

First, the parties both contend that the Collaboration Agreement was *lawful* at inception even though horizontal competitors were allocating territories, but one party now claims that the same lawful agreement *became* illegal. Second, the conduct which Procaps contends violates the Sherman Act arose because of Patheon's *unilateral* decision to acquire Banner -- a development never expressly contemplated by the parties. Third, the purported illegality is a result of *changed circumstances* -- developments which Procaps never specifically agreed to when it entered into the contract. Fourth, the parties have not submitted any persuasive, on-point authority

16

involving similar **changed circumstances** cases -- a reality that both parties conceded at the all-day hearing on the summary judgment motions.[4] Fifth, the terms of the Collaboration Agreement never changed, and the exclusivity provisions which Procaps says caused the illegality were *always* in the contract -- even when it was purportedly lawful. Sixth, Procaps, the party alleging the *per se* antitrust evil of horizontal market allocation, is itself a party to the very contract being challenged (albeit a contracting party which refused to participate in the contract-specified activity it ultimately deemed unlawful).[5]

Moving on from these points, the Court is not convinced by Patheon's fundamental argument that there never was the requisite agreement because Procaps

---

[4]     At the hearing, the Court asked counsel if they knew of "any case where a court has branded this type of a change of circumstance as a *per se* violation?" Procaps' counsel advised that he was "**not aware of a case** where the chronology of events is that something **began as a lawful** restraint, but because of a fundamental **change** in the nature of one of the parties to the restraint becomes a *per se* unlawful market allocation." His explanation continued: "And I would say as well that I am not aware of any case that says that when that occurs, the *per se* rule doesn't apply. **Neither side has identified a case like that**." [ECF No. 487, p. 15 (emphasis added)]. Procaps' counsel also noted that "I **can't cite a case that shows the chronology** we have here …" [*Id.* at p. 16 (emphasis added)]. The Court asked Patheon's counsel the same question, albeit phrased in slightly different words: "How do the courts deal with that, where you have a contract that the parties say is legal at the beginning and then there's a change of circumstance? How do you evaluate that?" Patheon's counsel confirmed that the parties could not pinpoint a published case involving this type of changed circumstance scenario: "The first answer to the question is, no, there is **no case specifically on point for the facts**." [*Id.* at p. 17 (emphasis added)].

[5]     These six reasons are the more-important grounds underlying the Court's decision to treat the case under the rule of reason, rather than under the *per se* approach. More on this later in the Order.

never specifically agreed to the Banner acquisition and did not agree or acquiesce to the purportedly unlawful activities generated after the Banner acquisition. Several reasons underlie this conclusion, which also explain why Patheon's argument is inappropriate for summary judgment resolution.

**First,** relying on *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752 (1984), Patheon is seeking to add a "unity of purpose" requirement onto the concerted action element of Procaps' case, i.e., that Procaps needed to agree to the illegal activities to have an unlawful agreement. But Procaps need not show that because its antitrust claims are based on a **contract** -- not on a conspiracy like in *Monsanto* (which is another way, under the Sherman Act, for parties to generate the threshold concerted action necessary for a section 1 violation).

The distinction between a contract and a conspiracy is significant, as was made clear in *Eskofot*, 872 F. Supp. 81. There, the plaintiff, like Procaps here, argued that the concerted action requirement was satisfied when the defendants entered into anticompetitive contracts. *Id.* at 91. The defendants, like Patheon here, relying on *Monsanto*, moved to dismiss, asserting that the complaint failed to allege a "unity of purpose or a common design and understanding, or a meeting of the minds in an unlawful agreement." *Eskofot*, 872 F. Supp. at 91, 92. The court rejected the defendants' argument and denied the motion, explaining that *Monsanto* did not involve allegations of a "contract" in restraint of trade, but of a "conspiracy," and its language regarding a

"common scheme" relates to **whether an agreement could be** *inferred* **from**

**circumstantial evidence**, not situations where an express contract is itself alleged to

restrain trade:

> The rule that Monsanto purports to establish is one that prevents independent action from being subject to section one of the Sherman Act. In other words, it is not enough that defendant and others acted in a way that restrained trade, if they acted independently of one another. Thus, to prevail on a conspiracy claim under section one, a plaintiff must demonstrate that there was a "conscious commitment to a common scheme."
>
> **The situation in the instant case is quite different**. There is no allegation of conspiracy; rather, plaintiff alleges that defendants entered into combinations and contracts in restraint of trade. There is **no need to show a common purpose in order to prove the absence of independent action because the relevant merger or contract amply demonstrates that there was no independence of action.**

*Id.* at 92 (emphasis added).

Similarly, in *Helicopter Support Systems, Inc. v. Hughes Helicopter, Inc.*, 818 F.2d

1530 (11th Cir. 1987), the district court granted summary judgment to the defendant

because it found that communications between a manufacturer and distributors did not

establish the manufacturer's "agreement" with the competing distributors to terminate

the plaintiff. *Id.* at 1534-35. The Eleventh Circuit, specifically applying *Monsanto*,

reversed because the district court had "overlooked" the express agreement there -- the

distributorship contract, which "[f]acially . . . indicates that the distributors and [the

manufacturer] have agreed to fixed resale prices. . . ." *Id.* at 1536.

Patheon's argument similarly pays inadequate attention to the fact that the market allocation Procaps challenges results from the Collaboration Agreement's explicit terms. Patheon confuses the parties' actual agreement -- the terms of the Collaboration Agreement -- with the **effect** of that agreement after the Banner acquisition (i.e., the removal of the Banner assets from the Territory and Field). Procaps and Patheon agreed to the Collaboration Agreement's exclusivity provisions, and the Court is not convinced that federal antitrust law also requires that they must further have agreed to the effect or result of those provisions in all later circumstances in order for the "contract" requirement of section 1 to be satisfied.

Moreover, if Patheon's argument were correct, as long as a contract did not restrain trade when first made, no subsequent activity or event bringing about even a fundamental change in market effects could ever give rise to a section 1 challenge based on the contract, no matter how anticompetitive the effect of the contract became. Such a finding would lead to the anomalous conclusion that the Collaboration Agreement would constitute concerted action if it were executed after the Banner acquisition, but that same agreement would not constitute concerted action when executed before the Banner acquisition, even though the anticompetitive effect of the exclusivity provisions would be **identical** in both instances.

**Second**, Patheon's own conduct of allocating opportunities with Procaps' main competitor (who became part of Patheon after the acquisition) can be viewed by a fact-

finder as evidence of concerted action because that conduct was undertaken pursuant to Patheon's exclusivity agreement with Procaps. Whether Procaps subjectively acquiesced to certain subsequent conduct is not controlling for purposes of evaluating the basic question of whether there is an **agreement** here sufficient to satisfy section 1.

Patheon did not suddenly unilaterally decide to withdraw the Banner assets and appoint David Hamby as the "gatekeeper" to allocate opportunities on a whim or because it suddenly deemed those steps to be wise business strategy. To the contrary, Patheon does not dispute that it allocated business between itself and Procaps because it was **bound to do so by a written contract with** Procaps, requiring it to allocate all commercial manufacturing to Procaps. In other words, Patheon made those decisions **pursuant to** the Collaboration Agreement, not independent of it. Decision-making in furtherance of the terms of an explicit contract with a competitor seems to be the antithesis of unilateral action, and it is sufficient to satisfy the concerted action requirement (i.e., the existence of a contract) of section 1 of the Sherman Act.

**Third,** Patheon makes a related argument that a party must agree to **perform** under the contract for the contract to satisfy the section 1 "agreement" requirement. This argument was rejected by the former Fifth Circuit in *Hobart Bros. Co. v. Malcolm T. Gilliland, Inc.*, 471 F.2d 894, 900 (5th Cir. 1973).

In *Hobart*, the parties had entered into a distribution agreement limiting the plaintiff to a specific geographic area, thereby reserving all other geographic areas to

the defendant. *Id.* at 896-97. Despite the express contract, the defendant argued that there was no agreement to allocate markets because the plaintiff refused to abide by the contract and instead sold products outside its assigned area. *Id.* at 899. But because the plaintiff did sell outside the assigned territory, so the argument went, it never assented. *Id.* The appellate court rejected this contention, explaining that "to show an illegal contract in restraint of trade [a plaintiff] is not required to abide by the terms of that illegal contract. It cannot successfully be argued that [a plaintiff] must continue to subject itself to anti-trust violations prior to bringing suit so that it can obtain relief when it comes into court." *Id.* at 901.

The Court accordingly concludes that the Collaboration Agreement itself can provide the basis for satisfying the contract type of concerted action requirement. Therefore, the Court does not accept for summary judgment purposes the argument that Procaps must have subjectively consented to Patheon's removal of the Banner assets from the Territory and Field in order to generate a section 1 violation. By its express terms, section 1 is satisfied when there is a "contract" between the parties. And there is one here. *Paladin*, 328 F.3d at 1153-54; *United States v. Delta Dental of Rhode Island*, 943 F. Supp. 172 (D.R.I. 1996); *Eskofot*, 872 F. Supp. at 91-92; *see also* Areeda & Hovenkamp, *Antitrust Law* ¶¶ 1400b & 1400c at p. 5 ("[a]n undisputed contract remains an agreement for antitrust purposes").

For these reasons, the Court denies Patheon's motion for summary judgment on the issue of "agreement." The Court will later in this Order determine whether the agreement is a *per se* unreasonable restraint of trade, as Procaps would have the Court conclude.

2.  *Did Procaps Withdraw From the Agreement?*

In the alternative, Patheon argues that even if Procaps satisfies the concerted action requirement of section 1 by virtue of the express contract, it withdrew from the Collaboration Agreement by refusing to accept new allocated business under the agreement after Patheon acquired Banner. Therefore, Patheon contends, the withdrawal means that there is no agreement and therefore there can be no section 1 violation under the contract type of antitrust violation. Procaps takes the position that it did not withdraw -- because it only held the Collaboration Agreement *in abeyance*.

First, as noted above, *Hobart Bros.* holds that a party need not perform under an unlawful contract in order to be able to sue for an antitrust violation. *Hobart Bros. Co.,* 471 F.2d at 900. Thus, Patheon's argument is not legally persuasive.

Second, a fact-finder could view Patheon's position -- that Procaps withdrew from the agreement -- as inconsistent with its own conduct and with its own view of the parties' roles as the contract unfolded. For example, a fact-finder could wonder: if Procaps *had* withdrawn from the contract before the Banner acquisition closed and if Patheon therefore deemed the agreement vitiated, then why did Hamby act as the

23

"gatekeeper" to allocate customers to Procaps pursuant to the agreement's terms? Similarly, a fact-finder could determine that Patheon's post-acquisition, mid-2013 purported termination of the Collaboration Agreement is inconsistent with the view that Procaps withdrew months earlier. Likewise, a fact-finder could rationally conclude that, based on the record evidence, Procaps would not have purported to reject Patheon's termination attempt if it had withdrawn many months earlier.

To be sure, a fact-finder could *also* conclude that Procaps **did** effectively withdraw and that its "hold-performance-in-abeyance" argument is simply a post-lawsuit, make-weight argument designed to avoid the devastating conclusion that it withdrew from the agreement. But for summary judgment purposes, there is insufficient evidence to sufficiently demonstrate "withdrawal" because there are disputed issues of fact on this Patheon contention.

### C.  <u>The Reasonableness of the Restraint – Which Analysis Applies</u>

Both parties acknowledge that the Collaboration Agreement restrained trade before Patheon acquired Banner. Both parties contend that the restraint between themselves (as competitors) was at that point lawful because a new product was being developed**.** Framed by this background, the Court now turns to the analysis of the reasonableness of the restraint -- i.e., whether the Collaboration Agreement unlawfully restrained trade.

1.   *Applicable Legal Framework*

Section 1 of the Sherman Act outlaws "unreasonable" restraints. *Ariz. v. Maricopa Cty. Med. Soc'y*, 457 U.S. 332, 343 (1982). The Supreme Court has set forth two basic modes of analysis for determining the reasonableness of a restraint: *per se* and rule of reason.

*Per se* or other truncated forms of analysis apply only to "the narrow category of activity" that is "so plainly anticompetitive that no elaborate study of the industry is needed to establish their illegality." *Texaco, Inc. v. Dagher*, 547 U.S. 1, 5, 8 (2006) (citation omitted). Thus, if the *per se* standard is applied, then the restraint is deemed conclusively unreasonable. *See N. Pac. Ry. Co. v. United States*, 356 U.S. 1, 5 (1958). As a result, "the per se label should be applied infrequently and with caution[,] . . . only when history and analysis have shown that in sufficiently similar circumstances the rule of reason unequivocally results in a finding of liability." *Seagood Trading Corp. v. Jerrico, Inc.*, 924 F.2d 1555, 1567 (11th Cir. 1991) (internal citation omitted). Consequently, there is a strong presumption in favor of the rule of reason because applying the *per se* rule carries the risk of condemning activity that promotes competition. *Dagher*, 547 U.S. at 3; *Seagood*, 924 F.2d at 1567 ("The presumption in cases brought under section 1 of the Sherman Act is that the rule-of-reason standard applies.").

The rule of reason analysis encompasses a variety of forms that are "meet for the [particular] case," including an abbreviated version sometimes referred to as the "quick

look" analysis. *See Cal. Dental Ass'n v. FTC*, 526 U.S. 756, 761 (1999) (rule of reason is a continuum and must be applied in a manner "meet for the case"); *NCAA v. Bd. of Regents*, 468 U.S. 85, 109 n. 39 & 110 (1984) (rule of reason can sometimes be applied "in the twinkling of an eye" and need not require detailed market analysis). Under the rule of reason, courts examine the reasonableness of the restraint by analyzing things like the nature of the restraint, its effects, and its history. *See, e.g., Chi. Bd. of Trade v. United States*, 246 U.S. 231, 238 (1918); *FTC v. Actavis, Inc.*, 133 S. Ct. 2223, 2237 (2013).

Determining whether the rule of reason analysis or *per se* analysis applies in a given case is a question of law for the Court. *State Oil Co. v. Khan*, 522 U.S. 3 (1997). In that regard, the Court notes that while reports of the death of the *per se* rule are "greatly exaggerated," the Supreme Court's antitrust cases over the past 35 years demonstrate a strong **trend** toward the rule of reason approach and away from truncated forms of analysis such as the *per se* approach.[6]

---

[6]   *See, e.g., Actavis*, 133 S. Ct. at 2235-36 (market allocation judged under the rule of reason); *Dagher*, 547 U.S. at 4-8 (price fixing judged under the rule of reason); *Broad. Music, Inc. v. Columbia Broad. Sys., Inc.*, 441 U.S. 1, 8-9 (1979) (hereinafter, "*BMI*"); *NCAA*, 468 U.S. at 103 (applying rule of reason to horizontal restraints that were the kind of restrictions on output and price that are ordinarily deemed illegal *per se*, because the justifications may be procompetitive); *Cal. Dental Ass'n*, 526 U.S. at 770 (requiring rule of reason for restrictions on price advertising).

The *trend*, however, does not mean that the somewhat-dated core opinions condemning horizontal restraints as *per se* violations have been implicitly *overruled*, nor does it necessarily mean that the Supreme Court has "expressly called those decisions into question." *In re Blue Cross Blue Shield Antitrust Litig.*, No. 2:13-CV-20000-RDP, 2014 WL 2767360, at *6 (N.D. Ala. June 18, 2014). *See generally Jacobs v. Tempur-Pedic Int'l, Inc.,*

2. *Discussion*

The Court finds that the rule of reason analysis is applicable here. Four reasons support this conclusion. First, the original basis for the application of the *per se* analysis, that the Banner acquisition turned Patheon and Procaps into competitors, is incorrect. Second, the changed circumstances caused by the Banner acquisition militate against a *per se* analysis. Third, if the Collaboration Agreement was originally subject to the rule of reason analysis to be deemed lawful, then that should be the case now. Finally, the Court finds that the Collaboration Agreement is not a naked restraint and, therefore, should be judged under the rule of reason.

i.   Procaps and Patheon *Were* Competitors

In its complaint, Procaps alleged that the Collaboration Agreement was a lawful "pro-competitive" and "efficiency enhancing arrangement" that "promote[d] competition" when executed. [ECF No. 1, ¶¶ 7, 10, 59-60, 67, 100]. Procaps claimed the Banner acquisition transformed it into an unlawful agreement because Patheon was **not a competitor** of Procaps *before* the acquisition, but *became* a competitor as a result of the acquisition. [*Id.*]. Thus, Procaps' original argument goes as follows: the Collaboration Agreement was not subject to antitrust condemnation because it was procompetitive

---

626 F.3d 1327, 1334 (11th Cir. 2010) (citing *United States v. Topco Assocs., Inc.*, 405 U.S. 596, 607-08 (1972) for the rule that horizontal market divisions are examples of *per se* illegality because they are business relationships "that, in the court's experience, virtually always stifle competition"). *Topco* is the 40-year-old seminal case that stands for the rule that allocating territories to minimize competition at the retail level is a horizontal restraint constituting a *per se* violation of section 1 of the Sherman Act.

and not between competitors. However, when the Banner acquisition closed, it turned the Collaboration Agreement into an agreement between competitors that was now subject to *per se* antitrust review.

The argument's first premise, however, is incorrect.

The parties *were* competitors before the Collaboration Agreement because they both: (1) could manufacture softgels (albeit Patheon had less capacity than Procaps); (2) pursued softgel business in the relevant markets; (3) called on customers to try and win softgel business; and (4) won softgel business. In fact, because Patheon and Procaps both had PDS manufacturing capabilities, the Collaboration Agreement allocated PDS opportunities between them on a project-by-project basis.  Likewise, Procaps insisted on the right to veto any effort by Patheon to expand its softgel facility to attain CMO manufacturing scale, and the Collaboration Agreement allocated all CMO opportunities to Procaps.

While Procaps no longer disputes that it was a competitor of Patheon before the Collaboration Agreement, it now argues that the parties were not *complete* competitors. But the law does not consider **degrees** of competition, and "no distinction is made between actual competitors . . . and potential competitors." *In Re Terazosin*, 352 F. Supp. 2d 1279, 1314 n. 34 (S.D. Fla. 2005); *United States v. El Paso Natural Gas Co.*, 376 U.S. 651, 661 (1964) ("Unsuccessful bidders are no less competitors than the successful one.").

Consequently, the original Collaboration Agreement was subject to antitrust review and, as Procaps conceded, could not have survived under a *per se* analysis.

As a result, the Court finds that the original justification for applying the *per se* analysis -- that Procaps and Patheon were *not* competitors when they entered into the Collaboration Agreement but *became* competitors after Patheon acquired Banner -- is no longer present.

### ii.   Changed Circumstances

"It is a bad idea to subject a novel way of doing business (or an old way in a new and previously unexamined context . . .) to per se treatment under antitrust law." *In re Sulfuric Acid Antitrust Litig.*, 703 F.3d 1004, 1011 (7th Cir. 2012), *cert. denied,* 134 S. Ct. 224 (2013) (affirming dismissal of class action antitrust claim brought under section 1).[7] The *per se* rule applies "only when history and analysis have shown that in sufficiently similar circumstances the rule of reason unequivocally results in a finding of liability." *Levine, Levine v. Cent. Fla. Med. Affiliates, Inc.*, 72 F.3d 1538, 1549 (11th Cir. 1996); *accord Seagood,* 924 F.2d at 1567. Before applying the *per se* rule, the judiciary must have "considerable experience" with the business practices so that the economic impact of such practices is immediately apparent. *BMI,* 441 U.S. at 9; *Consultants &*

---

[7]   The Seventh Circuit explained that the dismissal would be final because the plaintiffs "have made clear that the case is over if they are not allowed to try it as a *per se* case." 703 F.3d at 1006. In contrast, Procaps has advised the Court that it will still pursue the case under a rule of reason but agrees that it will be bound by Patheon's market definitions.

*Designers, Inc. v. Butler Serv. Grp., Inc.*, 720 F.2d 1553, 1562 (11th Cir. 1983) (court will apply the *per se* standard "only when history and analysis have shown that" similar circumstances "*unequivocally* result[] in a finding of liability." (emphasis added)).

Here, the judiciary does not have "considerable experience" in judging whether an agreement that was initially procompetitive becomes a naked restraint as the result of a change in circumstances unilaterally caused by one party's actions. Rather, when confronted with the rare scenario involving a change of circumstances, courts have frequently analyzed the change under the rule of reason.

The parties agree that the Collaboration Agreement was lawful when signed, and courts look to the circumstances surrounding an original agreement even if subsequent events called into question the arrangement's legality. *Valley Drug Co. v. Geneva Pharm., Inc.*, 344 F.3d 1294, 1306-07 (11th Cir. 2003) (reversing district court's finding that the alleged anti-competitive agreements were *per se* violations after patent was later declared invalid and noting that "the reasonableness of agreements under the antitrust laws are to be judged at the time the agreements are entered into"). In *In re Sulfuric Acid Antitrust Litigation*, Judge Posner noted that "agreements that restrict competition . . . are governed by the rule of reason, rather than being per se illegal, if the challenged practice when adopted could reasonably have been believed to promote 'enterprise and productivity.'" 703 F.3d at 1011-12. Likewise, in *Polk Bros. v. Forest City Enterprises,*

Judge Easterbrook stated: "A court must ask whether an agreement promoted enterprise and productivity at the time it was adopted. If it *arguably* did, then the *court must apply* the Rule of Reason." 776 F.2d 185, 189 (7th Cir. 1985) (emphasis added).

Because the parties contend (whether rightly or wrongly) that the *original* Collaboration Agreement was a lawful, procompetitive venture, the change of circumstances (i.e., the acquisition) calls for a fresh review under the *same* rule of reason analysis that both parties agree should be used to assess the original Collaboration Agreement.

> iii.   The Same Original Analysis Should Apply to the Collaboration Agreement

Apparently realizing its original "competitor transformation" theory was problematic, Procaps changed its argument. In its summary judgment papers, Procaps now argues that even though the *original* Collaboration Agreement was a market allocation between competitors, it *was* subject to the rule of reason because it was an efficiency-enhancing integration covered by *Dagher*, 547 U.S. 1. [ECF No. 395, pp. 9-10]. Procaps argues, in contrast, that the *post-acquisition* Collaboration Agreement must be condemned *per se* because Patheon could not integrate Banner into the Collaboration Agreement (as that required Procaps' consent, which Procaps would not give).

This new argument for application of the *per se* rule is inapplicable for several additional reasons (other than the change in circumstances which allegedly converted a

purportedly legal agreement into one immediately condemned as unlawful under a *per se* approach).

First, a fact-finder could conclude that the original Collaboration Agreement was a *partial* integration. Thus, the fact that Patheon did not integrate Banner into the Collaboration Agreement could mean that the Collaboration Agreement continued to be a partial integration to which both parties had not fully committed all of their facilities. So if *Dagher* saves the original Collaboration Agreement from *per se* condemnation because of the partial integration, then it could also be used to save the post-Banner Collaboration Agreement for the exact same reason.

Second, Procaps wrongly assumes there is a distinct entity, Banner, to integrate into the Collaboration Agreement. Banner, however, ceased to exist as a matter of law when Patheon acquired Banner and they became a single enterprise. *Copperweld*, 467 U.S. at 770-71. Thus, there is no Banner to be integrated. Rather, there was only Patheon, which remained integrated post-acquisition, albeit to a lesser degree given that it possessed more softgel assets post-acquisition.

Third, Procaps provides no authority for the proposition that a lawful efficiency-enhancing partial integration automatically and immediately becomes *per se* illegal simply because the degree of integration has declined somewhat. Patheon contends that the Collaboration Agreement is not subject to *per se* condemnation *after* the acquisition for the very same reasons it was not subject to *per se* condemnation *before* the acquisition

-- the market allocation can be viewed as continuing to enhance the venture's efficiencies. The Court finds this theory to be logical and persuasive enough to be viewed favorably by a fact-finder.

Procaps also argued that the Collaboration Agreement's restrictive provisions "resulted in the *subtraction* of a competitor from the marketplace" when Patheon acquired Banner. But this variation on its new theory cannot be reconciled with *Copperweld* either, because the parties were competitors before the acquisition, so it was the *acquisition*, not the Collaboration Agreement, that subtracted a competitor. Procaps could have challenged that "subtraction" under Section 7 of the Clayton Act, but it did not do so.

### iv.   The Collaboration Agreement is Not a Naked Restraint on Trade

"Naked" restraints of trade are restraints "with no purpose except stifling of competition." *BMI*, 441 U.S. at 2 (quoting *White Motor Co. v. United States*, 372 U.S. 253, 263 (1963)). Determining whether an agreement is "naked" requires an examination of the parties' **purpose** in designing the restraint. *White Motor Co.*, 372 U.S. at 263. If the restraint was designed to "increase economic efficiency and render markets more, rather than less, competitive," then the restraint is not a naked restraint and the rule of reason applies. *BMI*, 441 U.S. at 20; *Nat'l Bancard Corp. v. Visa U.S.A., Inc.*, 779 F.2d 592, 599 (11th Cir. 1986). So long as there is an efficiency that might plausibly offset the alleged restraining effects on trade, then courts assess the conduct under the rule of

reason. *Copperweld*, 467 U.S. at 768; *Polk Bros.*, 776 F.2d at 188-89 (holding that the *per se* rule does not apply to "agreements that facilitate productive activity").

The Collaboration Agreement took two competitors with weaknesses and complementary strengths and created a single potentially stronger competitor. Procaps did not have a sales force in North America; it had inadequate contacts with customers; it lacked North American experience; but it had a substantial softgel manufacturing facility in Colombia, and some unique softgel technology. Patheon had a small softgel manufacturing facility; it had no unique technology; but it had an experienced sales force and better contacts with North American customers. Under these circumstances, the original Collaboration Agreement was not a naked restraint of trade even though the parties had been competitors. A finder of fact could agree with the parties' view that there were plausible efficiencies inherent in the Collaboration Agreement and the restraints that allowed the parties to cooperate rather than compete against each other for the same softgel opportunities.

Nevertheless, Procaps condemns the **post**-Banner restraints as *per se* unlawful because they allegedly were not "ancillary to an efficiency enhancing integration of economic activity." But the Court does not accept Procaps' analysis under a *per se* condemnation evaluation and accepts Patheon's view that the rule of reason is the appropriate analysis.

Patheon argues that the Collaboration Agreement's restraints remained ancillary to the efficiency-enhancing integration between Patheon and Procaps both before and after the Banner acquisition. Ancillary restraints are those that are "an essential or at least important part of some arrangement that has potentially redeeming virtues." 11 Hovenkamp, *Antitrust Law* ¶ 1904, at 251 (1978). That is, "restraints . . . that are part of a larger endeavor whose success they promote." *Polk Bros.*, 776 F.2d at 188-89.

Under Patheon's perspective, the post-acquisition Collaboration Agreement possessed at a minimum the same efficiencies as the original Collaboration Agreement, and the restraints were just as necessary to achieve these efficiencies because they would assure cooperation between parties that would otherwise compete against each other for softgel opportunities. Patheon acknowledges that the acquisition turned Patheon into a bigger competitor, but says it did not negate the original efficiencies and the original justification for the restraints.

Procaps' argument is that the post-acquisition Collaboration Agreement must be condemned because restraining Banner's competition, as the Collaboration Agreement required, was not ancillary to anything. While a restraint ancillary to a procompetitive agreement would ordinarily be subject to the rule of reason, it does not follow that a restraint **must** be ancillary to avoid *per se* condemnation. In fact, this approach is directly at odds with Supreme Court precedent that ancillary restraints are just a subset of the form of analysis courts undertake to determine if a restraint is a naked restraint

35

"'with no purpose except stifling of competition.'" *BMI*, 441 U.S. at 2 (quoting *White Motor Co.*, 372 U.S. at 263).

As noted, determining whether an agreement is "naked" requires a broader examination of whether the restraint would be likely to "increase economic efficiency and render markets more, rather than less, competitive." *BMI*, 441 U.S. at 20; s*ee also Nat'l Bancard*, 779 F.2d at 599. If the net plausible effects might be procompetitive, then courts will apply the rule of reason to strike the balance. *BMI*, 441 U.S at 8; *In re Sulfuric Acid*, 703 F.3d at 1012. Here, Procaps' internal consideration of efficiencies that could result from bringing the Banner assets into the Collaboration Agreement reinforces the notion that the rule of reason applies to both the pre-acquisition and post-acquisition events. Indeed, Procaps' senior management initially recognized the potential efficiencies to the Collaboration Agreement resulting from the acquisition, including "opportunities" like "[b]etter production and development costs" and lower "manufacturing" costs. It also acknowledged that, through the inclusion of Banner's assets, the Collaboration Agreement would become a stronger competitor and win more P-Gels business because it would now have FDA-approved softgel manufacturing facilities in the United States.

To be sure, these Procaps-noted efficiencies did not occur. But the reason for that is (or could be) Procaps' refusal to explore Patheon's proposals to contribute Banner's assets to the Collaboration Agreement. A finder of fact could conclude that it was

reasonable for Patheon to abide by the Collaboration Agreement for some period while trying to convince Procaps to continue the Collaboration Agreement and thereby achieve additional efficiencies.

v.   Conclusion

The Court concludes that the rule of reason is the standard to be used to evaluate the reasonableness of the restraint.  The Court will later determine the precise structure of the rule of reason analysis which ultimately will be used at trial.

One final point: the rule of reason standard requires Procaps to prove: "(1) an anticompetitive effect of the defendant's conduct on the relevant **market**, and (2) that the conduct has no procompetitive benefit or justification." *Levine*, 72 F.3d at 1551 (emphasis added). In order to avoid providing discovery about markets, Procaps agreed to proceed under a *per se* approach and to adopt and not challenge Patheon's market definition if it had to proceed under the rule of reason. It further agreed to not put forward its own market definition. Therefore, the parties will use at trial a rule of reason analysis using Patheon's uncontested market definitions.[8]

---

[8]     Procaps' ability to effectively pursue the case under the rule of reason approach using Patheon's unassailable market definitions is beyond the scope of this Order.

### D. **Affecting Interstate Commerce**

Procaps has moved for partial summary judgment on the third element of a Sherman Act Section 1 violation, that the conduct at issue affects interstate or foreign commerce. Patheon does not dispute this point, as the Collaboration Agreement's exclusivity restraints reach all of North America (including the United States) as well as Europe, and much of Asia. Accordingly, the Court **grants** Procaps summary judgment on this point.

### E. **Antitrust Injury**

Antitrust injury is injury of the type the antitrust laws were intended to prevent and that flows from that which makes the defendant's acts unlawful. *Brunswick Corp. v. Pueblo Bowl O Mat*, 429 U.S. 477 (1977). Patheon contends that Procaps does not have standing because it has not demonstrated that it has suffered antitrust injury and, therefore, Patheon is entitled to summary judgment. The Court disagrees. Procaps has sufficiently demonstrated antitrust injury at this stage of the proceedings to have standing.

Patheon first argues that there is no antitrust injury because there is no evidence that the market division reduced output or increased prices. This argument confuses antitrust injury with competitive injury to the market. Antitrust injury -- as opposed to injury to competition -- must be viewed from the perspective of the plaintiff's position

in the marketplace, not from the perspective of the market as a whole. *Doctor's Hosp. of Jefferson, Inc. v. Se. Med. Alliance, Inc.*, 123 F.3d 301, 305-06 (5th Cir. 1997).

Procaps contends that it has been effectively or substantially excluded from competing in the Territory and Field because the Collaboration Agreement has become an unlawful market allocation.[9] A plaintiff's exclusion from the market as a result of an antitrust violation constitutes antitrust injury. *See Gulf States Reorganization Grp., Inc. v. Nucor Corp.*, 466 F.3d 961 (11th Cir. 2006) (antitrust injury existed where defendant's conduct reduced competition by "deny[ing] consumers the benefit of the pressure to lower prices that would likely accompany the [plaintiff's] becoming a viable competitor"); *Doctor's Hosp.*, 123 F.3d at 305 (antitrust injury satisfied when losses and "competitive disadvantage" flowed from defendant's conduct); *Re/Max Int'l v. Realty One*, 173 F.3d 995 (6th Cir. 1999) (impeding an innovative competitor's access to the market is antitrust injury). Thus, at a minimum, disputed issues of fact exist as to the degree of Procaps' exclusion from the relevant markets and its associated damages arising from Patheon's conduct.

Patheon next argues that Procaps' alleged injury is not an antitrust injury because it is the same injury it would have suffered if Patheon had breached the Collaboration Agreement. But Patheon concedes that lost profits is a viable measure of antitrust damages. [ECF No. 487, p. 122-23 ("Yes. A defendant's conduct can constitute

---

[9]     The existence or degree of such alleged exclusion is not before the Court at the summary judgment stage.

both an antitrust violation and a breach of contract. And the measure of damages in an antitrust violation under appropriate conditions can be lost profits.")].

In addition, Patheon's argument that a plaintiff does not suffer antitrust injury because it would have suffered the same injury in the absence of an antitrust violation is unconvincing under the facts at issue.

Procaps' expert economist, Dr. Blair, testified that the damages Procaps suffered to its business or property flow from the injury to competition that is presumed by virtue of the relevant markets being deprived of the benefit of the Collaboration Agreement. He stated: "Because of [the acquisition], the number of soft gel suppliers in the Territory / Field is reduced below the number in the 'but for' world, thereby limiting the options available to buyers and harming competition." At a minimum, this raises a genuine issue of fact as to whether and to what extent Procaps' claimed injuries constitute antitrust injury.

F.  **Unclean Hands**

Finally, Patheon argues that Procaps' section 1 claim is barred by the defense of unclean hands or *in pari delicto*. In *Perma Life Mufflers v. International Parts Corp.*, 392 U.S. 134 (1968), the Supreme Court appeared to completely "reject[] the application of the doctrine of *in pari delicto* in antitrust actions," which means that "an agreement may be challenged even by one of the parties who has acquiesced in the unlawful agreement." *Tidmore Oil Co., Inc. v. BP Oil Co.*, 932 F.2d 1384, 1388 (11th Cir. 1991). But later courts

have suggested that the defense *is* available in antitrust actions, albeit in situations limited to those where the plaintiff's responsibility is "essentially indistinguishable" from or "clearly greater" than the defendant's responsibility. Phrased differently, some courts hold that the *in pari delicto* doctrine does not bar an antitrust claim where there is "merely some culpability on the part of the plaintiff." *Moecker v. Honeywell Int'l, Inc.,* 144 F. Supp. 2d 1291, 1314 (M.D. Fla. 2001).

To be sure, *Perma Life* left open the question of whether "truly complete involvement and participation in a monopolistic scheme could ever be a basis, wholly apart from the idea of in pari delicto, for barring a plaintiff's cause of action." 392 U.S. at 140. Likewise, the Eleventh Circuit, in a post-*Tidmore* letter of credit fraud case not involving antitrust claims, noted that the defense should not be allowed "unless the degrees of fault are essentially indistinguishable or the plaintiff's responsibility is clearly greater." *Banco Indus. De Venezuela, C.A. v. Credit Suisse,* 99 F. 3d 1045, 1049 (11th Cir. 1996) (noting that the jury advised that plaintiff's fault was at least equal to or greater than the defendants).

Given the language in *Perma Life* which suggests that the defense might be available in a "complete involvement" (by plaintiff) case and the Eleventh Circuit's succinct, conclusory statement in *Tidmore* that the defense is inapplicable to antitrust cases, the Court is not prepared to conclusively determine that *in pari delicto* cannot be a defense here. Indeed, Procaps has not advanced that argument. To the contrary, it

impliedly concedes the theoretical viability of the defense, arguing instead that the resolution of the defense is inappropriate for summary judgment.

Both parties dispute who bears the greater responsibility for the parties' challenged conduct. For instance, Procaps argues that Patheon bears far greater responsibility because (1) Patheon "threw the unlawful antitrust punch" by acquiring Banner, (2) Patheon betrayed its collaborative partner by turning **itself** into Procaps' fiercest competitor, (3) Patheon benefited from the antitrust scheme, while Procaps did not, because Procaps was excluded from the Territory and Field, and (4) Procaps refused to accept allocated customers from Patheon. Consequently, because the *in pari delicto* defense involves a **weighing** of the evidence bearing on the issue of responsibility based on disputed issues of fact, summary judgment is inappropriate. *Wager v. Pro*, 575 F.2d 882, 885 (D.C. Cir. 1976) (reversing judgment on the pleadings against plaintiff on in pari delicto defense because of factual dispute concerning the issue of whether plaintiff was more at fault than defendant).

### G. <u>Conclusion</u>

Given the foregoing,  the Court **denies** Patheon's motion for summary judgment on Count I (declaratory relief), Count II (injunctive relief), and Count III (damages). For the same reason, the Court **denies in large part** Procaps' partial motion for summary judgment on Counts I and III. The Court **grants in small part** Procaps' partial summary

judgment motion that the affecting interstate commerce requirement for a Section 1 antitrust claim has been satisfied.

## IV.    DISCUSSION –THE FDUPTA CLAIM (COUNT IV)

Procaps' FDUPTA claim (Count IV) is based solely on the agreement to allocate customers or territories under the Collaboration Agreement. [ECF No. 1, ¶ 106 ("The [acquisition] renders the Collaboration Agreement an unfair method of competition and/or unfair or unconscionable trade practice."). There is no other misconduct alleged in Count IV. So the allegations making up the FDUPTA claim are **identical** to those supporting the Sherman Act claims.

The Court's ruling on the cross summary judgment motions concerning the Sherman Act claims applies to the FDUPTA claim. *Cf. QSGI, Inc. v. IBM Global Fin.*, No. 11-80880-CIV, 2012 WL 1150402, at *4 (S.D. Fla. Mar. 14, 2012) (finding that when "a plaintiff's FDUPTA claim is based on the same allegations as its antitrust claim, failure to establish a violation of antitrust law is sufficient to conclude the plaintiff has also failed to state a FDUTPA claim."). While the Court is denying Patheon's and Procaps' summary judgment motions on Count IV, it is appropriate at this time to pinpoint what claims Procaps cannot pursue at trial under this Count.

Procaps *now*, in its proposed summary judgment order, says that its FDUPTA claim is also based on allegations that Patheon did not protect Procaps' confidential information to which Procaps gave Patheon "full access." FDUTPA, however, requires,

at a minimum, that a defendant misuse or unlawfully disclose the confidential information to a third party. *Sensormatic Elecs. Corp. v. TAG Co. US, LLC*, 632 F. Supp. 2d 1147, 1193 (S.D. Fla. 2008) (defendant violated FDUTPA where its employees unlawfully disclosed plaintiff's confidential information).

Procaps' access to information FDUPTA theory is that Patheon had full access to Procaps' confidential information and can now use it to compete with Procaps and could disclose it. The meat of Procaps' allegation is that Patheon executive Geoffrey Glass, who is now the head of the Banner unit at Patheon, had access to Procaps' confidential information and this information is in his head and, therefore, he may use or disclose it.

But Procaps' theory is just that -- a theory. There is no evidence that Patheon **disclosed** Procaps' confidential information to a third party. There is also no evidence that Patheon has misused Procaps' confidential information. Even Procaps concedes that it "cannot pinpoint any specific piece of confidential information that [Patheon has] actually misused." Therefore, Patheon is entitled to summary judgment on Count IV for all claims beyond the antitrust claim.

## V.    DISCUSSION – THE UNFAIR COMPETITION CLAIM (COUNT V)

Procaps' common law unfair competition claim (Count V) is based on the following factual allegation: Patheon engaged in deceptive or fraudulent conduct "by entering into the Collaboration Agreement, thus gaining access to Procaps' intellectual

property and information . . . and then, shortly thereafter" acquiring Banner and "gaining access to Banner's intellectual property and information." [ECF No. 1, ¶ 112]. Procaps alleges that Patheon's actions caused customer confusion because customers were confused as to the status of P-Gels and why Patheon chose to acquire Banner a few months after entering into the Collaboration Agreement with Procaps. [*Id.* at ¶ 113]. There are no other allegations of misconduct.

### A.  Relevant Background

Under the Collaboration Agreement, Procaps trained Patheon employees on its new technologies, softgel formulation, and development. Such training sessions occurred in Colombia, North Carolina, and England. In addition to training sales personnel, Procaps also trained Patheon's executives, technology experts, and pharmaceutical development personnel. While in Colombia, Patheon employees toured Procaps' manufacturing facilities and heard detailed presentations not only on Procaps' existing machines, but also on the new technology that Procaps had created. Procaps also disclosed to Patheon its proprietary pricing strategies, business models, and cost sheets for ingredients, materials, and products.

### B.  Applicable Legal Standard

Florida's common law of unfair competition is "the umbrella for all statutory and non-statutory causes of action arising out of business conduct which is contrary to honest practice in industrial or commercial matters." *Am. Heritage Life In. Co. v. Heritage*

*Life Ins. Co.*, 494 F.2d 3, 14 (5th Cir. 1974). The elements of Florida's common law of unfair competition are far from precise. *Alphamed Pharms. Corp. v. Arriva Pharms., Inc.*, 432 F. Supp. 2d 1319, 1353-54 (S.D. Fla. 2006) (internal citation omitted), *aff'd*, 294 F. App'x 501 (11th Cir. 2008). Nevertheless, courts have found that a party must show (1) deceptive or fraudulent conduct of a competitor **and** (2) likelihood of consumer confusion. *Third Party Verification, Inc. v. Signaturelink, Inc.*, 492 F. Supp. 2d 1314, 1324 (M.D. Fla. 2007) (internal citations omitted); *Alphamed Pharms. Corp. v. Arriva Pharms., Inc.*, 391 F. Supp. 2d 1148, 1166 (S.D. Fla. 2005) (citing *Donald Frederick Evans and Assoc. v. Cont'l Homes, Inc.*, 785 F.2d 897, 914 (11th Cir. 1986)).

**C. <u>Analysis</u>**

In the instant case, it is clear that Procaps has not established either element of a common law unfair competition claim.

1. *Deceptive or Fraudulent Conduct*

According to Procaps, Patheon acted deceptively or fraudulently "**by entering into the** Collaboration Agreement, thus gaining access to Procaps'" confidential information, and then shortly thereafter acquiring Banner. [ECF No. 1, ¶ 112 (emphasis added)]. But there is no evidence, direct or circumstantial, that Patheon entered the Collaboration Agreement to gain access to Procaps' confidential information, knowing all along that it was going to acquire Banner. In fact, Procaps has not even made that allegation. Likewise, Procaps has presented no authority for the proposition that

46

entering into a contract with one party and then later entering into another contract with another party constitutes fraudulent or deceptive conduct. *See, e.g., Alphamed Pharms. Corp.*, 432 F. Supp. 2d at 1353 (proposed jury instruction for unfair competition included corporate espionage and sabotage as examples of unfair competition). This leads to the second point.

The heart of Count V is that by coupling the Banner acquisition with Patheon's access to Procaps' confidential information, Patheon is now going to be able to use Procaps' confidential information to unfairly compete with Procaps. To that end, Procaps makes much of the fact that Patheon executive Geoffrey Glass, who had access to Procaps' confidential information, is now in charge of the Banner unit in Patheon.[10]

_____

[10]    Although Procaps now alleges that Patheon misused Procaps' confidential information by using it to *internally* review the proposed Banner acquisition before the deal closed, that theory appears nowhere in Count V or in Procaps' summary judgment briefs. Procaps raised this theory in its proposed summary judgment order. To assert a new claim at the summary judgment stage, the proper procedure is to amend the complaint -- not argue it in a brief opposing a summary judgment motion. *Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1314–15 (11th Cir. 2004). This rule not only applies to legal claims, but to "additional facts" as well. *GeorgiaCarry.Org, Inc. v. Georgia*, 687 F.3d 1244, 1258 n. 27 (11th Cir. 2010) (declining to consider additional facts first raised in summary judgment briefing); *see also Flintlock Constr. Servs., LLC v. Well–Come Holdings, LLC,* 710 F.3d 1221, 1227–28 (11th Cir. 2013). Consequently, Procaps cannot advance this new theory and facts now.

Moreover, even if the Court were to consider this new theory, the Court does not find it persuasive because *Procaps'* confidential information was not the material considered. Procaps' allegation is that Patheon reviewed P-Gels pricing in reviewing the Banner acquisition. P-Gels is the product the parties *jointly* introduced into the marketplace as part of their collaboration. [ECF Nos. 333, ¶ 6; 335, ¶ 2]. As the Court has previously noted, because P-Gels was jointly introduced, the information surrounding

The problem for Procaps is two-fold. First, mere possession of information, even in Mr. Glass' head, is insufficient to establish a common law unfair competition claim in the context of this case. Rather, Florida law requires proof, at a minimum, that defendant improperly used or disclosed the allegedly confidential information to unfairly compete with plaintiff. *Gettinger v. Fla. Tape & Labels, Inc.*, 194 So. 2d 695, 697 (Fla. 2d DCA 1967) (holding plaintiff stated unfair competition claim only where defendants "used the [confidential] information" in unfair competition with plaintiff); *Sensormatic Elecs. Corp.*, 632 F. Supp. 2d at 1186 (finding misappropriation of confidential information that was disclosed to third-parties), *aff'd in part sub nom. Sensormatic Elecs., LLC v. Kahle*, 367 F. App'x 143 (Fed. Cir. 2010).

Second, there is no evidence that Patheon has improperly used or disclosed Procaps' confidential information. Indeed, Procaps has previously conceded that it "cannot pinpoint any specific piece of confidential information that [Patheon has] actually misused" and that it cannot pinpoint damages proximately caused by the alleged misuse of its confidential information. [ECF Nos. 138, pp. 6-7; 333, p. 12, ¶ 25]. Moreover, Procaps also revealed that it could not "describe the specific, actual competitive harm that has occurred from any actual misuse of this Confidential

it, including pricing information, cannot be "specific or proprietary to Procaps only. Rather, it is relevant to Patheon and Procaps." [ECF No. 505, p. 4]. As a result, Procaps' new theory fails.

Information, other than the fact that Procaps' direct competitor possesses its most sensitive confidential business information." [ECF No. 333-8, p. 17].

The Court understands that it may be difficult for Procaps to have direct evidence that its confidential information was misused. But Procaps has not presented any circumstantial evidence of misuse. For instance, there is no evidence that Patheon used Procaps' confidential information post-acquisition to: change its prices to be below Procaps' prices; incorporate Procaps' manufacturing procedure in its own facilities; or reverse engineer Procaps' technology or products. Indeed, as the Court is intimately familiar with the parties' discovery requests, it does not appear that Procaps even tried to get that information by, for example, requesting to inspect Patheon/Banner's manufacturing or development facilities. And the time to conduct that kind of discovery has long since passed.

2. *Customer Confusion*

Procaps' customer confusion theory is not based on confusion between products or services, a mistake about whether a product is produced by Procaps rather than by Patheon (or by Banner), or a marketing plan which mis-described Patheon products as Procaps products. Instead, it is based on the unusual notion that customers are confused "as to why Patheon chose to acquire Banner only a few months after entering into the Collaboration Agreement with Procaps, creating questioning as to whether this

indicates that Patheon perceived something wrong with Procaps' services and manufacturing." [ECF No. 1, ¶ 113].

This is an attenuated theory. Procaps has not submitted any authority to suggest that an unfair competition claim can be based on customers who heard about Patheon's Banner acquisition and then wondered if Procaps committed some type of business blunder which caused Patheon to acquire Procaps' main competitor. As such, the Court finds this theory of customer confusion unpersuasive.

In addition, this customer confusion theory is problematic for another reason: Procaps has not yet established that this alleged customer confusion (involving random questioning about Patheon's business motivations) proximately caused **damages**, a required element for a common law unfair competition claim. *See, e.g., Alphamed*, 432 F. Supp. 2d at 1354 (holding proof of damages essential to unfair competition claim); *Practice Mgmt. Assocs., Inc. v. Old Dominion Ins. Co.*, 601 So. 2d 587-88 (Fla. 1st DCA 1992) ("Florida case law [] requires injury . . . as an essential element of any claim of unfair competition."). The inability to establish that any unfair competition proximately caused damages plagues all of Procaps' unfair competition theories, whether actually alleged in the complaint or mentioned later in response to Patheon's summary judgment motion.

3.   *Conclusion*

As the former Fifth Circuit has noted, "[u]nfair competition is a matter of the totality of the evidence, . . ." *B. H. Bunn Co. v. AAA Replacement Parts Co.*, 451 F.2d 1254, 1262 (5th Cir. 1971). After reviewing the totality of the evidence here, the Court finds that there are no genuine disputed issues of fact to defeat Patheon's entitlement to summary judgment on this Count. Accordingly, the Court **grants** Patheon summary judgment on Count V.

## VI.   PROCAPS' DISCOVERY FAILURES

Patheon argued that the Court should deny Procaps' summary judgment motion because of its discovery failures. That request is now academic, as the Court has denied Procaps' motion for partial summary judgment (other than on the *agreed* position that the activities at issue met the affecting interstate commerce requirement for a Section 1 violation). Therefore, the Court need not wade into the thorny thicket of alleged discovery abuses, a result which is particularly appropriate given that the forensic analysis of Procaps' electronically stored information is not yet complete and given that the Court has appointed a special master to address issues flowing from the forensic analysis. [ECF No. 558].

## VII.    CONCLUSION

For the foregoing reasons, the Court: **denies** Patheon's summary judgment motion on Counts I-III; **denies** in part and grants in part Patheon's summary judgment motion as to Count IV; **grants** Patheon summary judgment on Count V; **denies** Procaps' motion for partial summary judgment on Counts I, III, and IV, with the exception that the affecting interstate commerce requirement has been met; and **finds** that the rule of reason methodology applies to this case. The Court will issue a more-detailed ruling on the specific structure of the rule of reason analysis to be used at trial.

**DONE AND ORDERED** in Chambers, in Miami, Florida, July 30, 2014.

Jonathan Goodman
UNITED STATES MAGISTRATE JUDGE

Copies furnished to:
All Counsel of Record