**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

**CASE NO. 12-24356-CIV-GOODMAN**

**[CONSENT CASE]**

PROCAPS S.A.,

      Plaintiff,

v.

PATHEON INC.,

      Defendant.

_____/

## ORDER ON DEFENDANT PATHEON'S SUMMARY JUDGMENT MOTION

This litigation arose out of a Collaboration Agreement between two companies involved in the pharmaceutical business, Plaintiff Procaps S.A. ("Procaps") and Defendant Patheon Inc. ("Patheon"). Procaps and Patheon have spent much of the past three years involved in an expensive, bitter, time-consuming, and hard-fought legal battle in federal court. Procaps contends that Patheon, in effect, turned on it relatively soon after their Collaboration Agreement was formed by acquiring Procaps' principal competitor, Banner Pharmacaps ("Banner").

The Collaboration Agreement, however, contains a dispute resolution clause which requires breach of contract claims, fraud in the inducement claims and disputes other than a limited list of excluded claims to be resolved through arbitration. An antitrust claim is one of the few types specifically excluded from the mandatory arbitration provision. Procaps decided to file an antitrust lawsuit.

Although Procaps agreed (and still agrees) that the Collaboration Agreement was *lawful* when initially enacted even though it contained horizontal market allocation provisions, it later alleged that Patheon transformed the Collaboration Agreement into an illegal restraint when it acquired Banner.

Over the past three years, Procaps has developed evidence which, if accepted by a fact-finder in a breach of contract claim, could support a compelling narrative about a company wronged by a business partner who should have been working *with* it under the comprehensive written Agreement. But, as noted, the Collaboration Agreement bans a traditional breach of contract lawsuit (i.e., it must be arbitrated), so the issue now is whether Patheon is entitled to a ruling in its favor on its summary judgment motion [ECF No. 889] targeting Procaps' remaining federal **antitrust** claim.

The Court has reviewed the motion, briefs, proposed orders, and evidentiary record, and heard oral argument at a hearing lasting almost eight hours on September 24, 2015.  For the reasons set forth below, the Court **grants** Patheon's motion.

## I.   Introduction

Procaps and Patheon entered into a Collaboration Agreement (the "Agreement") to work together to produce and market a new brand of softgel capsules called P-Gels. Several months later, Patheon acquired Procaps' main competitor, Banner. Procaps then filed this lawsuit, alleging that the acquisition made the Agreement illegal under federal and state antitrust laws. The case has been vigorously litigated.

Among other salient rulings, on February 25, 2013, the District Court denied Patheon's motion to dismiss, holding that Procaps stated a *per se* claim for violation of the Sherman Act. [ECF No. 50]. After a more fully-developed record, however, and after discovery had closed, the Undersigned ruled on the parties' cross-motions for summary judgment and determined that the restraint embodied in the Agreement should be analyzed under a rule of reason "meet" for this case, the precise structure of which the Court would later determine. [ECF No. 565]. The Court subsequently ruled that Patheon could take additional rule of reason discovery and file a second summary judgment motion.

Patheon later filed a second summary judgment motion. It now contends that it is entitled to summary judgment for four reasons, any one of which is sufficient to sustain a defense summary judgment: (1) There were no substantial actual detrimental effects on competition as a result of the removal of the Banner assets from the relevant markets; (2) Procaps did not, and cannot, prove **substantial** marketwide harm; (3) Procaps has the burden of proving the absence of *all* pro-competitive benefits or justifications, which it failed to satisfy; and (4) Procaps lacks antitrust standing because it has not been excluded *entirely* from the relevant markets.

As discussed in greater detail later, the Court notes that the parties strongly disagree about the applicable legal principles which control the resolution of many issues underlying the summary judgment motion. In some instances, the parties take

diametrically opposed positions, with one party representing that the law is one way and the other party stridently proclaiming that the law is exactly the **opposite.** Given the procedural history here, these basic legal disconnects are hardly surprising, though the degree of wrangling over the applicable law is atypical. In any event, the Undersigned grants Patheon's summary judgment motion on the first two grounds (but not on the third and fourth grounds).

## II.   <u>The Facts</u>

A significant part of the background of this case is set forth in the Court's previous summary judgment order. [ECF No. 565]. Other portions were developed after the initial round of summary judgment briefing and the order on those motions. Viewing the evidence and inferences in the light most favorable to Procaps, as the Court must do, the salient facts are these:

In January 2012, Patheon (the number two provider of commercial manufacturing operations worldwide in most delivery formats, except softgels) and Procaps (the largest manufacturer of softgels in South America) entered into the Collaboration Agreement to market product development services ("PDS") and commercial manufacturing outsourcing ("CMO") of softgels to third parties under the "P-Gels" brand (the "Collaboration"). Patheon would market P-Gels to potential customers and Procaps would provide development and manufacturing services through its Colombian facility. The parties' own products were excluded.

**Field Limited to Prescription Drugs.** In the Collaboration Agreement, Patheon and Procaps defined the collaboration's "Field" as "prescription pharmaceutical" products for the treatment of human diseases and maintenance of human health. [ECF No. 333-1, §§ 1.10, 2.1]. With minor exceptions, nutritional and over-the-counter softgels are excluded from the Collaboration.

**Manufacturing.** Under the agreement, Procaps has "the sole right and responsibility to perform or have performed all Commercial Manufacturing Activities." [ECF No. 333-1, § 3.2].

**Territory Limited.** The Collaboration's "Territory" is nominally worldwide but excludes large geographies, including countries where Procaps has an independent presence. [ECF No. 333-1, §§ 1.9, 1.22].

**Exclusivity.** In the Collaboration Agreement, each party agreed to "exclusively develop, market and provide the Soft Gel Branded Services in the Territory through [the] collaboration" with the other party, and agreed neither would "develop, Manufacture, promote, or otherwise commercially exploit . . . Soft Gel Capsules in the Field for use or sale in the Territory" (i.e., for prescription drug manufacturing services in the Territory). [ECF No. 333-1, § 10.2].

**Expansion by Patheon.** Patheon also agreed not to *expand* its current manufacturing capacity for softgel capsules for prescription drugs at its facility in

Cincinnati, Ohio for use or sale in the Territory, except with Procaps' approval. [ECF No. 333-1, § 10.3].

**Limitations on Collaboration.**   The Collaboration contains certain limits. For example, the Collaboration Agreement concerns the manufacturing of drugs owned by third- party customers, and not Patheon's or Procaps' *own* prescription drugs. [ECF No. 333-1, §§ 1.6, 1.7, 1.8, 1.11, 3.5, 10.5]. Thus it excludes, "Internal Development Products," defined to include prescription drugs for which Patheon or Procaps is the owner -- as opposed to third-party customers' prescription drugs. *Id*. The Collaboration Agreement is also clear that either party can independently "develop, manufacture, sell and otherwise exploit" softgels outside the Field (i.e., softgels other than for prescription drugs) and outside the Territory. [ECF No. 333-1, § 10.5].

**Six Month Grace Period After Acquisitions.**    The parties expressly contemplated that either Patheon or Procaps might acquire, during the term of the Collaboration Agreement, a third party that also provides softgel services to third party customers for prescription drugs. Section 1 0.4(b) provides that if either party acquires a company that bears on the exclusivity or capacity restrictions in sections 10.2 or 10.3, it would have a six-month grace period after the acquisition to address the issue, by either divesting the overlapping business or by bringing it into the Collaboration. The Agreement provides:

If during the Term a Party or any of its Affiliates acquires an entity by a Change of Control of a Third Party that would cause such Party or its Affiliates to be in breach of Sections 10.2 or 10.3 at the closing of such acquisition, then the acquiring party shall give advance notice to the other Party or make a public announcement of such acquisition, and *the acquiring party must within six (6) months of such acquisition* either (i) divest such portion of the acquired business that would be restricted by Sections 10.2 or 10.3 to a Third Party, or (b) include under this Agreement such portion of the acquired business solely with respect to any business or intellectual property activities conducted by the acquiring Party following the date of such acquisition.

[ECF No. 333-1, §10.4(b)] (emphasis supplied).

**Collaboration Agreement Dispute Resolution Procedures.** The Agreement also provides a mechanism for Procaps and Patheon to resolve disputes between them. The companies agreed to attempt to resolve disputes "in an expedient manner by mutual cooperation and without resort to litigation." The companies agreed "to follow the procedures set forth" to resolve "any controversy or claim arising out of" or "relating to" the Collaboration. [ECF No. 333-1, § 14.1].

These procedures specify that if the parties are "unable to resolve [a] dispute within thirty (30) days after such dispute is first identified" by either party in writing to the other, then the companies "shall refer such dispute to the Chief Executive Officers" ("CEOs") of the parties for attempted resolution by good faith negotiations. If the CEOs are unable to resolve the matter during an additional 30-day period, then the agreement requires **arbitration** of most claims (including those for breach of contract), but it allows for litigation of antitrust disputes. [ECF No. 333-1, §§ 14.2-14.4].

The Collaboration allocated manufacturing opportunities to Procaps. [ECF No. 565, p. 7]. It was amended to include *non*-prescription softgels for 10 customers. [*Id.*, at p. 7, n.3]. Although the Collaboration excluded drugs for several customers, the parties bid on at least two of those drugs (dutasteride and omega-3 acid ethyl esters). [ECF No. 889, p. 8; *Exs.[1] 2-6*].

As outlined above, the Agreement contained a market allocation provision. As this Court has described it, all CMO opportunities were allocated to Procaps, while PDS opportunities were allocated between the parties by mutual agreement. Neither party individually could develop or manufacture softgels within the scope of the Agreement. The parties both agree that the Agreement allocated markets and customers. [ECF Nos. 487, pp. 36, 137; 331, ¶ 7]. This Court likewise concluded that the Agreement "allocated markets and customers among horizontal competitors." [ECF No. 565, p. 8].

The parties nonetheless concur that the Agreement, even though it is one which allocated markets and customers, was **procompetitive** and lawful when it originated because it combined the complementary assets and capabilities of two companies who individually lacked the assets essential to compete in these markets and introduced a

---

[1]     Exhibits 1-73 are attached to Patheon's Motion for Summary Judgment [ECF No. 889]; Exhibits 74-118 are attached to Procaps' Memorandum in Opposition [ECF No. 931]; and Exhibits 119-128 are attached to Patheon's Reply in Support of Motion for Summary Judgment [ECF No. 958]. All Exhibits are referred to as "Ex." or "Exs." throughout.

new competitor and a new softgel offering, P-Gels, into the marketplace. [ECF No. 565, p. 8].[2]

From December 2011 to December 2012, the Collaboration bid on 43 projects but "won only two projects for a total of $123,003 in revenue." [ECF No. 565, p. 9]. Procaps' economist, Dr. Roger D. Blair ("Blair"), opined that the Collaboration was "largely unsuccessful." [*Ex.* 7].

By August 2012, Patheon, without telling Procaps, began to reconsider whether it had chosen the right "partner." [ECF No. 335, ¶ 24]. Patheon began considering (again) entering into a strategic relationship with Banner, the "#2" player in the prescription and over-the-counter ("OTC") softgel market by size. [ECF No. 335, ¶ 10].

By October 2012, Procaps reported that "'P-Gels came late'" to the market [*Ex.* 8], and Patheon told Procaps that it was considering an acquisition of Banner, a softgel competitor. [ECF No. 565, p. 9]. On October 22, 2012, during a meeting in Miami, Patheon notified Procaps that it might acquire Banner, and it proposed that Banner join the parties' collaboration. [ECF No. 333, ¶ 14].

Procaps began to analyze the pros and cons of integrating Banner. Procaps had some initial predictions that procompetitive benefits would result from integrating the Banner assets. [*Id.*, at ¶¶ 17-18]. But it never gave Patheon its blessing to bring in

---

[2]   The Court is not ruling on the lawfulness of the initial horizontal restraint in the Collaboration Agreement. Instead, the Undersigned is merely noting the parties' shared view that the agreement was lawful at its inception.

Banner. [*Id.*, ¶ 26]. On October 29, 2012, Patheon went ahead and signed the Stock Purchase Agreement to acquire Banner without Procaps' approval. [*Id.*].

By the beginning of November 2012, after further thought, Procaps believed that it could not continue performing under the Agreement because it believed the Collaboration had become an illegal horizontal restraint on trade. [ECF No. 333, ¶ 15]. At the same time, some Patheon executives also believed that Banner's acquisition was problematic. [ECF No. 335, ¶¶ 32-33]. In particular, they believed it created a conflict of interest for Patheon because both Banner and Procaps were engaged in the manufacture and sale of prescription softgels. [*Id.*].

The parties met in November 2012 to try and work out a solution to continue working together. [ECF No. 333, ¶ 16]. But this "strategic relationship" was, for all intents and purposes, over. Patheon suggested a few ways where all three entities could work together. [ECF No. 396, ¶ 14]. Procaps rejected all of Patheon's suggestions and offered none. [*Id.*]. Instead, Procaps focused on getting Patheon to pay it to leave the Collaboration Agreement or to divest Banner. [ECF No. 333, ¶ 20]. Patheon was not willing to do either.

After the November 2012 discussion failed to produce a resolution, some Procaps' executives predicted, in email correspondence, that if Procaps filed a lawsuit to interfere with the Banner acquisition, then Patheon would be willing to settle and pay Procaps to leave the Collaboration Agreement. [ECF No. 333, ¶ 20]. On December

10, 2012, before the acquisition closed, Procaps filed its complaint. [ECF No. 1]. Procaps did *not* challenge Patheon's acquisition of Banner as violating any antitrust laws. Rather, Procaps claimed that the parties were *not* competitors before the Collaboration Agreement, but that the acquisition would **transform** them into competitors. According to Procaps, this would in turn transform the Collaboration Agreement's allocation into an unlawful horizontal restraint on trade.

In the lawsuit, Procaps sought to "terminate" the Collaboration and "enjoin" the acquisition on the grounds that the acquisition transformed the Collaboration into a *per se* unlawful horizontal allocation in violation of Section 1 of the Sherman Act. [ECF No. 1]. Procaps immediately stopped participating in the Collaboration. [*Exs.* 22-23].

After its initial dismissal motion was denied, Patheon moved for summary judgment. One of its primary arguments was that Procaps failed to establish the requisite agreement to establish a violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. Patheon argued that despite Procaps being a party to the Collaboration Agreement, there was no *agreement* to unlawfully and unreasonably restrain trade because Procaps neither agreed to the activity which it says created the unreasonable restraint -- the Banner acquisition -- nor participated in Patheon's attempted allocation post-acquisition.

In other words, Patheon's argument was that the Collaboration Agreement is not, standing alone, sufficient to constitute the requisite agreement under Section 1.

Rather, Procaps must have agreed to participate in the activities which Procaps contends made the Collaboration Agreement illegal. And, as Patheon points out, Procaps never agreed to do that. Consequently, Patheon contended, there is no concerted action; there is only **unilateral** action -- its own.

But, according to Procaps, the Collaboration Agreement itself satisfies Section 1's agreement requirement. Procaps argued that under the Agreement, Patheon has the right to control Procaps' participation in the Field and Territory. Although that agreement was originally lawful, Procaps argued, it became unlawful after the Banner acquisition because now Patheon could control Procaps' and Banner's participation in the Field and Territory. Further, Procaps argued that there is no requirement for a Section 1 violation that it subjectively agree or acquiesce to the post-acquisition illegal activities under the Collaboration Agreement.

The Undersigned was not convinced by Patheon's argument in its initial summary judgment motion and rejected the defense theory that it was entitled to summary judgment on the ground that Procaps failed to establish concerted action. [ECF No. 565]. Patheon has not abandoned that argument, however. Therefore, if Procaps were to appeal this summary judgment order, then Patheon would not be foreclosed from again asserting its theory that only its own unilateral action (i.e., not an agreement required for a Section 1 violation) was involved in the purported unlawful restraint. *Thompkins v. Lil' Joe Records, Inc.*, 476 F.3d 1294, 1302 (11th Cir.), *cert. denied,*

552 U.S. 1022, 128 S.Ct. 613 (2007) (reviewing court can affirm summary judgment on any legal ground, regardless of the grounds addressed and relied upon by the lower court). *See generally Nat'l R.R. Passenger Corp. v. Rountree Transp. and Rigging Co.,* 286 F.3d 1233, 1263 (11th Cir. 2002) (appellate court may affirm ruling below "as long as the judgment entered is correct on any legal ground regardless of the grounds addressed, adopted or rejected by the district court").

**The restraint, the alleged actual detrimental effects, and the relevant markets:**

According to Procaps, the alleged restraint is a "contractual obligation, pursuant to the Collaboration Agreement, to remove the Banner assets from the relevant markets for the duration of the Collaboration." [ECF No. 822, p. 3]. The alleged detrimental effects on competition are "the simultaneous removal of the Banner assets from the relevant markets and the Patheon/Procaps Collaboration ceasing to compete in the relevant markets" [ECF No. 822, p. 3], which Procaps refined (in its opposition to the summary judgment motion) by alleging that the effects were, not "the elimination of a competitor" but the fact that in a "market division agreement, 'a source of supply is removed from the market.'" [ECF No. 931, p. 23, n. 9].

In order to avoid providing discovery about markets, Procaps agreed to Patheon's "uncontested" and "unassailable" market definition if it had to proceed under the rule of reason. [ECF No. 565, p. 37 & n. 8]:

(1) contract development and manufacturing of prescription softgels for sale in the U.S., and (2) contract development and manufacturing of non-

prescription softgels for sale in the U.S. by the ten buyers specified in an amendment to the parties' Collaboration Agreement.

[*Ex. 25*, p. 4].[3] According to Procaps' Response to Patheon's New Interrogatories, Banner's market share in the relevant markets was 6%; the Collaboration's market share was nearly 0%. [ECF No. 661-1, pp. 9-10; *Ex. 26*, pp. 66-67].

The relevant *product* markets *include* development and manufacturing services for certain products that were *excluded* from the Collaboration. [ECF No. 889, p. 10; *Ex. 1*, §1.8]. The *geographic* relevant markets are *narrower* because they only cover the U.S. [*Ex. 1*, §§ 1.9, 1.22]. Like the Collaboration, the relevant markets exclude "proprietary products." [*Ex. 38*, ¶¶ 105, 140, 144].[4] "Proprietary products" are a party's "own products" [*Id.*], meaning drugs "whose formulation is owned exclusively by an individual or business."[5]

**Post-Complaint:**

After the acquisition closed, Patheon continued to offer manufacturing opportunities to Procaps, but Procaps rejected them. [ECF No. 565, p. 10].

---

[3]    In the earlier order on summary judgment motions, the Court noted that "Procaps' ability to effectively pursue the case under the rule of reason approach using Patheon's unassailable market definitions is beyond the scope of this Order." [ECF No. 565, n.8]. Exhibit 25 to Patheon's summary judgment motion is found at ECF No. 886-7.

[4]    Exhibit 38 is the expert report of Patheon's expert, Jonathan Baker ("Baker").

[5]    *Proprietary Product*, Jonas:  Mosby's Dictionary of Complementary & Alternative Med., http://medical-dictionary.thefreedictionary.com/proprietary+product (visited Oct. 4, 2015).

Patheon appointed David Hamby ("Hamby"), its vice president of business services, to serve as the "Gatekeeper" who was charged with the responsibility to implement the Agreement's market allocation requirements. [ECF No. 521, ¶ 37]. Hamby would evaluate each opportunity as it came in and determine whether it went to the Collaboration or to Patheon/Banner. If the opportunity was within the Collaboration, "it went to Procaps." [*Id.*].

According to Procaps, the Banner acquisition put it in an untenable position. Procaps refused to participate in the allocation procedure and told Gatekeeper Hamby that it believed doing so would violate the antitrust laws. Procaps informed Patheon that it was not terminating the Agreement, but it demanded that Patheon fix the problem its acquisition of Banner had created. [ECF No. 519-1, ¶ 16]. Under the Agreement, Patheon had six months to either to divest Banner or bring the newly-acquired Banner assets lawfully into the Collaboration. [*Ex.* 1 § 10.4(b)]. It did neither. [ECF No. 519-1, ¶¶ 14, 17; *Ex.* 85 at 163]. Instead, at the end of the cure period, in July 2013, Patheon terminated the Agreement, thereby ending the Collaboration and its P-Gels offering.

Procaps contends that Patheon's acquisition of Banner, coupled with the Agreement's exclusive manufacturing provision that allocated markets and customers to Procaps, deprived customers in the relevant markets of the ability to use Patheon/Banner, because the Banner assets were required to be withdrawn. [*Ex.* 104 at

9-16]. Procaps also alleges that Patheon's Banner acquisition also deprived customers of the ability to purchase P-Gels since Procaps would not accept business opportunities it believed were being allocated to it in violation of the antitrust laws. [*Id.* at 16-22].

For purposes of this case, the relevant geographic market is the United States and the relevant product markets are (1) contract development and manufacturing of prescription softgels for sale in the U.S., and (2) contract development and manufacturing of non-prescription softgels for sale in the U.S. by the ten buyers specified in an amendment to the parties' Collaboration Agreement. [ECF No. 565 at 37; *Ex.* 104 at 31].

Concerning its own alleged injury, Procaps contended, in its Response to Patheon's New Interrogatories and its Revised Responses to those same interrogatories [ECF Nos. 661-1, p. 11; 811-5, p. 13] that it was "foreclosed from the relevant markets" after "Patheon's acquisition of Banner" and that "Procaps was substantially foreclosed from competing in the Markets as of December 12, 201[2]." After Patheon learned that Procaps was still competing (at least to an extent) in the relevant markets, Procaps took the position, in its opposition [ECF No. 931, pp. 34-35] to Patheon's second summary judgment motion, that "complete exclusion is not required" and that it was "effectively shut out" of the relevant markets."

## **Procaps' Efforts to Demonstrate Relevant Factual Disputes**

Procaps' opposition [ECF No. 931] to Patheon's second summary judgment motion includes arguments challenging Patheon's claim that no relevant factual disputes exist to preclude summary judgment. The Court will outline the parties' positions concerning the significant purported disputes (and will reference the specific numbered paragraph number):

Paragraph 2. Patheon contends that the Collaboration did not go well, but Procaps disputes this description (even though its own expert, Blair, explained in deposition testimony that it was "not very successful"). From the Undersigned's perspective, it is not particularly significant whether an expert or a fact witness used one adjective or a different adjective to portray the results of the Collaboration. Instead, the actual facts and the actual results are what matter. There is no dispute that the parties won only two contracts totaling approximately $123,000.00 in revenue in one year.

Paragraph 3. Patheon notes that Procaps initially recognized the potential efficiencies in the Collaboration resulting from the Banner acquisition. Procaps does not exactly dispute that its executives discussed competition-enhancing opportunities arising from a Banner acquisition into the collaboration. But its opposition memorandum says, in the title of a paragraph-by-paragraph review, that this particular paragraph (i.e., Patheon's numbered paragraph 3 in its statement of undisputed facts) is

"disputed." The Undersigned does not agree. The salient point here is that Procaps *initially* analyzed the news about the Banner acquisition, at least in part, in a favorable light, including the notion that "access" to Banner's technologies would be "certainly a gain for [Procaps]."[6]

Paragraph 5. Procaps does not dispute that Banner had only a 6% market share in the relevant markets.  It contends that market share is "irrelevant to this case but it also contends that Patheon "expected" Banner to have a 20-25% share in softgel prescription market by 2015. [ECF No. 931, p. 6].

Paragraphs 7 and 8. Procaps disputes Patheon's representation, as an undisputed fact, that Procaps' efforts to compete in the relevant markets following Patheon's acquisition of Banner involved six projects which will generate at least $2 million. Procaps does not challenge its involvement in the six projects, but it contends that they are outside the relevant markets. Procaps concedes that it has or shortly will generate $306,000.00 in revenues from non-excluded business opportunities in the relevant markets since Patheon terminated the Agreement in 2013.

Patheon contends that this $306,000.00 in revenue is sufficient to generate grounds to grant its summary judgment motion because it shows Procaps was not

---

[6]     In the earlier Order on the competing summary judgment motions, the Court noted that "Procaps began to analyze the pros and cons of integrating Banner" and "had some initial predictions that procompetitive benefits would result from integrating the Banner assets." That Order also noted that Procaps "never gave Patheon its blessing to bring in Banner." [ECF No. 565].

"completely foreclosed" from participating in the relevant markets. Procaps challenges the "completely foreclosed" legal theory and the Undersigned will address this dispute over the applicable law later, in the legal analysis section on antitrust injury. For now, the discussion concerns the so-called factual dispute over the contracts (above and beyond the $306,000.00 which Procaps admits) and whether they are in the relevant markets.

Paragraph 9. Patheon contends that it did **not** remove the Banner assets from the relevant markets. It agrees that it allocated the Banner assets initially by first offering opportunities arising after the Banner acquisition closed to Procaps, but it suggests that it later analyzed the opportunities on a case by case basis "and used its business judgment to pursue the ones that made business sense." To support this purported undisputed fact, Patheon relies on the declaration of Gatekeeper Hamby. But Procaps argues that Hamby's declaration is conclusory and contradicts his prior testimony. In addition, Procaps emphasizes that (1) Hamby did not identify any specific opportunity which Patheon then supposedly pursued and (2) Patheon did not in discovery identify any target customer for a proposal after Procaps rejected the opportunity.

The Court is unable to conclusively determine that there is no factual dispute concerning the removal of the Banner assets, and it will conduct the relevant antitrust analysis by acknowledging a factual dispute and by assuming that Procaps' factual interpretation is actually the correct one -- i.e., that Patheon **did** in fact remove the

Banner assets from the relevant markets for seven months, until it terminated the Collaboration Agreement in July 2013. Therefore, Procaps cannot complain about the existence of a factual dispute because this Order is based on *Procaps'* version of the facts concerning Patheon's removal of the Banner assets. The Undersigned is inferring that the facts are actually the way Procaps portrays them --  that the Banner assets were removed for seven months.

Paragraphs 12 and 13. Procaps disputes Patheon's contention that Procaps has not demonstrated any actual anticompetitive effects arising from the restraint (i.e., the removal of the Banner assets for seven months). But, as it turns out, this is not actually a **factual** dispute. Instead, it is merely wrangling over the significance of undisputed facts and which legal standard is used to evaluate those facts (i.e., may Procaps use general economic principles, assumptions and predictions, instead of specific empirical evidence?).

In its Court-ordered Supplemental Response to Patheon's New Interrogatories [ECF No. 811-5], Procaps advised that it "will establish the element of anticompetitive effect by showing that Patheon's behavior had an actual, detrimental effect on competition in the relevant markets defined by Patheon's expert economist and adopted by Procaps." It also represented that it "will not attempt to establish an interference of a potential for genuine adverse effects on competition based on present

or projected market shares of Patheon/Banner or the present and projected market shares of any other competitor in the Market."

In these same interrogatory answers, Procaps represented that it "does not have such an individualized accounting" and therefore could not provide a "customer-by-customer accounting of competitive harm."

In addition, Procaps further explained that it would prove its case through "well-established economic principles" but "cannot quantify the adverse impact on price or price levels flowing from the restraint[.]"

Similarly, in its opposition [ECF No. 931] to Patheon's summary judgment motion, Procaps "agree[d] that it has not presented an individualized accounting of specific transactions." Procaps attributes this omission to its argument "that it is not possible to quantify the specific competitive harm on a customer-by-customer basis." Procaps' response provided additional clarification of its position: "Moreover, although transaction-specific details do not themselves demonstrate an increase in price, reduction in output, or reduction in quality from the withdrawal of Banner's assets, those are not the only indicia of competitive harm." Therefore, Procaps says, "standard economic principles **predict** that the elimination of a competitor is inherently anticompetitive. It leads to higher prices, lower quality, reduced services and reduced innovation." (emphasis supplied).

These points all mirror the explanation that Procaps provided in a memorandum it filed with the Court in May 2015 [ECF No. 709], when it represented that its anticipated expert testimony would be that the so-called disruption of the proper functioning of the price and output setting mechanism (1) would be "based on well-established economic principles" and (2) "inevitably, predictably and inexorably led to adverse price and output effects as compared to the 'but for' world."

Procaps "does not dispute that it does not have quantitative evidence that any customer paid a measurably higher price for softgels as a result of the market allocation" and agrees that its expert "did not perform an empirical study or state in his report that there was empirically measurable evidence of higher prices, lower quality, poorer service or lower quantities." Thus, Procaps "does not dispute" that its expert "did not measure the magnitude of anticompetitive effects."

Therefore, Procaps does not dispute that it lacks empirical evidence.  It contends that other types of evidence, such as its expert's predictions, based on general economic principles, are sufficient. But this dispute -- over what type of evidence must be presented by an antitrust plaintiff required to demonstrate actual anticompetitive effects -- is a **legal** dispute.

Paragraph 17. Procaps challenges Patheon's view that the Banner acquisition allowed Patheon to implement efficiencies, including efforts to compete more aggressively in the relevant markets. For example, Patheon points to record evidence

demonstrating that it reduced the costs of manufacturing softgels at the former Banner facilities, which lowers prices. Procaps' position -- that a factual dispute exists -- is that "none of the purported efficiencies flow from the restraint or relate to competition in the relevant markets."

Patheon says the procompetitive effects or justifications need not arise from the restraint and that the issue is resolved by seeing if the benefit or justification was created after the restraint (i.e., performing an evaluation of the "but for world"). But, similar to its position that there is a factual dispute about actual effects, Procaps' so-called factual dispute is actually a legal dispute over which efficiencies can be considered. In other words, its point (that the efficiencies which Patheon points to do not flow from the restraint) is largely a legal-type argument about *whether* those efficiencies and justifications may even be considered. Once the correct standard is determined (i.e., that the efficiencies and justifications must relate to the challenged restraint), then, as discussed later, there is a factual dispute about whether there are in fact acceptable justifications for the restraint.

## III.   <u>The Summary Judgment Standard</u>

The Court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When "the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for

trial.'" *Scott v. Harris*, 550 U.S. 372, 380 (2007) (citation omitted). If the movant establishes the absence of a genuine issue, the non-movant must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

For issues on which the opposing party will have the burden of proof at trial, the movant can prevail by merely pointing out that there is an absence of evidence to support the non-movant's case. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). Therefore, if Procaps, as the non-moving party, fails to make a sufficient showing on an essential element of its antitrust claim, then summary judgment for Patheon is warranted.

"By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986) (emphasis in original). "As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* at 248. Likewise, a dispute about a material fact is a "genuine" issue only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

The non-movant cannot defeat summary judgment by: (a) "rest[ing] upon mere allegations or denials"; (b) "simply saying the facts are in dispute"; or (c) relying on "evidence that is merely colorable or not significantly probative." *Woolsey v. Town of Hillsboro Beach*, 541 F. App'x 917, 919 (11th Cir. 2013); *Latele Television, C.A. v. Telemundo Commc'ns Grp., LLC*, 2014 WL 7272974, at *7 (S.D. Fla. Dec. 18, 2014); *Fields v. Gorman*, 2010 WL 3769396, at *3 (S.D. Fla. Sept. 3, 2010). "Rhetoric and attorney argument are no substitute for record evidence." *Latele*, 2014 WL 7272974, at *7.

To the contrary, the opposing party has a duty to present affirmative evidence in order to defeat a properly supported summary judgment motion. *Anderson*, 477 U.S. at 252. Indeed, "Rule 56 mandates the entry of summary judgment, upon motion, against a party who fails to make a showing sufficient to establish an element essential to his case on which he bears the burden of proof at trial." *Schechter v. Ga. State Univ.*, 341 F. App'x 560, 562 (11th Cir. 2009). A mere "scintilla" of evidence in favor of the non-moving party, or evidence that is merely colorable or not significantly probative is not enough to defeat a properly supported summary judgment motion. *Id.; see also Mayfield v. Patterson Pump Co.*, 101 F.3d 1371, 1376 (11th Cir. 1996) (conclusory allegations and conjecture cannot be the basis for denying summary judgment).

Courts regularly grant summary judgment in antitrust cases, including those concerning alleged horizontal market allocations. *Hilton v. Children's Hosp.-San Diego*, No. 02-CV-1080, 2007 WL 935724, at *5-6 (S.D. Cal. Mar. 7, 2007) (granting summary

judgment to defendant when plaintiff, a radiologist who was denied certain privileges at a hospital, failed to demonstrate injury to competition because he failed to provide evidence showing an antitrust injury but instead asked the Court "to **speculate** about a **potential** antitrust injury") (emphasis added), *aff'd*, 315 F. App'x 607 (9th Cir. 2008); *In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 914, 920-22 (9th Cir. 2015) (affirming summary judgment to defendants because online DVD-rental subscribers did not make a sufficient showing that they suffered antitrust injury in fact from promotion agreement); *Metro Indus. v. Sammi Corp.*, 82 F.3d 839, 841-44 (9th Cir. 1996) (affirming summary judgment for defendants under rule of reason analysis in case alleging horizontal market division "between competitors at the same market level");[7] *Petri v. Va. Bd. of Med.*, No. 1:13-cv-01486, 2014 WL 6772478 (E.D. Va. Dec. 1, 2014) (granting summary judgment because plaintiff chiropractor did not establish that pricing in the market was altered or that other chiropractors failed to join, or left, the market because of the actions by the Virginia Board of Medicine, which allegedly allocated the service markets to medical doctors and to have excluded chiropractors).

---

[7]     In *Metro*, the alleged horizontal market division was not a "garden variety horizontal division," so the Court applied the rule of reason rather than a *per se* analysis. 82 F.3d at 841-44.

## IV.   Antitrust Principles and Legal Analysis

### Rule of Reason & Sliding Scale

Procaps must show an agreement that unreasonably restrains trade and prove that it has suffered an antitrust injury. *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 334 (1990); *Todorov v. DCH Healthcare Auth.*, 921 F.2d 1438, 1455-56 (11th Cir. 1991). It must also "prove: '(1) an anticompetitive effect of the defendant's conduct on the relevant market, and (2)[8] that the conduct has no procompetitive benefit or justification.'" [ECF No. 565, p. 37] (quoting *Levine v. Cent. Fla. Med. Affiliates, Inc.*, 72 F.3d 1538, 1551 (11th Cir. 1996)).

The Undersigned previously (in the Order on the earlier summary judgment motions) determined that the rule of reason mode of antitrust analysis applies to this case. [ECF No. 565].

The Supreme Court provided the classic articulation of the rule of reason in *Bd. of Trade of City of Chicago v. United States*:  "[T]he court [or factfinder] must ordinarily consider the facts peculiar to the business to which the restraint is applied; its condition before and after the restraint was imposed; the nature of the restraint and its effect, actual or probable."  246 U.S. 231, 238 (1918). The ultimate question is whether the

---

[8]    This second factor is the source of a significant legal dispute between the parties. Indeed, the dispute is so significant that the Undersigned will devote a separate section to discussing it.

restraint, in the end, "promotes competition or whether it is such as may suppress or even destroy competition." *Id.*

The Supreme Court's cases over the past 35 years not only move away from rigid application of the *per se* rule, but also demonstrate a trend away from a "full blown" rule of reason in favor of a more-tailored approach of "meet for the case." *See NCAA v. Bd. of Regents*, 468 U.S. 85, 109 n. 39 & 110 (1984) (rule of reason can sometimes be applied "in the twinkling of an eye" and need not require detailed market analysis); *Cal. Dental Ass'n v. FTC*, 526 U.S. 756, 781 (1999) (rule of reason is continuum to be applied in a manner "meet for the case, looking to the circumstances, details, and logic of a restraint"); *FTC v. Actavis, Inc.*, 133 S.Ct. 2223, 2237–38 (2013) ("there is **always** something of a sliding scale in appraising reasonableness" and "the quality of proof required should vary with the circumstances") (emphasis added).

Although Patheon's counsel asserted at the summary judgment hearing (and again in its proposed order [ECF No. 992-1]) that the sliding scale does not apply to this case [ECF No. 990, p. 196], the Court disagrees. In its prior order, this Court quoted several of the Supreme Court statements cited above [ECF No. 565, pp. 4, 25, 26], and the Court will follow the Supreme Court's instruction to ascertain the quality of proof required under the particular circumstances. *See generally Polygram Holding, Inc. v. FTC*, 416 F.3d 29, 35 (D.C. Cir. 2005) (noting that the courts have "backed away from any reliance upon fixed categories and toward a continuum").

Therefore, the Court will take the circumstances, details, and logic of the restraint into consideration in deciding the contours of the rule of reason and the sufficiency of the evidence. The sliding scale nature of the rule of reason requires as much. *See also Continental T.V., Inc. v. GTE Sylvania, Inc.,* 433 U.S. 36, 49 (1977) (under the rule of reason, "the factfinder weighs all of the circumstances of a case in deciding whether a restrictive practice should be prohibited as imposing an unreasonable restraint on competition").

But the use of a sliding scale approach does not mean that the Court will ignore applicable law imposing substantive requirements for the type of claim Procaps has opted to pursue.

Citing *Jacobs v. Tempur-Pedic, Inc.,* 626 F.3d 1327, 1334 (11th Cir. 2010), Procaps argues [ECF No. 931, p. 2] that "horizontal market division agreements . . . *virtually always stifle competition.*" (emphasis by Procaps in its opposition memorandum). But this suggests that the restraint here should be condemned under a *per se* rule, as opposed to being assessed under a sliding scale rule of reason methodology. The Court has previously determined that the rule of reason would be used, and recent United States Supreme Court cases confirm the wisdom of a flexible, case-specific approach. *See, e.g., Actavis,* 133 S.Ct. at 2235-36 (market allocation judged under the rule of reason); *Texaco, Inc. v. Dagher,* 547 U.S. 1, 4-8 (2006) (price setting by two oil companies operating in a joint venture evaluated under the rule of reason).

**Actual Detrimental Effects**

There are two ways to prove an "anticompetitive effect": (1) "an actual detrimental effect" ("Prong 1"); or (2) "the potential for genuine adverse effects" ("Prong 2"). *Levine*, 72 F.3d at 1151-52. To prove Prong 2, plaintiff must prove market power and link it to competitive harm in the market. *Jacobs*, 626 F.3d at 1338-40.

Patheon argues that Procaps cannot establish market power because the total market share (of Banner) is at most 6%. *Retina Assocs., P.A. v. S. Baptist Hosp. of Fla., Inc.*, 105 F.3d 1376, 1384 (11th Cir. 1997) ("fifteen percent . . . [is] insufficient, as a matter of law, to establish market power" in a horizontal market restraint case); *Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*, 792 F.2d 210, 229 (D.C. Cir. 1986) ("Atlas has 6% or less of the relevant market, far too little to make even conceivable an adverse effect upon output."). But regardless of whether Procaps could establish market power, the significant point is that it is undoubtedly proceeding under Prong 1 [ECF No. 710], which requires that it prove actual detrimental effects -- and that market power is not part of its direct case.[9] In fact, Procaps represented in writing to the Court that it was bound by its decision to proceed solely under a Prong 1 actual effects methodology.

---

[9]    A plaintiff like Procaps who proceeds under a Prong 1 actual harm alternative must, of course, "identify the relevant market in which the harm occurs." *Jacobs*, 626 F.3d at 1336. The parties here have agreed on the relevant geographic and product markets.

## Proving Detrimental Effects: What *Type* of Evidence is Required?

The parties disagree about the type of proof which Procaps must submit in order to demonstrate the actual detrimental effects required by Prong 1 of the *Levine* standard. Basically, Procaps contends that well-established economic principles about markets and how they function are adequate. Patheon disputes this, arguing that empirical data is required, not assumptions and not predictions.

In an earlier Order [ECF No. 710] denying Patheon's motion [ECF No. 710] for an Order requiring Procaps to show cause why it has not complied with an Order that it file a formal binding notice on how it intends to prove anticompetitive effects, the Court noted that Procaps' position "may be fatal or significantly damaging to its case." The Order further pointed out that Procaps "might not be able to sustain its burden to prove anticompetitive effects" using its approach and that "[t]ime (and the inevitable further legal briefing) will tell."

Time has now passed, and it must be determined, as a matter of law, whether Procaps may establish actual detrimental effects through principles and theories and assumptions, rather than with actual empirical data of specific injury to competition in the applicable geographic and product market.

Patheon contends that Procaps must present evidence of "'specific damage done to consumers' in the market" such as an actual "reduction of output, increase in price, or deterioration in quality." *Jacobs*, 626 F.3d at 1339 (quoting *Spanish Broad. Sys. Of Fla.,*

*Inc. v. Clear Channel Commc'ns, Inc.*, 376 F.3d 1065, 1072 (11th Cir. 2004); *Levine*, 72 F.3d at 1551-52). According to Patheon, the actual adverse effect must have *actually happened* (*e.g.*, output or quality went down, or price went up). *Jacobs*, 626 F.3d at 1339 (dismissing case for failure to allege actual adverse effect where plaintiff never established that the restraint "artificially raised prices"); *Levine*, 72 F.3d at 1551-52 (granting summary judgment where no actual adverse effects existed, because plaintiff failed to show restraint led to "rising fees").

According to Patheon, predictions based "on general economic theory" or "academic suppositions" on what could or would happen are not evidence of actual adverse effects.  *Mil. Servs. Realty, Inc. v. Realty Consultants of Va., Ltd.*, 823 F.2d 829, 832 (4th Cir. 1987) (granting summary judgment where expert "based his conclusion on general economic theory and did not conduct any . . . studies . . . to determine the actual effect the appellees had on competition"); *R.C. Dick Geothermal Corp. v. Thermogenics, Inc.*, 619 F. Supp. 441, 460-61 (N.D. Cal. 1985) (rejecting Section 1 claim of actual effects where plaintiff relied on "academic suppositions" and "a theoretical hypothesis" and "provided no evidence . . . to support this theory of price effect"), *aff'd*, 890 F.2d 139 (9th Cir. 1989); *Tops Mkts., Inc. v. Quality Mkts., Inc.*, 142 F.3d 90, 96 (2d Cir. 1998) (evidence of "*potentially* higher prices" without proof that "prices were *actually* higher" insufficient to show an actual harm); *Roy B. Taylor Sales, Inc. v. Hollymatic Corp.*, 28 F.3d 1379, 1385 (5th Cir. 1994) ("speculation about anticompetitive effects is not enough.").

Thus, Patheon concludes, actual detrimental effects cannot be proved with evidence of "inherent[]" effects. *Spanish Broad.*, 376 F.3d at 1072-73.

Under Patheon's view of the applicable law, to prove actual detrimental effects (*i.e.*, "specific damage" to consumers), there must be "sufficient 'empirical demonstration concerning the [adverse] effect of the [defendants'] arrangement on price or quality.'" *K.M.B. Warehouse Distribs. v. Walker Mfg. Co.*, ("*KMB*"), 61 F.3d 123, 128 (2d Cir. 1995) (brackets in original) (affirming summary judgment) (quoting *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 30 & n.49 (1984)). When a plaintiff fails to empirically demonstrate the alleged decrease in output, increase in price, or decrease in quality, Patheon emphasizes, courts grant summary judgment for defendant.[10]

Patheon relies on *Levine*, where a doctor brought a Section 1 claim against defendants based on a suspension of privileges at a hospital and denial of membership in a preferred provider organization. 72 F.3d at 1544. In that case, the Eleventh Circuit affirmed the summary judgment ruling in defendant's favor, concluding there was no genuine issue of material fact about plaintiff failing to establish "actual detrimental

---

[10]     Patheon cites *Minn. Ass'n of Nurse Anesthetists v. Unity Hosp.*, 208 F.3d 655, 662 (8th Cir. 2000) (plaintiff failed to provide "concrete evidence" of "increased prices for anesthesia services, or a decline in either the quality or quantity of such services"); *Coca-Cola Co. v. Omni Pac. Co., Inc.*, No. 3:98-CV-0784, 2000 WL 33194867, at *7 (N.D. Cal. Sept. 27, 2000) (plaintiff "did not quantify or otherwise demonstrate the level of impact" or show "how substantial this 'adverse impact' has been"); *see also Viazis v. Am. Ass'n of Orthodontists*, 314 F.3d 758, 766 (5th Cir. 2002) (affirming judgment as a matter of law because plaintiff "failed to present data demonstrating the anticompetitive effects" and "[i]n the absence of such data, he has not carried his burden to demonstrate that the restrictions have a net anticompetitive effect").

effects." *Id*. at 1551-52. The alleged actual detrimental effect was "rising fees" for various medical products and services. *Id*. at 1546, 1551-52. Plaintiff's "evidence" of those fees was defendant's Master Payor Rate Schedules, which were not sufficient to show an actual effect because they were not the fees actually "**charged**" in transactions. *Id*. at 1551-52 (emphasis added). So, Patheon notes about the facts in *Levine*, because the necessary data was lacking, "the actual fees cannot be calculated." *Id.* Thus, plaintiff failed to show that "provider fees have risen" so there were no actual adverse effects as a matter of law. *Id.*

Patheon also relies on *Jacobs*, where this Circuit affirmed a motion to dismiss an actual effects claim because the complaint failed to "establish[] the competitive level above which [defendant's] allegedly anticompetitive conduct artificially raised prices." 626 F.3d at 1339. In addition, Patheon points to the remand decision in *California Dental,* where the Ninth Circuit found no anticompetitive effect where plaintiff did not show "relevant data from the precise market at issue." 224 F.3d at 957.

Patheon's  view of the remand in *California Dental* is supported by *Viazis v. Am. Ass'n of Orthodontists*, 314 F.3d 758, 766 (5th Cir. 2002) ("The [Ninth Circuit on remand] noted that the Federal Trade Commission had failed to prove actual harm by presenting relevant data from the precise market at issue."). After evaluating plaintiff's "empirical evidence," the Court ruled that plaintiff failed to show an anticompetitive effect because

it had "never **quantified** any increase in price or reduction in output of dental services resulting from" the restraint. *Cal. Dental*, 224 F.3d at 957 (emphasis added).

On the other hand, Procaps cites *FTC v. Indiana Federation of Dentists,* 476 U.S. 447 (1986),[11] for the proposition that, to prove actual adverse effects, it does not have to show "measurable evidence of price increase" but, instead, needs to show only that the restraint was "likely enough to disrupt" the "price setting mechanism of the market[.]" [ECF No. 931, pp. 19-20].

Regardless of the Supreme Court's use of "likely enough," courts evaluating a plaintiff's Prong 1 case in the 30 years since *IFD* do not seem to overtly hold that predictive-type evidence (i.e., a result is "likely" to occur) is permissible and could be sufficient proof, nor do they unequivocally and expressly mandate "empirical" or "quantitative" evidence. Instead, they typically tend to discuss the actual facts and the types of evidence and then conclude whether the actual evidence is sufficient (though they sometimes explain why evidence is lacking, such as a plaintiff's undue reliance on predictions).

Patheon contends that *IFD* is distinguishable, and it urges the Court to not be swayed by the Supreme Court's use of the phrase "common sense and economic

---

[11]      Referred to hereafter as "*IFD*" or "*Indiana Federation.*"

theory" (and to not interpret the language as a signal that empirical evidence is not required).[12]

In *IFD*, there were specific transactions where dentists submitted claim forms to insurance companies to get reimbursement for dental services on behalf of insured patients. 476 U.S. at 449-51. A group of dentists formed a federation that issued a rule forbidding its members from submitting patient x-rays with claim forms. *Id*. at 451. The federation's actions led to almost a complete reduction of the output of x-rays by a "heavy majorit[y]" of dentists "over a period of years," such that insurers were "actually unable to obtain compliance with their requests for submission of x-rays." *Id*. at 460. The FTC found the rule to be an unreasonable restraint and the federation sought judicial review.

The Supreme Court addressed two modes of analysis under the rule of reason. Its primary holding "formed the basis for what has come to be called the abbreviated or 'quick-look' analysis under the rule of reason." *Cal. Dental*, 526 U.S. at 769-70. The FTC had "reasonably relied" on "common sense and economic theory" to satisfy its burden under the quick look form of analysis by showing the restraint was "likely enough to

---

[12]     In *IFD*, the Supreme Court commented about the FTC's finding that individual dentists would have been subject to market forces of competition, creating incentives for them to comply with the requests of their patients' third-party insurers in the absence of concerted behavior: it noted that the finding "finds support not only in common sense and economic theory, upon both of which the FTC may reasonably rely, but also in record documents[.]" 476 U.S. at 456.

disrupt the proper functioning of the price-setting mechanism of the market[.]" *IFD*, 476

U.S. at 456, 461-62 (citing *Nat'l Soc'y of Prof'l Eng'rs v. United States*, 435 U.S. 679 (1978)).[13]

Indeed, in its proposed order on its *own motion* for partial summary judgment, Procaps

itself relied on *IFD* as an example of the "quick look analysis." [ECF No. 506-1, p. 8].

    *IFD* contained a four-sentence alternative holding that, "even if" the restraint

was not "naked," and the "quick-look" did *not* apply, plaintiff would still have

prevailed under a non-truncated rule of reason approach because it proved an "actual

detrimental effect." *Id*. at 460-61; *see also Realcomp II, Ltd. v. FTC*, 635 F.3d 815, 828 (6th

Cir. 2011) ("Although the policy at issue in *Indiana Federation* was initially afforded

abbreviated treatment, the Supreme Court **also** analyzed the restriction as if it were not

sufficiently 'naked.'") (emphasis added).

    The "actual detrimental effect" was the actual, almost 100% reduction in the

output of x-rays, as insurers were "actually unable to obtain" the x-rays they sought

from the dentists as part of the transactions to reimburse dentists for their services to

insured patients. *IFD*, 476 U.S. at 460; *see Reazin*, 899 F.2d at 968 & n.24 (the "Court

agreed that ample evidence supported the finding that actual detrimental effects had

been proven, because 'in two localities . . . Federation dentists constituted heavy

majorities of the practicing dentists and . . . as a result of the efforts of the Federation,

insurers in those areas were, over a period of years, *actually unable* to obtain compliance

---

[13]    *National Society* is a quick look case. *Cal. Dental*, 526 U.S. at 770.

with their requests for submission of x rays.'"); *Viazis*, 182 F. Supp. 2d at 573 (*IFD* "viewed the factual record as facially showing . . . output in the relevant market actually being reduced"); *First Data Merch. Servs. Corp. v. Securitymetrics, Inc.*, No. RDB-12-2568, 2015 U.S. Dist. LEXIS 126490, at *32-34 & n.21 (D. Md. Sept. 22, 2015) (*IFD* was "a case involving reduced output"); ABA, *Antitrust Law Developments* 69 (7th ed. 2012) ("The Court viewed [the restraint] as an actual reduction in output").

Patheon contends that the Court's references to "common sense and economic theory" -- and its holding that the restraint is "likely enough" to disrupt the market -- applied only to its quick-look analysis, and other cases support this view. *Cal. Dental*, 526 U.S. at 770 (the conduct *IFD* deemed "likely enough" to harm competition was condemned under a quick look analysis); *Realcomp*, 635 F.3d at 827-28 (in a non-truncated case, merely showing that a restraint is "likely enough to disrupt the . . . price-setting mechanism" is not enough to prove an actual detrimental effect); *United States v. Brown Univ.*, 5 F.3d 658, 673 (3d Cir. 1993) (citing *IFD*'s "likely enough" language to support quick look analysis). This language was ***not*** in the four-sentence alternative holding on actual detrimental effects, and it does not describe the evidence necessary to prove actual adverse effects in a non-truncated case.[14] This lawsuit, of course, is now a non-truncated case, proceeding under a rule of reason approach.

---

[14]   If "theory" and "likely" effects prove actual effects, then there would have been no need for the Court to separately and alternatively consider actual effects (*i.e.*, the x ray output). *IFD*, 476 U.S. at 460-61. The same is true in *Realcomp*, where the court found

*IFD* demonstrates how *market power* (typically reserved for Prong 2 case analysis) can impact what must be shown in an actual effects (Prong 1) case. The *IFD* Court focused on market power and the fact that the federation consisted of 100% and 67% of the marketplace in two specific locales. As the court in *Viazis* noted, "the Supreme Court viewed the factual record as facially showing the Indiana dentists with market power, output in the relevant market actually being reduced, and costs likely having been increased. In other words, it was **obvious** that when almost 100% of the dentists were engaged in the effort to prevent insurance companies from receiving the cost analysis x-rays they had specifically desired, output and price in the relevant market were impacted." 182 F. Supp. 2d 552, 573 (E.D. Tx. 2001) (emphasis added).

In essence, because of the sheer strength of the defendant's market power, the *IFD* Court could give a "quick look" to the situation and deem it an "obvious" anticompetitive effect, because no matter the restraint, when an organization controls 100% or 67% of a market, that restraint will effect output in that market by sheer market presence alone. No such obvious results are present here, however, and Procaps has not demonstrated that market power is sufficient to trigger a quick look approach.

Based on the Undersigned's review of the applicable law and a careful reading of *IFD*, there appears to be significant support for the view that the actual detrimental

_____

the restraint was similar to that in *IFD*, and therefore "likely enough" to disrupt the competitive process, but still *separately* analyzed whether the restraint resulted in actual adverse effects.  635 F.3d at 828, 832-34.

effect must be a result which has in fact already **happened**, as opposed to a result which is speculative, hypothetical, likely, inherent or one having potential to create damage. *See Coca-Cola Co. v. Omni Pac. Co., Inc.*, No. 3:98-cv-0784, 2000 WL 33194867, at *6-8, (despite expert testimony "that [defendants'] policy has had an adverse impact upon competition," the court granted summary judgment because plaintiff still "failed to introduce sufficient evidence to create an issue of material fact that TCCC's policy has had a substantial impact on the relevant market."). *See also Mil. Servs. Realty, Inc.*, 823 F.2d at 832 (the court granted summary judgment for defendant where the expert "based his conclusion on general economic theory and did not conduct any . . . studies . . . to determine the actual effect the appellees had on competition," which meant that plaintiff did not meet its burden because the expert's "affidavit does not contain any factual predicate for its theoretical conclusion").

In fact, the cases cited by Patheon are a powerful indication that predictions and general theories are insufficient. For example, in *Roy B. Taylor Sales, Inc.*, , the Fifth Circuit referred to *Jefferson Parish*, noting that **"[s]peculation** about anticompetitive effects is **not enough**. Taylor had to show that the tie 'as it actually operated[d] in the market' harmed competition." 28 F.3d 1379, 1385 (emphasis added) (citing *Jefferson Parish*, 466 U.S. at 30). Likewise, in *KMB*, the Court held that to prove actual detrimental effects (i.e., "specific damage" to consumers), there must be "sufficient '**empirical** demonstration concerning the [adverse] effect of the [defendants'] arrangement on price

or quality.'" 61 F.3d at 128 (brackets in original but emphasis supplied) (affirming summary judgment) (quoting *Jefferson Parish*, 466 U.S. at 30 & n.49).

To provide yet another illustration, the plaintiff in *Flegel v. Christian Hosp., Ne.-Nw.*, 4 F.3d 682, 684, 688-89 (8th Cir. 1993) alleged that exclusion from a hospital was a sufficient detrimental effect. The Eighth Circuit rejected plaintiff's argument that "the presence of expert testimony by two economists suffices to survive summary judgment," holding that this is "only true **if** the experts' testimony would allow a finding of **actual detrimental effects** to competition." *Id.* at 688-89 & n.6. Because the expert testimony "addresses only the **possibility** that the hospital services market . . . is not competitive," it was insufficient to show "actual detrimental effects to competition." *Id.* (emphasis added).

Additional post-*IFD* authority further supports the view that predictions and speculation and possible effects are insufficient to show the required actual detrimental effects. *See McLaughlin Equip. Co. v. Servaas*, No. IP98-0127-c-t/k, 2004 WL 1629603, at *29 (S.D. Ind. Feb. 18, 2004) ("Plaintiff's expert testified only that McLaughlin's termination as a Carpenter dealership *may* have resulted in increased prices, and she has **no evidence** that they **did in fact** increase. Such testimony, even from an expert, is insufficient to establish an adverse effect on competition and avoid summary judgment") (emphasis supplied); *Virgin Atlantic Airways Ltd. v. British Airways PLC*, 257 F.3d 256, 264 (2d Cir. 2001) ("**expert testimony rooted in hypothetical assumptions**

**cannot substitute for actual market data**") (emphasis added); *Tops Mkts., Inc.*, 142 F.3d

at 96 (evidence of "**potentially** higher prices" without proof that "prices were **actually**

higher" is insufficient to show an actual harm) (emphasis supplied).

Given the abundance of case law rejecting general theories or speculation as

sufficient to establish actual detrimental effects, it is readily apparent that *IFD* is a fact-

specific case involving substantial market power -- and that its use of "likely" and

"common sense" does not eliminate Procaps' obligation to demonstrate the actual

anticompetitive effects required in a Prong 1 approach with empirical evidence of

events which have actually already occurred.

## Did Procaps Meet its Burden?

## Permissible Types of Evidence

Because Procaps cannot rely on general antitrust principles or assumptions about

inherent consequences to predict the adverse effects it needs to establish under the

prong it selected for its sole approach to establishing anticompetitive conduct, the Court

concludes that Procaps has not met its burden and that Patheon is entitled to summary

judgment.

Procaps failed to establish that any "specific damage done to consumers," such

as an actual "reduction of output, increase in price, or deterioration in quality," actually

happened (as opposed to a prediction that it would happen). *Jacobs*, 626 F.3d at 1339. It

offered no **evidence** that: (a) any customer's price in fact increased and, if it did, how

much it increased; (b) output in the relevant markets in fact decreased and, if it did, how much it decreased; or (c) the quality of softgels actually decreased.

In its opposition memorandum, Procaps admits that its expert, Blair, "did not perform an empirical study" or find "empirically measurable evidence of higher prices, lower quality, poorer services, or lower quantities." [ECF No. 931, p. 13]. Procaps has not introduced evidence showing a single transaction (*i.e.*, a contract for services signed by a customer) in the relevant markets which would sufficiently prove an argument that a customer was harmed. And it "agrees that it has not presented an individual accounting of specific transactions" and in fact claims that "it is not possible to quantify the specific competitive harm on a customer-by-customer basis." [ECF No. 931, p. 12].

But Procaps did not quantify the actual competitive harm on *any* basis with any actual empirical evidence. Moreover, Blair was unaware of any transactions where a customer was harmed, or any transaction where a customer could have been harmed. [ECF No. 889, ¶ 12; *Ex. 51*, pp. 176, 189].[15]

Blair's expert report [ECF No. 936] is bottomed on predictions, not specific evidence. For example, in paragraph 56 of his report, he opines as follows: "the removal

---

[15]    In his deposition, Blair was asked about "the seven-month period where it's alleged that the Banner assets were out of the market." He was asked if he was "aware of any deals in the relevant market that were actually negotiated to conclusion in that seven-month period," and he said, "not specifically, no." Later in the deposition, he was asked if "there would have been an actual adverse effect in the seven months if no contracts were signed in that seven-month period of time." His answer: "not necessarily, no."

of a major source of supply such as Banner reduced the competitive pressure on the other potential suppliers. This reduced competitive pressure **likely** resulted in more favorable terms to the winning bidder." (emphasis added). Similarly, in paragraph 85, he noted that "an observer with a rudimentary understanding of economics would recognize that the elimination of competition between market participants is inherently anticompetitive. As I explained previously, standard economic principles **predict** even in a competitively structured market, the exclusion of a participant will cause price to rise and output to fall."  And in paragraph 94, he underscored the predictive nature of his opinion by explaining that "standard economic principles **predict** that the elimination of a competitor is **inherently** anticompetitive," which "**leads** to higher prices, lower quantity, lower quality, reduced services and reduced innovation." (emphasis added).

Thus, Blair has no *actual* empirical *evidence* of detrimental effects to support his theory that the removal of assets "likely resulted in more favorable terms to the winning bidder." What he has instead is a belief that principles apparently recognizable by persons with a basic economic education predict that certain types of behavior should inherently generate anticompetitive results.

Procaps bases its case (and its summary judgment opposition) on what economic theory predicts should happen, not what actually *did happen*. Quoting the opinion of its expert, Procaps' opposition memorandum claims that "standard economic principles

*predict* . . . the exclusion of a participant will cause price to rise and output to fall" and its effects are based on "predictable anticompetitive consequences." [ECF No. 931, pp. 12-13] (emphasis added).

And in its rule of reason memorandum[16] [ECF No. 822, p. 8], Procaps argues the removal of a single competitor, regardless of market share, "preempt[s] the normal working and proper functioning of [the relevant] markets and disrupt[s] their price, quality, and output-setting mechanisms." It also submitted an illustration from its expert's report on what "likely" occurred in the relevant markets in theoretical graphs "not drawn to scale". [*See Ex.* 71]. Its other expert, David Heyens, contends that, "if Banner was not competing . . . in the relevant markets, this *would have* created a power shift from the purchaser to the seller" and "*would have* affected how Catalent and the other sellers marketed, negotiated, and priced their products in the relevant markets." [ECF No. 811-4, ¶¶ 28-30] (emphasis added).

Similarly, Procaps urges, in its rule of reason memorandum, that it "equally can satisfy its burden by demonstrating that other indicia of competition, including non-price terms of contracts, **likely** have been impaired by the restraint." (emphasis added). [ECF No. 822, p. 8].

---

[16]    The Undersigned required [ECF No. 778] the parties to submit their suggested protocol for the rule of reason analysis if they could not agree on a methodology. The parties could not agree, and each submitted a comprehensive memorandum on the suggested legal framework. [*See* ECF Nos. 822 (Procaps' submission); 823 (Patheon's submission)].

Procaps' predictions (i.e., certain events "would have" occurred or were "likely" to have occurred), theories and graphs might be relevant to a *potential effects* (Prong 2) approach because they concern what might happen, but they cannot be used to determine what *actually* happened.[17] Procaps is, for all practical purposes, referring to the potential *ability* to influence the market (market power) -- not whether the conduct *did* in fact influence it. [*Exs.* 73, pp. 130-31, 145-46; 81, p. 150 (Blair testifying that market power is the ability to influence competitive conditions)].

Market power evidence and arguments relate to a *potential* effects approach (Prong 2), not actual effects (under Prong 1). *Spanish Broad.*, 376 F.3d at 1073-74 (Prong 2 requires that "defendants possessed power in [the relevant] market" and how that market power "would be likely to harm competition"); *Jacobs*, 626 F.3d at 1339-40 (same). At the risk of stating the obvious and repeating the reality of this case, Procaps is not proceeding on a Prong 2 potential effects case, and it has unequivocally urged that market power is not relevant (a position it took in order to avoid providing discovery about market power). In fact, Procaps represented [ECF No. 709, p. 2] that its interrogatory answers "did expressly advise that it is **not** pursuing a theory that

---

[17]    They show theoretical price and output effects, not actual ones. Indeed, the graphs are "illustrative" only, contain no numbers, and are "not drawn to scale." [*See Ex.* 71, ¶¶ 49-56].

    In *Spanish Broadcasting,* the Eleventh Circuit explained how evidence that behavior was "likely to harm competition" is relevant in a Prong 2 "potential effects" case once market power has been established. 376 F.3d at 1072-74 and n.9. But this is not a prong 2 case.

requires **market power."** (emphasis added). And it similarly made clear that it was not proceeding under a theory of proving "potential adverse effects through evidence of a surrogate: market power." *Id.* (emphasis added).

Procaps contends that it may "satisfy its initial burden through the use of expert evidence." [ECF No. 822, p. 8, n. 4]. To be sure, an antitrust plaintiff proceeding under a Prong 1 actual effects approach could meet its burden through expert witness testimony -- if the opinions are based on actual evidence, rather than speculative predictions.

Reviewing cases where courts conclude that expert testimony *is* sufficient is helpful to determining whether the expert opinions offered here by Procaps are sufficient. In *Realcomp*, for example, plaintiff's expert conducted "[t]hree quantitative analyses," including a "time-series analysis" demonstrating an actual 50% decline in listings; a "benchmark study" on other factors that could have caused the decline; and "ten statistical-regression analyses to evaluate the effects of different factors." This was deemed "substantial evidence" of actual anticompetitive effects. 635 F.3d at 831-34. In *American Needle, Inc. v. New Orleans La. Saints,* to provide another illustration, plaintiffs offered evidence that, after the restraint, (a) "prices of licensed hats rose by a significant degree while output of those items dropped" and (b) "higher prices and lower output continued for years, never returning to their pre-exclusivity levels." No. 04-cv-7806, 2014 WL 1364022, at *2 (N.D. Ill. April 7, 2014).

In contrast to these cases involving specific evidence and expert testimony based on empirical data, courts confronting speculative expert testimony in actual effects cases do not hesitate to grant summary judgment to defendants when a plaintiff's expert's opinion is too predictive and not sufficiently based on data.

For example, in *Flegel*, plaintiff alleged actual detrimental effects based on its exclusion from a hospital. 4 F.3d at 684, 688-89. Affirming a defense summary judgment, the Eighth Circuit rejected plaintiff's argument that "the presence of expert testimony by two economists suffices to survive summary judgment," holding that this is "only true **if** the experts' testimony would allow a finding of actual detrimental effects to competition." *Id.* at 688-89 & n.6 (emphasis added). Because the expert testimony there "addresse[d] only the *possibility* that the hospital services market . . . is not competitive," it was insufficient to show "actual detrimental effects to competition." *Id.* (emphasis added).

Similarly, in *Coca-Cola*, despite expert testimony "that [the counterclaim defendant's] policy has had an adverse impact upon competition," the court granted summary judgment for the counterclaim defendant because the expert "did not quantify or otherwise demonstrate the level of impact [the counterclaim defendant's] policy has had" or "provide specific information on how substantial this 'adverse impact' has been," and thus "failed to introduce sufficient evidence to create an issue of

material fact that [the counterclaim defendant's] policy has had a substantial impact on the relevant market." 2000 WL 33194867, at *6-8.

In the same vein, the court in *McLaughlin* rejected speculative expert testimony:

Plaintiff's expert testified only that McLaughlin's termination as a Carpenter dealership *may* have resulted in increased prices, and she has no evidence that they *did* in fact increase. Such testimony, **even from an expert,** is insufficient to establish an **adverse effect** on competition and avoid summary judgment. (emphasis supplied).

2004 WL 1629603, at *29 (emphasis supplied).

In *Realty*, the Fourth Circuit affirmed summary judgment for the defendants under a rule of reason analysis where an "expert based his conclusion on **general economic theory** and **did not conduct any market surveys or other studies** of the relevant market to determine the actual effect the appellees had on competition." 823 F.2d at 832 (emphasis added).

Expert testimony is not a panacea for a failure to demonstrate actual adverse effects with evidence of events, rather than predictions based on assumptions. This conclusion about the limitations on expert testimony is not limited to antitrust claims, of course. *See generally Alphamed Pharmaceuticals Corp. v. Arriva Pharmaceuticals, Inc.,* 432 F. Supp. 2d 1319, 1352 (S.D. Fla. 2006), *aff'd* 294 F. App'x 501 (11th Cir. 2008) (granting defendant's post-trial motion for judgment as a matter of law -- which prevented plaintiff from recovering a $78 million jury award -- and rejecting the plaintiff's expert witness testimony because "an opinion has a significance proportioned to the sources

that sustain it" and plaintiff did not "offer sufficient proof of the **assumptions"** used by the expert "as the foundation for his opinion") (emphasis supplied).

Confronted with Patheon's summary judgment motion and the point that it failed to submit empirical data and actual evidence to establish actual detrimental effects, Procaps argues that "it is not possible to quantify the specific competitive harm on a customer-by-customer basis." And it argues that its two experts, Baker and Heyens, "agree that no such accounting is possible in these markets." [ECF No. 931, p. 12].

This impossibility argument is not persuasive. First, it ignores the cases where a plaintiff does submit sufficient evidence of actual detrimental effects and overcomes a summary judgment motion. *Laumann v. National Hockey League,* 56 F. Supp. 3d 280, 297-98 (S.D.N.Y. 2014) (denying defendants' four summary judgment motions and noting that plaintiffs carried their initial burden of showing an actual impact on competition).

Second, Procaps overlooks the all-important point that it *chose t*o proceed under a Prong 1 approach.

Third, it glosses over the reality that "because proof that the concerted action actually caused anticompetitive effects is often **impossible** to sustain, proof of the defendant's market power will suffice." *U.S. Horticultural Supply v. Scotts Co.,* 367 F. App'x 305, 309 (3d Cir. 2010) (emphasis added). The mere fact that proof for a Prong 1 case is usually difficult, if not impossible, to establish in a specific case does not mean

that the legal requirements are vitiated. Instead, this reality often leads to a scenario where a plaintiff chooses to use a Prong 2 case because a Prong 1 case would be impossible to prove. Or it may mean that a plaintiff fails to provide the necessary proof in the typically-difficult Prong 1 case. Alternatively, it could mean that a plaintiff, recognizing the challenging standards, obtains the necessary empirical data.

And fourth, it ignores the reality that if a plaintiff could prove actual detrimental effects with experts providing opinions based on inherent tendencies and evidence-free general principles, then few plaintiffs, if any, would ever try to prove a Prong 2 potential effects case because proving detrimental effects would be easy. *See also Gordon v Lewistown Hosp.*, 423 F.3d 184, 210 (3d Cir. 2005) (affirming summary judgment for defendant hospital in antitrust lawsuit brought by eye surgeon whose staff privileges had been revoked and noting that proof of anticompetitive effects "is often impossible to sustain").

Finally, Procaps fails to address the practical point that it voluntarily decided to not pursue a claim in arbitration for breach of contract or other claims required to be arbitrated because it chose instead to pursue a federal antitrust claim. Not every wrong committed in a business setting (even if committed in bad faith) which involves a restraint generates an antitrust claim with its potential for treble damages. *Levine*, 72 F.3d at 1545 ("not every agreement that restrains competition will violate the Sherman Act").

### Procaps' "Market *Presence*" Theory

In its opposition, Procaps argues about a concept it calls "market presence," and it says its case "is a 'market presence' case, not a 'market power' case." [ECF No. 931, p. 28]. Apparently, Procaps is suggesting that it can establish the constraining effects on competition that emanates from market power without having to prove the market share thresholds for a Prong 2 case, which requires a showing of market power.

But Procaps denied Patheon discovery on market power by binding itself to proceeding only under a Prong 1 actual detrimental effects case.

Procaps does not adequately define "market presence," nor does it sufficiently explain how market presence is different than market power. Moreover, its opposition memorandum frequently discusses market *power* type of evidence, *i.e.*, Banner was "the only significant constraint on Catalent"; Banner was "the key source of supply"; other competitors were "fringe players"; and the "markets are concentrated." [ECF No. 931, pp. 1, 14, 24, 30].

But Procaps conflates the relevant markets by referring to *all* softgels (*i.e.*, including proprietary products). Procaps never (1) defines a "market presence" case, (2) cites authority holding that "market presence" and "market power" are different concepts, or (3) pinpoints authority that allows Procaps to circumvent part (b) of a market power case by relying on "market presence." Nor does Procaps' market

presence label change the fact that it is seeking to use potential effects evidence that the law reserves for market power cases.

Rather, it offers market power proof:  market structure, market participants, and the strength of those participants, as **predictors** of anticompetitive effects.  *See generally U.S. Anchor Mfg. v. Rule Indus.*, 7 F.3d 986, 994 (11th Cir. 1993) (explaining essential elements of a claim alleging attempted monopolization under Section 2 of the Sherman Act).

Procaps' use of "constraint" and similar market structure type evidence is a proxy for market power.  *KMB,* 61 F.3d at 128 130 (explaining concept in section entitled "market power as a proxy for adverse effect"); *Spanish Broad.*, 376 F.3d at 1073 ("[P]laintiff seeking to use market power . . . must show . . . the inherent anticompetitive nature of the defendant's behavior or the structure of the interbrand market"); *Reazin,* 899 F.2d at 967 & n.23 ("[N]umber and strength of the defendant's competitors" and "the difficulty or ease of entry into the market by new competitors" is part of the market power inquiry.).  Blair conceded that his conclusions are based on "an analysis of the market structure . . . Catalent was the biggest player and . . . Banner provided a competitive check on Catalent . . . this is the kind of analysis . . . that's appropriate." [ECF No. 936; *Ex.* 2, pp. 152, 197-98, 211].

Assuming that there is a recognizable antitrust theory of a market presence case which is separate from a market power case (and Procaps has not demonstrated this),

the Court will not permit Procaps to avoid summary judgment with this theory because it avoided discovery on these very topics by avoiding a market power case and because it repeatedly and unequivocally represented that it was *not* pursuing a Prong 2 case. [ECF No. 807-2, pp. 4-6, 12-13].

### Absent Market Power, Removal of a Competitor is Not an Actual Adverse Effect

Procaps argues that the removal of Banner, the exclusion of Procaps, and/or the demise of the Collaboration is an actual anticompetitive effect.  But "damage to a single competitor . . . does not state a claim under Section One of the Sherman Act." *Spanish Broad.*, 376 F.3d at 1072; *NYNEX Corp. v. Discon, Inc.*, 525 U.S. 128, 139 (1998) ("[H]arm to [a firm] does not automatically show injury to competition."); *Weight-Rite Golf Corp. v. U.S. Golf Ass'n*, 766 F. Supp. 1104, 1111 (M.D. Fla. 1991) ("Evidence that a single competitor has been removed from a relevant product market, in and of itself, is insufficient to establish a violation of the rule of reason."), *aff'd*, 953 F.2d 651 (11th Cir. 1992); *Prods. Liab. Ins. Agency, Inc. v. Crum & Forster Ins. Cos.*, 682 F.2d 660, 663 (7th Cir. 1982) ("Now there is a sense in which eliminating even a single competitor reduces competition. But it is not the sense that is relevant in deciding whether the antitrust laws have been violated."); *McLaughlin*, 2004 WL 1629603, at *23, 28 (a plaintiff's "elimination from the market simply does not equate to reduced output"). "'[A]nticompetitive effects' are measured by their impact on the market rather than by their impact on competitors." *Spanish Broad.*, 376 F.3d at 1071.

Indeed, absent market power, the removal of a competitor does not establish competitive harm unless it is accompanied by proof of an actual adverse effect.[18] *Brookins v. Int'l Motor Contest Ass'n*, No. c96-134, 1998 WL 937242, at *4 (N.D. Iowa July 15, 1998) (courts hold "that the mere fact that a certain supplier is prevented from participating in the market does not of itself show an actual adverse effect.") (collecting cases); *Capital Imaging Assoc., P.C. v. Mohawk Valley Medical Assoc., Inc.*, 996 F.2d 537, 546 (2d Cir. 1993) (finding plaintiff's exclusion was not an "actual detrimental effect" because plaintiff failed to produce evidence showing higher prices or deterioration in quality); *Tops Mkts.*, 142 F.3d at 96 (mere fact that plaintiff was excluded does not "prove an adverse effect on competition as a whole").[19]

Procaps' argument conflicts with two well-settled lines of cases. *First*, it would eliminate the legal distinction between harm to a competitor and harm to **competition**. *Weight-Rite*, 766 F. Supp. at 1109-10 ("Plaintiffs must show injury to competition in [the] market[. S]howing merely injury to oneself as a competitor is insufficient."); *Brookins*, 1998 WL 937242, at *4 ("If a plaintiff could generate . . . injury to competition simply by

---

[18]    Procaps has not been completely eliminated as a competitor. It concedes its efforts to compete and acknowledges its success to date (i.e., $306,000.00). And Patheon contends that Procaps is actually involved in millions of dollars in additional contracts (a point Procaps disputes, but not because the contracts do not exist).

[19]    *See also Craftsmen*, where the court granted summary judgment because plaintiff lacked evidence of "actual, sustained adverse effects on competition of the type hypothesized." 491 F.3d at 391.

asserting that his less expensive or superior product was excluded . . . the distinction between injury to a competitor and injury to competition would be lost.").

*Second*, it would, for all practical purposes, render all horizontal mergers unlawful because, by definition, horizontal combinations remove an independent competitor. *Broad. Music, Inc. v. Columbia Broad. Sys., Inc.* ("*BMI*"), 441 U.S. 1, 23 (1979) ("Mergers among competitors eliminate competition."). This argument (and its extreme result), however, undermines the law, which does not automatically condemn as unlawful all horizontal mergers. *DOJ & FTC Horizontal Merger Guidelines* §§ 1, 9-10 (2010) (describing multiple circumstances under which horizontal mergers are lawful); *DOJ & FTC Antitrust Guidelines for Collaborations Among Competitors* 1 (2000) (same, with respect to horizontal collaboration agreements).[20]

### Alleged Elimination of Capacity or Supply

In its Opposition Memorandum [ECF No. 931, p. 23, n. 9], Procaps cryptically refers to a reduction of supply and lowering output. But it did not cite authority for this succinct contention that elimination of capacity is an actual detrimental effect. Nevertheless, the Court will discuss whether capacity was in fact eliminated.

Before the acquisition, the Collaboration competed with Banner. [ECF No. 635-6, pp. 24-25; *Ex.* 36, p. 171]. Thereafter, Procaps stopped participating in the Collaboration

---

[20]    Procaps argues that horizontal mergers are distinct from horizontal market allocations because they do not necessarily eliminate capacity [ECF No. 931, p. 23 n.9], but offers no authority for the proposition that all mergers are unlawful if they eliminate capacity.

and competed with Patheon. [ECF No. 889, ¶¶ 7-10]. Because the Collaboration was using Procaps' capacity, the capacity was not lost to the market when Procaps stopped participating in the Collaboration and started competing on its own. [*Id.*, ¶¶ 7-10, 16]. As shown below, Procaps continued to compete in the relevant markets after it decided to no longer participate in the Collaboration Agreement.

Procaps argues that the Collaboration could have been a more significant competitor than Procaps [ECF No. 931, p. 35], but those who make efforts to compete in a market, regardless of success, are competitors. *United States v. El Paso Nat. Gas Co.*, 376 U.S. 651, 661 (1964) ("Unsuccessful bidders are no less competitors than the successful one."); [ECF No. 565, p. 28]; *Polypore Int'l, Inc. v. FTC*, 686 F.3d 1208, 1214-15 (11th Cir. 2012) (firm was "an actual competitor" because, among other things, "[i]t had begun discussions with several companies").

### Loss of Customer Choice/Innovative Technology Theory

Patheon alleges that the *only* way that loss of consumer choice may be considered as an anticompetitive effect is in instances of complete monopoly or market power, but the Undersigned is not convinced that this is an accurate statement of the law.

Among other arguments, Patheon cites [ECF No. 992-1, p. 23, n. 14] to *Levine*, 72 F.3d at 1554, for its defense theory that "the mere elimination of choice 'does not rise to the level of an actual detrimental effect on competition.'" But the *Levine* court did not exactly say this. Instead, it explained that "a patient's inability to see Dr. Levine in the

Sand Lake Hospital ER when she asked for him did not rise to the level of an actual detrimental effect on competition." *Id.* Thus, the Eleventh Circuit did not conclude that this scenario involved an actual loss of choice. Instead, it effectively concluded that there was no loss of choice because "had the patient gone or been taken to (another hospital which has five locations), where Dr. Levine did have staff privileges, she would have been able to use Dr. Levine's services." *Id.*

Patheon has not cited applicable authority which conclusively and expressly rules out the use of loss of consumer choice as an anticompetitive effect when demonstrating an unreasonable restraint on trade in the absence of market power. Patheon cites to *Spanish Broadcasting* as a case that rejected a loss of consumer choice argument made by the plaintiff. 376 F.3d at 1072. But the argument made by the plaintiff in the section that Patheon cites to (which was rejected by the court) was that any damage suffered by the plaintiff *inherently* damages competition in the market because plaintiff was defendant's primary competitor. *Id.*

While the court, in rejecting this inapposite argument, did note that in the cases plaintiff used for support, "the defendants' anticompetitive practices achieved a complete monopoly in the relevant market, leaving consumers with no alternative[,]" this is different than concluding that loss of consumer choice *can never* be considered an actual effect. *Id.* (citing *Full Draw Productions v. Easton Sports, Inc.*, 182 F.3d 745 (10th Cir.

1999); *Caribbean Broadcasting System, Ltd. v. Cable & Wireless PLC*, 148 F.3d 1080 (D.C. Cir. 1998)).

Patheon also argues that *Jefferson Parish* bars the use of loss of consumer choice as an actual effect. 466 U.S. 2, 29-31 (1984). This is not completely convincing. To be sure, the Court deemed the record insufficient to show any actual effect on consumers when the "range of choice" among doctors was reduced from four to five. *Id.* at 30-31. But the Court *considered* the argument and it analyzed this potential adverse effect in the context of the case, noting "the range of alternatives open to the patient would be severely limited by the nature of the transaction and the hospital's unquestioned right to exercise some control over the identity and the number of doctors to whom it accords staff privileges." *Id.* at 30.

This analysis in *Jefferson Parish* evidences (1) that the Court recognized that loss of consumer choice is, if demonstrated with actual evidence, to be analyzed (as opposed to being outright rejected) in light of the circumstances in the case, and (2) that there must be demonstrable actual evidence of the actual effect. The Court found that "the record sheds little light on how this arrangement affected consumer demand for separate arrangements with a specific anesthesiologist[,]" and then ultimately concluded that "[w]ithout a showing of actual adverse effect on competition, respondent cannot make out a case under the antitrust laws, and no such showing has been made." *Id.* at 30-31. As a matter of evaluating the facts, the Court rejected the

argument, but at no point did the Court expressly and unequivocally state that a loss of choice argument could *never* prevail.

Patheon also points to *KMB,* claiming that the Second Circuit roundly rejected the loss of consumer choice argument in general. This, too, is an incorrect reading of the case. 61 F.3d 123, 128 (2d Cir. 1995). "KMB's proof on this point consists almost entirely of affidavits from twelve of its current customers stating that they prefer both Walker products and KMB's superior service. Such isolated statements of preference **are not a sufficient 'empirical demonstration** concerning the [adverse] effect of the [defendants'] arrangement on price or quality[.]'" *Id.* at 128. (quoting *Jefferson Parish*, 466 U.S. at 30 n. 49). Once again, this demonstrates that a plaintiff submitted insufficient proof, *not* a rejection of the loss of choice *concept* altogether.

However, concerning loss of consumer choice, *KMB* **does** demonstrate the uphill battle that a plaintiff faces when trying to prove actual detrimental effects. It is clear from that decision and *Jefferson Parish* that courts may *consider* the argument but still demand demonstrative, empirical evidence of a substantial effect on consumers and an impact on the market in order for a plaintiff to prevail.

Thus, while loss of consumer choice is not normally a prevailing argument, it does not appear to be *per se* barred as an actual anticompetitive effect for the Court to consider. *See generally Heart v. Virtua Health, Inc.,* No. 11-1290, 2015 WL 1321674, at *15 (D.N.J. March 24, 2015) (concerning "patient choice," the court assumed that many

more patients than those mentioned in the statement of facts were "pipelined" to another facility but observed that this alleged restriction on choice involved less than 2% of the market, and then concluded that the evidence alone was insufficient).

In order for loss of choice to be a sufficient actual detrimental effect, though, a Prong 1 antitrust plaintiff must show how the actual anticompetitive effects had an "impact on the **market** rather than by their impact on competitors." *Spanish Broad.*, 376 F.3d at 1072 (emphasis added).

So loss of choice could theoretically be evidence of actual adverse effects of the challenged restraint if the necessary impact on the market is also demonstrated, but Procaps has not submitted sufficient proof that this available theory actually manifested itself.

Procaps argues that the P-Gels product is a "truly innovative product" which could have a marketwide output detrimental effect if customers were deprived of supply. But the Undersigned recently denied [ECF No. 1019] Procaps' motion to supplement the summary judgment record [ECF No. 1006] with the transcript of a video interview that Patheon's Geoff Glass gave at an industry conference in late May 2012. In that interview, Glass quickly and succinctly described the softgel as a "very innovative technolog[y]" and a "really exciting offering." Procaps wanted to (belatedly) submit this transcript to bolster its argument that the P-Gels are a truly groundbreaking and innovative product. But this video was not produced in discovery and may well be

a marketing-type presentation arranged with the cooperation of a publicist, rather than being a legitimate interview with a completely independent reporter.

But *even if* Glass' comments in the proffered-but-rejected transcript were in the summary judgment record and *even if* Procaps established (and it hasn't) that the product was new and exciting, Procaps still has not submitted any empirical evidence to adequately support this new theory and to adequately establish the requisite anticompetitive actual detrimental effect.

In addition, this loss of choice argument is similar to, and morphs into, Procaps' elimination of technology argument, which is also unconvincing. In its opposition [ECF No. 931, pp. 21, 28], Procaps contends that the removal of the Collaboration's P-Gels technology is an actual detrimental effect. But Procaps is the entity which brought this technology to the Collaboration. When Patheon terminated the Collaboration, Procaps retained the rights to its technology and it continues to use that technology. [ECF No. 992-1, p. 26].

Procaps has market access because it continues to explore business opportunities with dozens of companies in the relevant market, made multiple presentations regarding its patented technology to showcase its capabilities and, in fact, generated sales. Moreover, its expert confirmed that Procaps did not lose any innovative technology. He also conceded that he found neither lower quality nor lower quantity. [*Ex.* 155, pp. 122, 126].

Moreover, even if Procaps could sufficiently prove that a customer was deprived of choice or could not obtain a purportedly new and desirable product, it did not demonstrate (with actual evidence of events which occurred) how this impacted the market. Moreover, even if it did, Procaps did not establish **substantial** market harm. Substantial market harm (or a standard similar to it) is required, as the Undersigned will discuss immediately below.

Patheon is entitled to summary judgment on the first of the four grounds.

### Did Procaps Need to Establish *Substantial* Market Harm (and, if so, did it)?

While "every commercial agreement restrains trade," *Nw. Wholesale Stationers v. Pacific Stationary & Printing Co.*, 472 U.S. 284, 289 (1985), only restraints causing *substantial* adverse effects on marketwide competition are cognizable under the federal antitrust laws. *United States v. Arnold, Schwinn & Co.*, 388 U.S. 365, 375 (1967) (the inquiry is whether the "effect upon competition in the marketplace is **substantially** adverse") (emphasis added). To "show a violation of the rule of reason, a plaintiff must show that the challenged conduct will **substantially** restrain competition in a relevant product market." *Weight-Rite Golf Assoc.*, 766 F. Supp. at 1109 (emphasis added). *See also L.A. Draper & Son v. Wheelabrator-Frye, Inc.*, 735 F. 2d 414, 422 (11th Cir. 1984) (plaintiff must prove "substantial impact" on the relevant market); *Levine*, 72 F.3d at 1553 (citing *L.A. Draper* for the rule that the "challenged anticompetitive actions" must have "substantial impact"); *Metro Indus., Inc. v. Sammi Corp.*, 82 F.3d 839, 847 (9th Cir. 1996)

(requiring, in sub-heading, plaintiff in horizontal market allocation case to prove a **"[s]ubstantial"** anticompetitive effect and then noting that a formal market analysis is unnecessary if plaintiff shows the restraint "actually produced **significant** anti-competitive effects").

Plaintiff must measure the magnitude of the actual adverse effects "by their impact on the market rather than by their impact on competitors" and show that they are felt "marketwide." *Spanish Broad.*, 376 F.3d at 1071, 1074-75 & n.5 (alleged conduct must injure "competition in the market as a whole" rather than "individual firms"); *see also Jacobs*, 626 F.3d at 1340 (requiring proof of "marketwide increased prices or reduced output").

But Procaps contests its need to now establish substantial marketwide harm, arguing instead that it is required to show only more than a *de minimis* effect and that the jury will later determine the magnitude of the injurious adverse effects. The Undersigned is not persuaded.

*Levine*, for example, quotes *L.A. Draper* for the concept that "[a]n antitrust plaintiff . . . makes out a *prima facie* case under the rule of reason only upon proof of a well-defined relevant market[21] upon which the challenged anticompetitive actions

---

[21]     This quoted sentence and the section of the analysis in *Levine* clearly relate to a market power/potential effects analysis, but there is no reason to believe that the potential effects of market power analysis in a Prong 2 approach (i.e., are they substantial?) would be governed by a standard different than the one used in an actual detrimental effects analysis in a Prong 1 actual effects assessment. While the *type* of

would have *substantial* impact." 72 F.3d at 1553 (emphasis added). Additionally, in *Graphic Prods. Dist., Inc. v. Itek Corp.*, the Eleventh Circuit noted similarly that "a plaintiff must first offer proof of 'a well-defined relevant market upon which the challenged anticompetitive actions would have had a **substantial** impact.'" 717 F.2d 1560, 1568 (11th Cir. 1983) (quoting *Cornwell Quality Tools Co. v. C.T.S. Co.*, 446 F.2d 825, 829 (9th Cir. 1971), *cert. denied*, 404 U.S. 1049 (1972) (emphasis added).

In contrast to this, Procaps proclaims that the effect must be only more than *de minimis*. Procaps tries to support this by discussing a subject alien to the substantive rule of reason analysis (see the below discussion on *McLain v. Real Estate Bd., Inc.*) and by pointing to cases where courts dismissed antitrust lawsuits for not providing *any* proof of effect or just proof of *de minimis* effect. *See H&B Equip. Co., Inc. v. Int'l Harvester Co.*, 577 F.2d 239, 241 (5th Cir. 1978) (no rule of reason violation in a vertical restraint case when elimination of a single distributor had only a *de minimis* effect on intrabrand commerce). *Cf. Rio Grande Royalty Co. v. Energy Transfer Partners, L.P.*, 786 F. Supp. 2d 1190, 1198 (S.D. Tex. 2009) (where the court states that the rule requires "that the alleged conduct had a substantial anticompetitive effect," but, without elaboration, in the following sentence, states: "To prevail on a Section 1 claim, a plaintiff must show that

---

proof may differ for each, a Court in each instance is trying to address the same question: whether the alleged restraint is unreasonable under the Sherman Act. *See Standard Oil Co. v. United States*, 221 U.S. 1 (1911).

the defendants (1) engaged in concerted action (2) that produced *some* anti-competitive effect (3) in the relevant market.") (emphasis added).

Procaps' rationale for the "more than *de minimis*" threshold for anticompetitive effect is unconvincing. Just because one court noted that a plaintiff had not even offered proof of a *de minimis* anticompetitive effect does not mean that the threshold is in fact that low. In the very paragraph cited by Procaps in *H&B*, the court contrasted plaintiff's case with another, stating that "[u]nlike the record in *Coleman Motor Co. v. Chrysler Corp.*, 525 F.2d 1338, 1347 (3d Cir. 1975), the evidence here does not contain **substantial** expert testimony that the manufacturer's dealers enjoyed a general shelter from competitive forces and all possessed discretion to raise their prices within a certain range and still make sales." (emphasis added). *H&B Equip. Co., Inc.*, 577 F.2d at 241. The explanation provided by the *H&B* court indicates a threshold burden far more stringent than "not-insubstantial" or "more than *de minimis*."

Concerning *Rio Grande*, an out-of-circuit, non-binding district court decision, there is no indication as to *why* that court seemingly lowered the burden from "substantial" to "some" anticompetitive effect in consecutive sentences. However, the Undersigned is not at all convinced that it was done in any intentionally meaningful way or that it should have any impact upon the present case. Moreover, even that court did not decide the case on that point (i.e., some v. substantial proof); it ruled based upon plaintiff's failure to present evidence of "concerted action" among the defendants.

Procaps next attempts to use inapposite case law about the Sherman Act's effect on commerce to show that substantial actually means "not insubstantial." *See McLain v. Real Estate Bd., Inc.*, 444 U.S. 232, 242-46 (1980). Although *McLain* and the other cases cited to by Procaps involve both the Sherman Act and the phrase "substantial effect," the context of the phrase's usage there is entirely different from the present context. Those cases concern the issue of federal jurisdiction, not the substance of the rule of reason analysis under the Act. *Id.* at 264 ("To *establish federal jurisdiction in this case*, there remains only the requirement that respondents' activities which allegedly have been infected by a price-fixing conspiracy be shown "as a matter of practical economics" to have a not insubstantial effect on the interstate commerce involved.") (emphasis supplied).

Procaps' stance on the "jury question" is puzzling, as such a position (in essence, disallowing a court from determining as a matter of law a pivotal issue in the case) is incompatible with the summary judgment standard. If a court is capable (based on the record at summary judgment) of determining that no reasonable finder of fact could find for plaintiff on a case-dispositive issue, then why would the law require the court to still put that issue to the jury? The *Graphic Products* court could not have been taking the position that substantiality can *only* be a jury question because that would be contrary to federal rules on summary judgment.

Procaps cites to footnote 20 in *Graphic Products* (717 F.2d at 1572 n. 20) for the proposition that substantiality is left for the jury and that the Court is somehow foreclosed from making any determination at summary judgment. However, the footnote cited makes no mention of any such concept. Naturally, *any factual question* is one for the finder of fact (i.e. the jury), but, even then, if the Court determines that no rational factfinder could ever reach a certain conclusion *as a matter of law*, then the Court may always rule on summary judgment. So, regardless of whether the effect must be "substantial," "not insubstantial," "genuine," "inherent," "significant," or "actual and sustained," the rules of summary judgment procedure prevail and a Court, in the appropriate circumstances, may always determine that no reasonable factfinder could reach a certain conclusion as a matter of law.

Moreover, the notion that a jury must determine whether the anticompetitive conduct generated substantial market harm is inconsistent with the ample authority in which summary judgment was entered. *See, e.g., Adaptive Power Solutions, LLC v. Hughes Missile Systems Co.,* 141 F.3d 947, 951-52 (9th Cir. 1998) (affirming summary judgment for defendant when plaintiff failed to demonstrate substantial anticompetitive actual effects).

Framed by the law requiring an antitrust plaintiff to establish substantial marketwide harm, the Court notes that Procaps' expert, Blair, provided answers which negate Procaps' ability to meet the substantiality standard:

68

He did not measure the magnitude of the anticompetitive effects. He could not categorically state that the anticompetitive effects are not very small because he did not know one way or the other. [*Ex.* 55, p. 89]. He admitted that his report did not say that the restraint caused higher prices in the market, did not say there was lower quality, did not say there was actual lower quantities, did not determine there were adverse effects in innovation, and did not determine that there were adverse effects relating to the requirements over the reservations of specific capacity for a specific customer. [*Ex.* 55, pp. 122-26].

Courts grant summary judgment where there is no genuine dispute of material fact that a plaintiff failed to demonstrate substantial anticompetitive actual effects. *Adaptive Power*, 141 F.3d 947 (summary judgment because plaintiff failed to show substantiality as a matter of law); *Metro Indus.*, 82 F.3d at 847 (same); *JetAway Aviation LLC v. Bd. of Cty. Comm'rs.*, No. 07-cv-02563, 2012 WL 1044304, at *4 (D. Colo. Mar. 28, 2012), *aff'd*, 754 F.3d 824 (10th Cir. 2014) (same); *Jame Fine Chems., Inc. v. Hi-Tech Phar. Co.*, No. 00-3545, 2007 WL 927976, at *5 (D.N.J. Mar. 27, 2007) (same); *Heart v. Virtua Health*, No. 11-1290, 2015 WL 1321674, at *11-16 (D.N.J. March 24, 2015) (same); *Coca-Cola*, 2000 WL 33194867, at *7 (summary judgment because plaintiff did not meet its burden of showing significant anticompetitive effects).

Here, there is no genuine factual dispute on substantiality because Procaps never measured the magnitude of the alleged effects on the relevant markets. Indeed, it

conceded it has "not presented an individualized accounting of . . . specific competitive harm on a customer-by-customer basis" and it has no "quantitative evidence that any customer paid a measurably higher price for softgels as a result of the market allocation." [ECF No. 931, ¶¶ 12-13]. Thus, it cannot, and does not, provide evidence of "marketwide" effects. [*Id*.].

And while Procaps argues that 17 customers were affected by Patheon's conduct, the Court rejects this argument because the documents it relies on show only certain customers interested in getting bids from Patheon or Patheon offering incoming Collaboration opportunities to Procaps -- not actual harm to these customers. [ECF No. 889, ¶ 12]. Procaps presents no evidence that these customers did not get a bid from Patheon or that they were harmed because opportunities first went to Procaps (*e.g.*, paid a higher price for softgels). So this dispute is not the type of factual dispute preventing summary judgment, because there is no substantive evidence to support Procaps' argument that the customers were affected in a way which would matter for the analysis.

Assuming that the customers were harmed in a meaningful way (and Procaps has not demonstrated this with competent evidence), this hypothetical alleged harm to such a small subset of customers could not be considered a *marketwide* anticompetitive effect as a matter of law. *KMB*, 61 F.3d at 128 (affirming defense summary judgment on Section 1; affidavits from 12 customers didn't prove actual harm because "isolated

statements of preference are" insufficient). Indeed, the *Heart* court held that the "Sherman Act was designed to prohibit significant restraints of trade," and rejected that plaintiff only had to "demonstrate that the effects are 'more than *de minimis*'" to prevail. 2015 WL 1321674, at *11-13. Impact on a "subset" of patients in the market was insufficient as a matter of law.  *Id.*, at *15.

The seven-month duration of the restraint is also far too short as a matter of law to create the required substantial marketwide harm of actual detrimental effects. The Sherman Act is concerned with conduct that has "long-run anticompetitive effects." *Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 767-68 (1984) (reversing Section 1 judgment). Restraints with short durations are "not significant enough" to have a substantial adverse effect. *Adaptive Power*, 141 F.3d at 951-52 (summary judgment granted; 4-10 month restraint too short as a matter of law to be a "substantial" anticompetitive effect); *JetAway Aviation,* 2012 WL 1044304, at *4 (same; 1 year); *Jame Fine,* 2007 WL927976, at *5 (same; 5-9 months).[22]

---

[22]    Procaps' claim (in its opposition memorandum) that, in *Adaptive Power*, the "number of suppliers remained the same" [ECF No. 931, p. 30], is incorrect because the court there assumed a "temporary decline in the number of competitors." 141 F.3d at 952. If anything, removing the competitor in *Adaptive Power* would have been more severe in that case because there were fewer competitors (3) than here (9+). In any event, the Court held that "any harmful effect on competition" was "at most, temporary." It also explained that "a temporary decline in the number of competitors" is "not significant enough to be classified as an injury to competition under the Sherman Act. *Id.*

Procaps fails to identify a single long-run actual adverse effect, relying only on an unmeasured and unquantified effect of short duration on a small subset of customers. Realizing that its concession that the restraint lasted only a "brief" period is detrimental to its case [ECF No 807-2, p. 12], it now argues that the Collaboration's entire contractual term (*i.e.*, 7 years into the future) should be considered, even though the <u>actual</u> alleged restraint lasted only 7 months. [ECF No. 931, pp. 28-31].

Procaps cites no authority for this argument [ECF No. 990, p. 168], nor does its argument make sense in an actual effects case where actual effects flowing from the actual restraint must be considered -- not a hypothetical that the restraint might have continued in the future (with hypothetical effects).[23]  Procaps does not challenge the fact that the actual restraint ended in July 2013, after seven months, when Patheon terminated the Agreement. [ECF Nos. 889, ¶¶ 10-11; 931, ¶¶ 10-11].  Although Patheon has recently advanced the argument that there never was a restraint because it claims the Banner assets were never removed, the Court is assessing the restraint as one lasting

---

*Adaptive Power* is also helpful to Patheon on another point. It held that "just as a **temporary** decline in the number of competitors is not a significant restraint of trade, neither is a related temporary decline in quantity, quality or efficiency." *Id.* (emphasis added).

[23]     Procaps contractually agreed that Patheon had six months to incorporate newly acquired assets and admits the Collaboration (which contained this six month incorporation period) was *procompetitive* at the time of its execution. Thus, Patheon argues that it logically follows that Patheon's offering of new opportunities to Procaps during this six-month period is also procompetitive.

seven months, in order to avoid a factual dispute over Patheon's argument that the Banner assets were *never* removed. But Procaps' position that the entire contract duration (i.e., an additional six years) should be considered is simply a *legal* argument which the Undersigned rejects. There is a dispute, but it is a legal one, not a factual one.

Although Procaps' expert, Blair, opined that the removal of the Banner assets for seven months was a "substantial anticompetitive effect," he has no dividing line between substantial and insubstantial effects, did not attempt to measure the effects and had not even thought about this issue. Given that Blair testified that he did not know whether the effects were very small, his substantiality opinion is not based on the type of data which courts recognize as sufficient.

Therefore, Procaps did not establish substantiality as a matter of law (*e.g.*, it never measured the magnitude of the supposed detrimental effects, so a factfinder could not, as a matter of law, find the requisite substantiality). As a result, Patheon is entitled to summary judgment on this ground as well.

**<u>Evaluating Procompetitive Benefits or Justifications</u>**

**<u>Determining Applicable Eleventh Circuit Law</u>**

Patheon contends that Eleventh Circuit law requires *Procaps* to prove that the restraint has *no* procompetitive benefit or justification. Procaps recognizes the Eleventh Circuit legal authority from which Patheon's position flows (*Levine* and other circuit cases citing it) but has several reasons why it believes the case law is wrong and not

binding. According to Procaps, it is the *defendant* who must prove the existence of procompetitive benefits in a Section 1 case (after a plaintiff meets its initial burden of showing anticompetitive results).

Therefore, Patheon and Procaps have diametrically opposed views about which party has the burden concerning procompetitive benefits. In order to understand Procaps' position and its multi-step effort to distinguish Eleventh Circuit law, the Undersigned will first discuss the Eleventh Circuit cases.

As expressly explained in the Eleventh Circuit's *Levine* decision, and as cited in my earlier summary judgment order [ECF No. 565, p. 37], the rule of reason analysis requires a **plaintiff** to prove "that the conduct has **no procompetitive benefit or justification**." 72 F.3d at 1551 (emphasis added). Many other post-*Levine* Eleventh Circuit cases have adopted this requirement. *Spanish Broad.*, 376 F.3d at 1071; *Retina*, 105 F.3d at 1383; *S. Card & Novelty, Inc. v. Lawson Mardon Label, Inc.*, 138 F.3d 869, 876 (11th Cir. 1998); *Seagood Trading Corp. v. Jerrico, Inc.*, 924 F.2d 1555, 1570 (11th Cir. 1991) (burden of proving "unjustified anticompetitive effect is on plaintiffs").

Moreover, although the 2013 Eleventh Circuit Pattern Jury Instructions no longer contain any specific antitrust jury instructions, the 2005 version did. Relying on *Levine* and *Seagood,* the earlier version (following the *Levine* rule) required that a plaintiff "must prove that . . . defendant's conduct had no justification or competitive benefit." So although that instruction is no longer in effect, it is not because the standard was

jettisoned or because the law changed. Instead, it is because **all** the antitrust instructions were effectively rescinded (as they are no longer in the current set of instructions).

Procaps makes several points about this pattern jury instruction factor:

First, it says that the Eleventh Circuit's *Levine* rule -- imposing on an antitrust plaintiff the burden of demonstrating an absence of procompetitive benefits -- is different "from every other circuit" and is "out of step with decisions of the Supreme Court, other Eleventh Circuit decisions[.]" [ECF Nos. 994-1, p. 35; 822, p. 15].

Second, it argues that Patheon's reliance on this statement from *Levine* is "misplaced" because the statement is "neither an accurate statement of the law in the Eleventh Circuit nor binding on this Court." [ECF No. 822, p. 14].

Third, in order to support its position that *Levine's* language is not the law, Procaps argues that the language is *dictum* because "it was unnecessary to the actual holding." [ECF No. 822, p. 14].

Fourth, it argues that other, post-*Levine* cases[24] quoting the *Levine* rule statement *also* involved dicta, for the same reason (i.e., the decisions affirmed the district court's conclusions that the plaintiffs never demonstrated an injury to competition in the first place, so there was no need for the court to determine who had the burden concerning procompetitive benefits and balancing).

---

[24]    *Spanish Broad.*, 376 F.3d at 1071; *Retina Assocs.*, 105 F.3d at 1383; *S. Card & Novelty, Inc.*, 138 F.3d 869; *Maris Distributing Co. v. Anheuser-Busch, Inc.*, 302 F. 3d 1207 (11th Cir. 2002).

Fifth, it argues that the *Levine* "dictum" is inconsistent with prior Eleventh Circuit precedent. Specifically, Procaps contends that prior law -- *Graphics Products*, 717 F.2d 1576 -- expressly rejected the proposition that an antitrust plaintiff must "conjure up every possible pro-competitive rationale for a . . . restraint and prove their inapplicability to the restraint in question" and deemed it to be "an insurmountable burden." [ECF No. 822, pp. 15-16]. Procaps notes that *Graphics Products* used a burden-shifting approach: after a plaintiff demonstrated the existence of anticompetitive effects, the defendant was free to come forward with a showing that the restraints were reasonably necessary to achieve legitimate, procompetitive purposes.

Because *Graphic Products* predated *Levine* and because *Levine* was merely a panel decision (not an *en banc* opinion), Procaps argues that *Graphic Products (*and not *Levine*) is the law governing the burden of proving or negating procompetitive effects. Thus, Procaps concludes that the prior precedent rule requires that the earlier decision (i.e., *Graphic Products*) controls, and it emphasizes that *Levine* never cited *Graphic Products.*

Sixth, Procaps notes that other, post-*Levine* cases[25] correctly state "that the burden of showing procompetitive benefits shifts to the defendant." [ECF No. 822, p. 16].

---

[25]     *Schering-Plough Corp. v. FTC*, 402 F.3d 1056 (11th Cir. 2005) and *McWane, Inc. v. FTC*, 783 F.3d 814 (11th Cir. 2015). Patheon distinguishes *McWane* on the ground that it is an inapplicable FTC enforcement action under Section 5 of the FTC Act and that the Eleventh Circuit's review is more deferential than a *de novo* review of a district court's legal rulings in a Sherman Act case. [ECF No. 992-1, p. 31]. *Schering-Plough* is also an FTC case.

Seventh, Procaps argues that the *Levine* rule (even though repeated, albeit allegedly in dictum by other Eleventh Circuit panels) is contrary to the logic of the rule of reason. Because the rule of reason analysis balances procompetitive effects against anticompetitive effects to determine whether a restraint unreasonably restrains trade, no balancing would ever be performed, Procaps says, if the only way a plaintiff can prevail is to show the absence of **all** procompetitive benefits.

Eighth, Procaps contends that leading antitrust commentators urge a burden-shifting approach which provides that "we look to the defendant, with its knowledge of its own situation, to identify the possible justifications for its conduct." [ECF No. 822, pp. 17-18].

Ninth, and finally, Procaps says there is "internal evidence in *Levine*" that the Eleventh Circuit "merely used *careless language* and did not intend to modify the burden of proving procompetitive effects." (emphasis added).

In response, Patheon repeats its position that the *Levine* rule is the law in the Eleventh Circuit. It further notes that *Graphic Products* would actually further undermine Procaps' case because "it requires market power to prevail in a rule of reason case." [ECF No. 958, p. 8, n. 11.] *Graphic Products* does require that a plaintiff attacking vertical restrictions establish the defendant's market power under a rule of reason analysis.

Although Procaps' arguments are hardly frivolous or substantively illogical on their face, the Undersigned is not prepared to boldly conclude that the *Levine* rule (cited by several later Eleventh Circuit panels and used for several years in this Circuit's standard jury instructions for antitrust cases) is dicta, produced by a panel approving sloppy language, and should be jettisoned.

Several reasons support my reticence to adopt the multi-step analysis required to adopt Procaps' request that I not follow *Levine.*

First, until fairly recently in this three-year-old case (filed in December 2012), Procaps itself cited *Levine* (and other cases citing it, such as *Spanish Broadcasting)* with approval. For example, in its May 6, 2015 response [ECF No. 709, pp. 1, 2] opposing Patheon's motion accusing it of failing to comply with a discovery order and in its response to Patheon's new interrogatories, which Procaps filed on May 6, 2015 [ECF No. 709-2], Procaps repeatedly relied on *Levine.* To be sure, it cited the case for its statement of the two available methods (i.e., Prongs) to prove anticompetitive behavior and did not expressly cite it for the rule requiring a plaintiff to disprove procompetitive benefits, but it never stated or even suggested that *Levine* was not good law.

Second, Procaps' argument requires the simultaneous conclusion that the few other Eleventh Circuit cases it cites *implicitly* overruled the *Levine* rule (because the cases mentioned by Procaps do not expressly say they are reversing, distinguishing or

modifying the *Levine* rule). Given that courts have frequently[26] cited *Levine* with approval, the Undersigned is not now going to conclude that a few cases *silently* abandoned the rule and adopted a contrary holding.

Third, the few cases Procaps relies upon for its argument that the Eleventh Circuit has somehow implicitly abandoned the *Levine* rule arose in a different context. *McWane, Inc. v. FTC* arose in an FTC enforcement action in which an administrative law judge found that McWane's actions constituted an illegal exclusive dealing policy used to maintain its monopoly power in the domestic ductile iron pipe fittings market. 783 F.3d 814 (11th Cir. 2015). The appellate court was tasked with deciding whether the FTC's factual and economic conclusions were supported by substantial evidence and whether its legal conclusions comported with governing law. In finding that they did, the Eleventh Circuit never mentioned the *Levine* rule (or the other cases adopting it).

*Schering-Plough* also arose in an FTC setting, where the Eleventh Circuit vacated the FTC's cease and desist order because it focused on the efficiency-enhancing objectives of a patent settlement. It did not, however, even mention the *Levine* rule that a plaintiff is required to demonstrate the absence of all procompetitive benefits. If it had

---

[26]     A Westlaw search of *Levine* run on October 20, 2015 reveals that *Levine* has 744 citing references. Of those, only 2 are listed as having given negative treatment. Those two cases are both non-binding district court opinions which do not actually criticize the applicable *Levine* rule being discussed here.  *Alabama Ambulance Service, Inc. v. City of Phenix City, Ala.,* 71 F. Supp. 2d 1188, 1192, n. 1 (M.D. Ala. 1999); *Corey Airport Services, Inc. v. City of Atlanta,* 632 F. Supp. 2d 1246, 1300 (N.D. Ga. 2008) (*citing Levine* for an antitrust standing issue). *Corey Airport* was reversed in part on other grounds in *Corey Airport Services, Inc., v. Decosta,* 587 F.3d 1280 (11th Cir. 2009).

followed *Levine*, then the result would have been the same, as the FTC did not, and could not, sustain that burden.

Moreover, the Court of Appeals did not actually balance anticompetitive effects against efficiencies in *McWane*. 783 F.3d 841-42. [Procaps' approach would require a balancing once it met its initial burden of demonstrating anticompetitive effects]. The *McWane* court did not engage in balancing because it determined that the procompetitive justifications were "merely pretextual." *Id.* at 842.

Fourth, Procaps' position would compel me to conclude that *all* of the other Eleventh Circuit cases citing *Levine* did so in dicta which should therefore be ignored. This is quite an undertaking, and the Undersigned is not prepared to conclusively determine that every Eleventh Circuit opinion which expressly invokes the *Levine* rule did so in pure dicta.

Fifth, Procaps is, in effect, requesting that the Undersigned ignore or deem insignificant the Eleventh Circuit pattern jury instructions which for several years followed the *Levine* rule. The pattern jury instructions are drafted by a committee of district judges appointed by the Chief Judge of the Circuit and adopted by resolution of the Judicial Council of the Eleventh Circuit. *United States v. Dohan*, 508 F.3d 989, 994 (11th Cir. 2007). While a "valuable resource," *United States v. Carter*, 776 F.3d 1309, 1324 (11th Cir. 2015), this Circuit's pattern jury instructions are "not binding law." *Id.* In that regard, the Resolution adopting the 2005 revision to the pattern instructions provides

that it "shall not be construed as an adjudicative approval of the content of such instructions which must await a case by case review by the Court."

Because the Eleventh Circuit no longer has *any* pattern jury instructions for antitrust cases, the Undersigned does not deem it significant that the *Levine* rule is no longer part of the instructions. And although the *Levine*-based instruction was not binding, the Undersigned considers its former status *somewhat* significant.

Sixth, Procaps has not focused attention on any Eleventh Circuit case expressly stating that *Levine* is no longer the law and that a rule of reason plaintiff need not prove the absence of "procompetitive benefit or justification."

Seventh, if the *Levine* rule is indeed "out of step" with Supreme Court jurisprudence and contrary to the law in most, or all, other circuits, it appears to still be law in *this* circuit. If Procaps wants a rule which is "in step" with the trend it identified and prefers a burden-shifting protocol consistent with what it says is the law in every other circuit, then it will need to obtain that result from the Eleventh Circuit or the U.S. Supreme Court. *Springer v. Wal-Mart Assocs. Group Health Plan*, 908 F.2d 897, 900 n.1 (11th Cir. 1990) ("[E]ven if there were a relevant circuit split, the district court is bound by controlling Eleventh Circuit precedent.").

So, for the reasons outlined above, the Undersigned is not going to adopt Procaps' rule, which would, in effect, require me to maneuver through a thorny thicket of legal arguments to reach a destination which facially appears inconsistent with well-

established (and frequently quoted) Eleventh Circuit law.[27] In the words of singer/songwriter Paul Simon: "Who am I to blow against the wind?"[28] Consequently, the Court will continue to use the *Levine* rule, which expressly and unequivocally uses clear language placing on an antitrust rule of reason plaintiff the burden of proving the restraint has no procompetitive benefits.

### Did Procaps Prove the Restraint Had no Procompetitive Benefits or Justifications?

Restraints are procompetitive when they "increase economic efficiency and render markets more, rather than less, competitive." *BMI*, 441 U.S. at 19-21. Procaps agrees that the restraint here was procompetitive when created even though it was a horizontal market allocation. [ECF No. 565, p. 8]. Procompetitive benefits include effects like increased output, reduced costs, and other operating efficiencies. *BMI*, 441 U.S. at 19-21. ("the substantial [l]owering of costs . . . is of course potentially beneficial to both sellers and buyers."); *Seagood*, 924 F.2d at 1570-72 (economies of scale benefit customers because they lead to reduced costs which are "procompetitive").

---

[27]     Iconic singer/songwriter Bob Dylan musically discussed this type of situation in his "Gotta Serve Somebody" song (on the *Slow Train Coming* album, Columbia Records, 1979). The following lyrics, which place an individual's status in the universe in context, could easily apply to the legal universe -- i.e., a federal magistrate judge handling a case by consent who is asked to disregard language which the binding appellate court has often used and which has not been expressly reversed: "You may be a state trooper, you might be a  young Turk / You may be the head of some big TV network / You may be rich or poor, you may be blind or lame / You may be living in another country under another name / But you're gonna have to serve somebody, yes you are."

[28]     From the song "I Know What I Know," on the *Graceland* album, Warner Bros., 1986.

### What *Type* of Procompetitive Effects are Being Evaluated?

Not surprisingly for this case, the parties disagree on the applicable law. The existence of this legal tussle requires the Undersigned to first tackle the issue of whether the "procompetitive effects" (which *Procaps* must establish do not exist) can be *any* effects (Patheon's position) or if they are limited to those arising out of the **restraint itself** (Procaps' position).

As stated in *Levine*, the plaintiff in a Section 1 antitrust action must prove "that the defendant's conduct has no pro-competitive benefit or justification." 72 F.3d at 1551. A procompetitive benefit is one that flows from the restraint and impacts "competitive conditions" in the marketplace. *Nat'l Soc'y of Prof'l Eng'rs v. United States*, 435 U.S. 679, 688-91 (1978) ("Contrary to its name, the Rule does not open the field of antitrust inquiry to any argument in favor of a challenged restraint that may fall within the realm of reason. Instead, it focuses directly on the challenged restraint's impact on competitive conditions. . . . [T]he inquiry is confined to a consideration of impact on competitive conditions."). "However, merely offering a rationale for a vertical[29] restraint will not suffice; the record must support a finding that the restraint in fact is necessary to enhance competition and does indeed have a pro-competitive effect." *Graphic Prods.*, 717 F.2d at 1576.

---

[29]     While the restraint analyzed in *Graphic* is clearly a vertical one, the analysis being applied is still the rule of reason, which is the approach used in the instant case.

The *IFD* court noted that this "procompetitive virtue" may include "the creation of efficiencies in the operation of a market or the provision of goods and service." 476 U.S. at 459 (citing *BMI*, 441 U.S. 1 (1979); *NCAA*, 468 U.S. 85 (1984). Patheon infers that the Court may just analyze procompetitive benefits by comparing the "but-for" world generally to the actual world of the restraint, without necessarily linking the procompetitive effects to the restraint. However, this is an incorrect view. While it is true that *BMI* broadly states that the court should consider whether the practice at issue "increase[s] economic efficiency and render[s] markets more, rather than less, competitive[,]" the court is clearly referring to the *restraint* as the cause of the efficiency and increased competitiveness. 441 U.S. at 20. Thus, the Court must determine if the procompetitive effects on the marketplace are actually attributable to the alleged restraint.

Patheon, in its "Proposed Rule of Reason Structure," claims that *United States v. Am. Exp. Co.*, 88 F. Supp. 3d 143 (E.D.N.Y. 2015) supports its position that if the efficiencies must be weighed, then the proper manner of doing so is to compare the but-for world (without the alleged restraint) with the actual world. However, the portion of that opinion that invokes a "but-for" analysis does not address *pro*competitive benefits, but rather *anti*competitive effects. *Id.* at 218-24. Section VI of that opinion, aptly titled "Pro-Competitive Justifications," states clearly at the outset the same rule of law that Procaps encourages: "'the broad sweep of the rule of reason 'does not open the field of

antitrust inquiry to any argument in favor of a challenged restraint that may fall within the realm of reason,' but rather, 'focuses *directly on the challenged restraint's impact on competitive conditions.*'" *Id.* at 224 (quoting *Nat'l Soc'y of Prof'l Eng'rs v. United States*, 435 U.S. 679, 688, (1978)) (internal quotation omitted) (emphasis added).

Likewise in *In re Online DVD Rental Antitrust Litig.*, 2011 WL 5883772, at *12 (N.D. Cal. Nov. 23, 2011), the "but-for" analysis that Patheon claims supports its interpretation concerns causation of antitrust injury, *not* the establishment of procompetitive effects. 2011 WL 5883772, at *11-12 ("It requires that a plaintiff prove what is known as 'injury in fact'—i.e., the fact of harm to plaintiff, caused by the defendant's conduct. . . . Plaintiffs' theory depends on proof that in the but-for world (i.e., absent the allegedly anticompetitive agreement), Walmart would have continued to compete in the online DVD rental market and Netflix would have lowered its prices to $15.99 as a result."). This is clearly addressing an entirely different subject than procompetitive benefits, and, as such, Patheon's case law is inapposite to the situation being addressed here. Furthermore, in addressing procompetitive effects, the defendant in *Online DVD Rental* argued that the alleged restraint "actually benefitted customers[,]" not that there were efficiencies unrelated to the restraint in the general "but-for" world. *Id.*, at *10.

Thus, any proffered efficiencies cannot be independent of the agreement that forms the restraint; they must flow from the restrain itself. *NCAA*, 468 U.S. at 114

(rejecting efficiency justification for NCAA television plan related to marketing of broadcast rights and noting that the district court did not find that the television plan produced any procompetitive efficiencies which enhanced the competitiveness of college football television rights). *See also U.S. v. Apple, Inc.*, 952 F. Supp. 2d 638, 694 (S.D. N.Y. 2013) (rejecting Apple's alleged procompetitive effects because they are "independent of the Agreements and therefore do not demonstrate any pro-competitive effects flowing from the Agreements"); FTC/DOJ Competitor Collaboration Guidelines 3.36 (discussing procompetitive benefits of a collaboration and explaining that "efficiencies generated **through** a competitor collaboration can enhance the ability and incentive of the collaboration and its participants to compete ") (emphasis added).

## <u>Evaluating the Proffered Procompetitive Justifications</u>

In order to determine whether Procaps has met its burden of demonstrating the absence of procompetitive benefits flowing from the restraint, the Court needs to confront the justifications proffered by Patheon and see whether Procaps has either proved that they do not exist or demonstrated that the so-called justifications are irrelevant because they are independent from the restraint (and therefore not the type of benefit which would be deemed procompetitive).

Patheon asserts three proposed justifications, but the Undersigned is not convinced that they are sufficient to justify summary judgment for Patheon.

**First**, Patheon argues that "post-acquisition, Patheon used Banner's assets to "compete more aggressively" in the relevant markets, thereby increasing competition and benefiting customers. [ECF No. 889, p. 28]. Procaps argues that Patheon's use of the Banner assets in the relevant markets after the restraint ended is not a benefit of the restraint itself but a benefit of *ending* the restraint. [ECF No. 931, pp. 32-33]. According to Procaps, this cannot be a justification *for* the restraint. If anything, Procaps says, it is evidence of the anticompetitive effect of removing those assets from the market in the first place.

The Court is not convinced that Patheon's use of the Banner assets flows from the restraint. The benefit seems to arise from Patheon's *acquisition* of Banner, not from the restraint.

**Second**, Patheon asserts that the Banner acquisition "reduced the costs of manufacturing softgels in the relevant markets." [ECF No. 889, p. 28]. Patheon's Benjamin Beauvalot described several cost savings to Patheon as a result of the Banner acquisition, including increasing Patheon's EBITDA[30] and "higher earnings." [*Ex.* 62]. He does not say that these cost savings were passed on to customers in the relevant markets. Nor could he. None of these purported efficiencies flows from the restraint in the Collaboration Agreement or relates to competition in the relevant markets. Dr. Blair elaborated on this point, testifying that, as an economic matter, efficiencies related to

---

[30]     "Earnings before interest, taxes, depreciation and amortization."

the Banner acquisition but unrelated to the market division provisions of the Collaboration Agreement have no relevance to the relevant markets because the market division excludes Patheon/Banner from the relevant markets.

Blair opined that acquisition-created efficiencies are not efficiencies that resulted from the anticompetitive conduct at issue -- the market division scheme. [*Ex.* 74, ¶¶ 64-65]. Procaps also cites Patheon's expert, Dr. Baker, who testified that there was no benefit to Procaps from being excluded from the Collaboration and that Patheon's touted efficiencies flowed from the Banner acquisition, not the market division. [ECF No. 335 ¶¶ 39-41]. Baker characterized the market allocation as a "ministerial function" where "someone is just applying the rules," and he testified that there were no efficiencies flowing from that function. *Id.*

**Third**, Patheon argues that "the Collaboration could have been successful with Banner's assets" but Procaps "blocked this possibility by refusing to participate in the Collaboration." [ECF No. 889, p. 29]. But, as Procaps notes, this is purely hypothetical because Patheon never made any specific proposals, renegotiated the Collaboration Agreement, or revamped the Agreement to "bring the Banner assets" into the Agreement. [*See* ECF No. 931 (citing ECF No. 519-1, ¶¶ 14, 17; *Ex.* 85, p. 163)]. Patheon's CEO James Mullen merely suggested that Procaps go along with the market allocation, and Patheon's General Counsel Michael Lytton suggested the opposite -- that the parties "suspend all interaction" between them. Record evidence supports Procaps'

view that Patheon never made any concrete proposals to bring Banner's assets within the Collaboration [ECF No. 519-1, ¶ 14], but that at the end of the Collaboration Agreement's six-month period for resolving the dispute, Patheon terminated the Agreement rather than divest Banner or find a way to include its assets.

Thus, using the *Levine* standard, Patheon has not sufficiently demonstrated that Procaps failed to meet its burden to show an absence of procompetitive justifications for the restraint. Patheon is not entitled to summary judgment on this ground.

## Antitrust Injury

### Must Procaps Prove it was *Completely* Foreclosed From the Market?

Patheon argues that Procaps must show it was "*completely* foreclosed from the market" in order to demonstrate the necessary antitrust injury it needs for standing to pursue this antitrust claim. Using this statement of what it considers applicable law, Patheon notes that Procaps cannot meet this burden since it is in fact competing in the relevant markets. As noted earlier, Patheon contends that Procaps is competing in the relevant market. Patheon argues [ECF No. 889, p. 30] that not only was Procaps not excluded from the relevant markets, but "it is winning more business than the collaboration won" (i.e., more than $123,000.00 in one year). Patheon contends that Procaps has earned (or will soon earn) *millions* of dollars in revenues in the relevant markets. But I cannot resolve the dispute (about whether Procaps is in fact competing in the relevant markets with most of the contracts) because the record is murky.

Therefore, I must determine whether Procaps' **undisputed** post-Banner participation (of slightly more than $300,000.00) causes it to lose standing under Patheon's theory that *any* amount of competition in the markets by Procaps is sufficient to establish that Procaps lacks antitrust injury.

Although Procaps agrees that it is competing on a *modest* scale (i.e. $306,000.00 in sales in the relevant markets), it says this is insufficient to justify a summary judgment award in Patheon's favor. The Undersigned is not persuaded by Patheon's argument (that anything less than complete foreclosure from the market dooms Procaps' claim) because I am not convinced that the Eleventh Circuit requires complete exclusion (or that a plaintiff who was not completely foreclosed lacks antitrust standing).

While it is true that several courts have not in specific cases found antitrust injury where the plaintiff was not completely excluded from the market, they do not necessarily create or follow a rule that complete exclusion is *always* required for an antitrust injury. Instead, it appears that the courts were merely evaluating the relevant facts and, in concluding that there was insufficient antitrust injury, mentioned that the plaintiff did not prove complete foreclosure from the relevant market. Furthermore, several of the cases cited to by Patheon can be distinguished by certain unique facts.

The general rule for antitrust standing requires a case-by-case evaluation to see if the plaintiff connected the harm imposed on it to the alleged wrongdoing. *See Todorov*, 921 F.2d at 1448-49 ("Thus, the Court fashioned an approach for analyzing antitrust

standing that requires [courts] to 'evaluate the plaintiff's harm, the alleged wrongdoing by the defendants, and the relationship between them.'") (quoting *Associated Gen. Contractors, Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 535 (1983)).

It would appear that in a case of near-monopoly, as was the alleged restraint in *Gulf States Reorganization Grp., Inc. v. Nucor Corp.*, 466 F.3d 961 (11th Cir. 2006), the harm inflicted on the plaintiff would reflect that specific type of restraint (which the Eleventh Circuit did find). The Eleventh Circuit thus found that "the injury to [plaintiff] -- its exclusion from the market -- is inseparable from the alleged harm to competition. Thus we conclude that the [plaintiff] has satisfied the requirement of demonstrating antitrust injury, i.e. injury of the type against which the antitrust laws are designed to protect." *Id.* at 968. Procaps is not alleging that the removal of the Banner assets created a near-monopoly situation, as was the case in *Gulf States*.

But in *Pierson v. Orlando Reg'l Healthcare Sys. Inc.*, the plaintiff's harm did not reflect the alleged restraint. 619 F. Supp. 2d 1260, 1276-77 (M.D. Fla. 2009, *aff'd*, 451 F. App'x 862 (11th Cir. 2012). The court there stated the standard rule governing antitrust injury. Quoting *Todorov* and *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977), the court stated: "Antitrust injury is defined as: 'injury of the type the antitrust laws were intended to prevent and that flows from that which makes the defendants' acts unlawful. The injury should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation. It should, in short, be the type

of loss that the claimed violations . . . would be likely to cause." *Pierson*, 619 F. Supp. 2d at 1275-76 (quoting *Todorov*, 921 F2d at 1449 (quoting *Brunswick*, 429 U.S. at 489)) (internal quotation marks omitted).

The *Pierson* court found that the plaintiff was not excluded from the market at all (the market being the two hospitals at which he worked). *Id.* at 1280 ("Plaintiff was not excluded from either of the two hospitals at issue; instead, [defendant] stopped referring emergency and trauma cases to him. He could still treat patients at these hospitals, and there is no allegation that he was prevented from competing at other hospitals in the Orlando area."). It is clear that the *Pierson* court was finding *no* exclusion of the plaintiff from the relevant market, *not* that the plaintiff was excluded only to a certain degree.

*Pierson* does provide "that '[a] plaintiff simply looking to increase his profits, like any competitor[,] does not have antitrust standing.'" *Pierson*, 619 F. Supp. 2d at 1276 (quoting *Feldman v. Palmetto Gen. Hosp., Inc.*, 980 F. Supp. 467, 469 (S.D. Fla. 1997)). But this does not transform into a hard and fast rule that even a modest amount of participation causes a plaintiff to lose antitrust standing.

In *Feldman*, the district court found that "[h]ere, Dr. Feldman's harm is not to competition within the marketplace but to himself as an individual doctor. It is a well settled principle that the antitrust laws were enacted for 'the protection of *competition*, not *competitors*.'" 980 F. Supp. at 469 (quoting *Brunswick*, 429 U.S. at 489) (emphasis in

92

original). As a general principle, the *Feldman* court noted that "an antitrust plaintiff must allege and show that his own injury coincides with the public detriment from the alleged violation thereby increasing the likelihood that public and private enforcement will further the same goal of increased competition." *Id.* (citing *Todorov*, 921 F.2d at 1450).

It is clear that the *Feldman* court is emphasizing the *individual* nature of the plaintiff's harm when rejecting it as an antitrust injury, not necessarily making a statement that only partial exclusion from the market automatically renders the plaintiff unable to pursue a claim. Hypothetically, if the plaintiff in *Feldman* presented partial exclusion across the board for himself *and* the rest of the marketplace, and it was *that* injury that he was seeking to rectify, then it is conceivable that the decision could have come out differently.

In *Bocobo v. Radiology Consultants of S. Jersey, P.A.*, also cited by Patheon, the Third Circuit ruled similarly to *Feldman*. 477 F. App'x 890 (3d Cir. 2012) (in a hospital staffing case, a doctor's attempt at showing antitrust injury proved insufficient where he had "not shown that he was excluded entirely from the radiology job market").

To be sure, the *Bocobo* court used the "excluded entirely" language. However, it emphasized the connection between the alleged injury and the alleged anticompetitive effects, finding that the plaintiff had "not established a nexus between his purported exclusion from the market for radiology jobs and the anticompetitive effects on that

market that would make Defendants' exclusive contracts or alleged boycott illegal under the antitrust laws." *Id.* at 897 (citing *Atl. Richfield Co. v. USA Petrol. Co.*, 495 U.S. 328, 335–36 (1990) (holding that losses resulting from a competitor's vertical, maximum price-fixing agreements were not "'antitrust injury,' since [the] losses d[id] not flow from the aspects of vertical, maximum price fixing that render it illegal"); *Brunswick*, 429 U.S. at 489; *W. Penn Allegheny Health*, 627 F.3d at 102 (finding no antitrust injury to a hospital where "Highmark's elimination of [its low-cost insurance plan] violated the antitrust laws, if at all, because it tended to reduce competition in the . . . market for health insurance," not medical services)).

Overall, *Bocobo* does not impose any hard and fast rule concerning level of exclusion from the market; it emphasizes that the antitrust injury must stem from the antitrust allegation and that injury cannot be of such an individualized nature.

Finally, Patheon cites to this Court's own order [ECF No. 565, p. 28] on the original summary judgment motions for the concept that "the law does not consider degrees of competition." This quote, however, is taken out of context because it relates to the *per se* analysis. In the present context, the law does leave open the possibility that an unreasonable restraint on trade does not necessarily have to be a monopoly and does not necessarily have to exclude competitors from the market entirely to be considered an antitrust injury, so long as the plaintiff can still meet the nexus requirements established in *Brunswick*.

It seems that in a case where a plaintiff is not alleging that the restraint was one that monopolized the market or dominated to a near-monopoly state, then one should not expect the resulting antitrust injury to be that type of injury (i.e. one that completely excluded the plaintiff). Rather, the injury must reflect the restraint being alleged. If a plaintiff alleges an unreasonable restraint because of 50% market power, then, logically, plaintiff's antitrust injury shouldn't necessarily require a showing of 100% exclusion.[31] Rather, there should be a 'relationship' between the *injury* alleged and the restraint that plaintiff demonstrates.

The Court therefore rejects Patheon's "complete exclusion" theory. *Cf. McWane*, 783 F.3d 814 (affirming FTC order finding an unlawful exclusive dealing policy even though party "was not completely excluded" from the domestic fittings market and had still been able to enter and grow despite the exclusivity rule). Thus, Procaps' $306,000.00 in revenue in the market does not automatically cause it to lose standing (and is not a ground on which to grant Patheon summary judgment).

---

[31]    The Undersigned recognizes that this is not a market power case. But for purposes of discussing this specific point (and thus clarifying the meaning of the required antitrust injury), it is helpful to use specific figures for a general demonstration. In an actual effects case, such as the one here, the Undersigned does not have the benefit of such a clear mathematical demonstration. This absence of specificity further exemplifies why it is imperative for each matter to face a rigorous case-by-case determination dependent on the unique circumstances of each injury and restraint alleged.

### Did Procaps Lose Standing by Voluntarily Not Pursuing Opportunities?

In its proposed order (granting the summary judgment motion) [ECF No. 992-1], Patheon argues, in a separate section entitled "An Antitrust that Plaintiff Voluntarily Foreclosed Itself from **Opportunities** in the Relevant Markets Lacks Antitrust Standing," that Procaps lacks antitrust standing by not pursuing opportunities. It cites several cases in support of this theory. In addition, Patheon asserted those arguments and those authorities in its earlier-filed reply memorandum [ECF No. 958].

But the one place where Patheon never sufficiently asserted the argument is the actual summary judgment motion itself.

In its summary judgment motion, Patheon succinctly mentions, in a footnote, only *one* of the purported facts it later relies upon (in its reply and proposed order) to support its "voluntarily-not-pursuing-opportunities" theory -- that "Procaps also rejected opportunities in the relevant markets, including a "potentially game-changing opportunity to build a new softgel manufacturing facility in the U.S." [ECF No. 889, p. 6, n. 9]. Procaps says this allegedly undisputed fact *is* disputed.[32]

It is well established that a party cannot for the first time in a reply memorandum (or in a post-hearing proposed order) assert new factual arguments to support a summary judgment motion. *Foley v. Wells Fargo Bank, N.A.*, 849 F. Supp. 2d 1345, 1349 (S.D. Fla. 2012) ("Because it is improper for [the party] to raise this new

---

[32]     More on that dispute over a dispute below.

argument in its Reply brief, the argument will not be considered") (citing *Herring v. Sec. Dep't of Corr.*, 397 F.3d 1338, 1342 (11th Cir. 2005) ("As we repeatedly have admonished, arguments raised for the first time in a reply brief are not properly before a reviewing court")). But that is what Patheon has done.

In its post-motion reply and proposed order, Patheon focuses on the purported softgel manufacturing facility -- and on **new** arguments never raised in the summary judgment motion. Its proposed order (filed more than a month after it filed its summary judgment motion) discusses for the first time in a summary judgment context *other* business opportunities which Procaps supposedly did not pursue (beyond the softgel manufacturing plant in the United States) and a possible strategic alliance with Catalent. [ECF No. 992-1, pp. 42-44]. Moreover, its reply memorandum [ECF No. 958, p. 12] cites legal authority for the first time --- case law not mentioned in the original summary judgment motion.[33] And its proposed order cites even more additional cases which were not disclosed in the summary judgment motion.[34]

---

[33]    *Untracht v. Fikri,* 454 F. Supp. 2d 289, 310 (W.D. Pa. 2006), which it cited for the proposition that "voluntary foreclosure of one's own opportunities for competition is not the type of antitrust injury for which the antitrust laws were designed to provide redress", and *McDonald v. Johnson & Johnson,* 722 F.2d 1370, 1374 (8th Cir. 1983), which it summarized in a parenthetical as standing for the rule that "no antitrust standing when plaintiff voluntarily withdraws from the market."

[34]    Patheon's proposed order [ECF No. 992-1, p. 40] also cites *NicSand, Inc. v 3M Co.,* 507 F.3d 442, 447-49 (6th Cir. 2007) *(en banc)* and *El Aguila Food Prods., Inc. v. Gruma Corp,* 301 F.Supp.2d 612, 621 (S.D. Tex. 2003). It relied on *NicSand* because the court found no antitrust injury because plaintiff "had every opportunity to compete and yet it

In addition to not considering new facts asserted for the first time in a reply to a summary judgment motion, a court will not consider an entirely new legal argument or theory raised for the first time in a reply. *Foley*, 849 F. Supp. 2d at 1349. Therefore, the Undersigned will not consider the summary judgment arguments concerning Catalent and other prospective business opportunities which Procaps allegedly failed to pursue.

That leaves **one** business opportunity which Procaps allegedly failed to pursue -- a proposed softgel plant in the United States. This scenario *was* mentioned in the summary judgment motion (albeit in a footnote).

However, this fact was mentioned in Patheon's summary judgment motion in a section addressing an argument completely different from a "not-pursuing-opportunities" theory. Instead, this point appears briefly, in a footnote, in a section of Patheon's undisputed facts concerning "Procaps participation in the relevant market <u>after</u> the Banner acquisition." A section discussing Procaps' affirmative *participation* in the market after the Banner acquisition is notably distinct from a theory based on Procaps' alleged *failure* to participate (because it allegedly declined intentionally to pursue opportunities in the market). Therefore, even though Patheon briefly mentioned this (supposedly undisputed) fact in a one-sentence footnote in its motion, it did not present it in connection with the later-asserted "not-pursuing-opportunities" theory.

---

failed to do so." And it cited *El Aguila Food* because the court described plaintiff's evidence as "suffer[ing] from a self-inflicted wound" after the plaintiff refused on principle to negotiate with retailers for shelf space.

But even if Patheon had overtly discussed this point and even if it clearly flagged its relevance to the different theory in its summary judgment motion (which it did not), the Court would still not view the fact as sufficient to justify summary judgment on the new theory that Procaps "foreclose[d] itself from opportunities in the relevant market." The factual basis for this self-inflicted injury argument is inadequate.[35] At bottom, Patheon relies on a brief email reference by a Procaps employee (Ted Green) which is far too speculative to constitute evidence of an actual, realistic, viable opportunity which Procaps did not pursue.

First, the one-sentence email reference is to a "potentially" game-changing partnership, and then notes, in passing, as an *example*, "a new US softgel plant." A new plant is, therefore, far from certain. Second, a higher-ranking Procaps executive, Alvaro Franco, responded almost immediately, rejecting the suggestion: "We would rather not include this as an objective, since we are not actively looking for a strategic partner." Third, deciding to not embark on a plan to establish a new softgel manufacturing plant in another country is substantially different than a plaintiff who refuses to negotiate for shelf space at a store (the scenario in *El Aguila Food*) or a doctor (in *Untracht)* who chose not to work in an existing hospital where he had privileges. Fourth, the financial and other barriers associated with a plan to open a new plant are significant and the

---

[35]     In its response [ECF No. 931, pp. 7-8] to Patheon's summary judgment motion, Procaps challenges Patheon's description of footnote 9 as being undisputed, saying "Procaps never seriously contemplated building a new softgel plant in the United States."

Undersigned is not prepared to conclude that Procaps loses standing merely because it chose not to pursue a substantial investment requiring the construction of a new factory after an employee casually mentioned it in an offhand way in an email.

For these reasons, the Undersigned rejects Patheon's self-inflicted-injury/failure-to-pursue-opportunities argument. Thus, the Court rejects Patheon's fourth ground for summary judgment.[36]

## V.     Conclusion

The Undersigned **grants** Patheon's summary judgment motion on all remaining counts in the Complaint.

The Court will enter a **separate final judgment**.

The Court will **reserve jurisdiction** to enter an award for costs and, if applicable, attorney's fees.

All trials, hearings and status conferences are **cancelled**.

---

[36]     If the Court were denying Patheon's summary judgment motion on <u>all</u> grounds and if the case were to proceed to trial, then Procaps would likely encounter great difficulty in establishing antitrust injury (because of its continued participation as a competitor and evidence suggesting it deliberately chose not to pursue opportunities). But this hypothetical difficulty is not sufficient to justify a defense summary judgment on Patheon's failure-to-establish-antitrust-injury argument. [*See* ECF No. 565, p. 39].

All pending motions are **denied without prejudice as moot**.

**DONE AND ORDERED** in Chambers, in Miami, Florida, October 29, 2015.

Jonathan Goodman
UNITED STATES MAGISTRATE JUDGE

<u>Copies furnished to</u>:
All Counsel of Record